Eric Slocum Sparks
Arizona State Bar No. 11726
LAW OFFICES OF ERIC SLOCUM SPARKS, P.C.
110 South Church Avenue, #2270
Tucson, Arizona 85701
Telephone (520) 623-8330
Facsimile (520) 623-9157
eric@ericslocumsparkspc.com

Attorney for Debtors

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

In re:

SAGUARO RANCH DEVELOPMENT
CORPORATION,

      Debtor.

**Jointly Administered Under**
Case No. 4:09-bk-02490-EWH
Chapter 11

In re:

PCC INVESTMENTS, LLC,

      Debtor.

Case No. 4:09-bk-02484-EWH
Chapter 11

In re:

SAGUARO GUEST RANCH
MANAGEMENT CORPORATION,

      Debtor.

Case No. 4:09-bk-02489-EWH
Chapter 11

In re:

SAGUARO RANCH INVESTMENTS,
LLC,

      Debtor

Case No. 4:09-bk-02492-JMM
Chapter 11

In re:

SAGUARO RANCH REAL ESTATE
CORPORATION,

      Debtor.

Case No. 4:09-bk-02494-EWH
Chapter 11

**MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364
AND BANKRUPTCY RULES 2002, 4001, FOR FINAL ORDERS (I) AUTHORIZING
DEBTOR TO OBTAIN POST-PETITION FINANCING (II) AUTHORIZING DEBTOR TO
UTILIZE CASH COLLATERAL (III) MAKING A FINDING OF ADEQUATE
PROTECTION TO PRE-PETITION SECURED LENDER AND (IV) SCHEDULING FINAL
HEARINGS**

Saguaro Ranch Development Corporation, Debtor, along with the debtors in the above-captioned jointly administered cases (collectively hereinafter referred to as "Debtor") and Debtors in possession in the above-captioned cases hereby moves for entry of a final order (the "Final Order"), under sections 105, 361, 362, 363 and 364 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules for the United States Bankruptcy Court for the District of Arizona (the "Local Rules") (i) authorizing Debtor to obtain post petition financing, (ii) authorizing Debtor to utilize cash collateral, (iii) making a finding as to adequate protection for the pre-petition lenders (as defined below), (iv) approving the term sheet (the "Term Sheet") attached in a separate document, due to its size, as **EXHIBIT A**, and all provisions thereof, (v) approving the commitment letter (the "Commitment Letter") and all provisions thereof and (vi) scheduling a final hearing on this motion (the "Motion").  In support of the Motion, Debtor, by and through undersigned counsel, respectfully represents as follows.

**I. BACKGROUND**

**A. The Chapter 11 Filing**

1.    On February 13, 2009 (the "Petition Date"), Debtor, along with each jointly administered case, commenced bankruptcy proceedings by filing a petition for relief under Chapter 11, Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code").  Debtor continues to operate its businesses and manage properties as Debtor and Debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March 4, 2009, this Court entered an Order for joint administration of these cases under Saguaro Ranch Development Corporation,

2

1    Case No. 4:09-bk-02490-EWH.

2    2.   No creditors' committee has been appointed in these Chapter 11 cases by the United

3         States Trustee. No trustee or examiner has been appointed in any of the Debtors'

4         Chapter 11 Cases.

5    3.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6         Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding

7         pursuant to 28 U.S.C. § 157(b)(2).

8    4.   The statutory predicates for the relief requested herein are Bankruptcy Rule 1015 and

9         Local Rule 1015-1.

**B.  Background and Current Business Operations**

5.   Each of the Debtors is a limited liability company or sub-chapter S Corp organized

     under the laws of Arizona, where Debtors also maintain their primary place of

     business. After its formation, Debtor acquired and became the owner of various

     parcels of real property (1038 acres) located in Marana/Tucson, Arizona which is

     described in greater detail below (the "Saguaro Ranch").

6.   Saguaro Ranch was established by Stephen Phinny ("Phinny") in 2000. As of the

     Petition Date, various owners of each of the Debtors were listed in bankruptcy

     schedules on file with the court. All of the asset values were prepared by Debtor's

     principals using the most recent appraisals. The respective companies are as follows:

     Jointly Administered Debtors: Business Operations

     a.   Saguaro Ranch Development Corporation

     b.   PCC Investments, LLC

     c.   Saguaro Guest Ranch Management Corporation

     d.   Saguaro Ranch Investments, LLC

     e.   Saguaro Ranch Real Estate Corporation

3

| Date Formed | Entities and Ownership Structure | Type | Ownership | Function | Debt | Amount | Assets | Federal ID # |
|---|---|---|---|---|---|---|---|---|
| 5/1/2001 | Saguaro Ranch Investments, LLC | LLC | Attached | Holds Land- No Operations | KFI | Shared | $43.5M | 86-1022866 |
| 5/23/2002 | Saguaro Ranch Development Corp | S Corp | Attached | Development & Sale of Land | (1)KFI (2)Vendor Payables | (1) $26M (2) $3.0M | $52.4M | 80-0049814 |
| 6/11/2003 | Saguaro Ranch Real Estate Corp. | S Corp | Attached | SR Real Estate Brokerage | | $0 | $0 | 06-1704501 |
| 10/1/2000 | PPC LLC | Sole Prop | | Management Entity | | | $0 | 86-1572662 |
| 1/19/2004 | Saguaro Ranch Guest Management Corporation | S Corp | | Restaurant Operations | Vendor Payables | $90k | $200k | 20-5330755 |

7.     In addition to the above mentioned lien obligations, Debtor's properties may be subject to other various liens. Thus, Debtor has obtained a title report from First American Title Insurance Company (the "Title Report") as **EXHIBIT B** which lists any further lien obligations on Debtor's properties.

8.     Debtor is an elite development located in the Tortilita Mountains in Tucson/Marana Arizona. Saguaro Ranch is a realization of a life long dream for Phinny, who has the experience, finances, determination, charisma and patience to create this legendary development. Saguaro Ranch is one of the finest residential communities in the country located in an emerging luxury corridor of properties including golf courses, hotels like the Ritz Carlton of Tucson, and upscale living at Dove Mountain located 15 miles northwest of Tucson along the Tortilita Mountain Range.

Background of Developer- Stephen Phinny ("Phinny")

Phinny, the son of former U.S. Ambassador Robert H. Phinny and grandson of Daniel F. Gerber, founder of Gerber Products Company, developed Saguaro and gained experience in several real estate developments in Western Michigan and Telluride, Colorado before setting his sights on Tucson.

9.     Stephen Phinny spent twenty years of his life developing an incredible vision,

4

another six years searching for the perfect site and another three years acquiring 36 contiguous real estate parcels, installing the infrastructure of a small city, engineering a dramatic and very private 700-foot entrance tunnel and assembling a team of experts to bring all the elements to life. Phinny started assembling the property in June of 2000 and acquired the same with his private investors. The assembly of 36 individual parcels required costs in excess of $13,875,000 to acquire and took approximately 3 years to assemble. During this time, Phinny worked to perfect the entitlements on the property and obtain access to water from the City of Tucson. Phinny and Saguaro Ranch broke ground in late November 2003.

10. Saguaro Ranch successfully completed Phase I and II of its planned project which included 57 home sites. Fifty unites were sold, producing gross revenues of $61,300,000.00. All these funds were invested back into the project and/or used to make payments to secured creditor, Kennedy Funding. Phinny built a 700-foot entry tunnel through the Tortilita Mountains, a gatehouse, all underground utilities, infrastructure, a General Stores/Post Office and fine dining restaurant named McClintock's. McClintock's Restaurant is owned and operated by Saguaro Ranch and is considered Tucson's best special occasion restaurant.

11. Saguaro Guest Ranch, when completed, will be a central gathering place for socializing, dining, learning and entertainment. Future plans include development of 63 casitas, two additional superb restaurants, a Spa and Fitness Center, outdoor basketball, volleyball, tennis courts, a pool and Art Barn featuring visiting artists, music, and literary classes, a horse ranch complete with ranch hands, riding instructions and private boarding, over 25 miles of hiking, biking, bridle trailers, a store with Post Office and McClintock's restaurant. A total of $106,000,000.00 has been invested in the project to date. McClintock's was recently voted by Dinner's Choice awards, through 3 million plus subscribers, as having one of the "Top 50 Most

1     Scenic Views In America."

2   12.   Saguaro Ranch is conveniently accessible for tourists and locals. It is located 25 miles

3     northwest of Tucson, 75 miles north of Mexico, 25 miles north of Tucson

4     International Airport, 99 miles south of Phoenix Sky Harbor International Airport and

5     15 miles east of Marana Regional Airpark (accommodating private jet travel).

6 Filing of Chapter Eleven

7   13.   There are several factors that negatively impacted the financial status of Saguaro

8     Ranch, leading it to file for Chapter 11 protection.  The first factor was the

9     uncertainty after the downturn of the Arizona real estate market. The second factor

10     was the  issue of the development loan (the "Loan") made by Kennedy Funding

11     ("Kennedy") to Debtor  in the amount of $50,000,000.00.

12 Debtor's Financial History

13   14.   Debtor's principal, Phinny, assembled over 36 parcels of  property, paid for by Phinny

14     and his family investor group. Phinny's investor group contributed in excess of

15     $25,000,000 into the project. Debtor obtained a short-term construction loan from

16     National Bank of Arizona ("NBA") in the approximate amount of $12,000,000.

17     Debtor had been working with UBS who agreed to pay off NBA and advance

18     additional monies to complete the project. UBS decided *not* to fund the loan three

19     weeks before the NBA note was due. Debtor's representative contacted Kennedy from

20     New Jersey who agreed to loan Debtor $50 million dollars in 10 days in December of

21     2005. Not all of the monies, however, were provided to Debtor. While Debtor did not

22     receive all of the funds, it utilized some monies to pay off NBA, used five million for

23     interest reserve, and paid Kennedy $3 million in fees. A portion of the loan was *not*

24     provided to Debtor. The Kennedy Funding Loan was for $50,000,000.

25     $28,000,000 was allocated at the close of the loan, which left $22,000,000 available

26     for draws. The initial $28,000,000 included a $5,000,000 interest reserve. At the time

27

28

of the filing, the outstanding principal balance owed Kennedy Funding
was $23,899,754.

Bucket Loans

15. Loan draws, which would only be funded by Kennedy if Saguaro Ranch had repaid a like or greater amount of the request for monies through sales proceeds, were typically delayed 14 to 15 days with differing explanations provided, *if* a Kennedy representative could be contacted at all. These delays affected Debtor's relationships with contractors and vendors causing construction delays and unfavorable pricing. Debtor believes Kennedy used Debtor's sale proceeds to fund advances to Debtor instead of providing monies "borrowed" by Debtor. If Debtor had had timelier and more favorable financing, it would have been able to develop much needed lot inventories.

History of Sales

16. Debtor began selling lots with its in house brokerage and sales team in 2004. By the spring of 2008, when the financial tsunami hit Southern Arizona, it had sold 50 of the 51 lots in Phase I plus one lot in Phase II. The average lot price exceeded $1.2 million; the record high was $1.9 million leaving Debtor with minimal inventory.

17. Numerous attempts to refinance the loan were made by Saguaro directly and by brokers. However, the credit markets were frozen and other funding sources were nonexistent.

18. During 2004 through 2006, construction costs escalated and certain materials (concrete, steel and asphalt) became difficult to obtain. These circumstances led to cost overruns and time delays.

19. The economic downturn of the real estate market and Debtor's relationship with Kennedy ultimately forced Saguaro Ranch to seek Chapter 11 protection.

Debtor in possession (DIP) Financing- Use of Monies

7

20.     Saguaro has obtained a commitment for DIP financing from Loanvest XIV, LP. *See*
        Term Sheet filed with the Court as **EXHIBIT A**. The commitment to fund under the
        Term Sheet is also described in a Commitment Letter, filed with the Court as
        **EXHIBIT C**. The commitment to fund under the Term Sheet and the Commitment
        Letter is withdrawable at any time by Loanvest XIV, LP in its sole and absolute
        discretion prior to the hearing (including, without limitation, any continuations
        thereto) by the Bankruptcy Court or the Debtor's Motion to approve the final
        documentation of the proposed loan. This financing will allow the company to
        develop much needed lot inventories, make improvements to existing infrastructure
        and complete some needed amenities such as casitas and a spa which will allow sales
        to resume.

Final Order

21.     (A) One of the conditions of Debtor obtaining post petition financing is that this
        Court enter an Order approving terms and conditions set forth in the Terms Sheet and:

        (i)     Authorize Debtor to borrow and authorize lenders to lend under the DIP Loan
                Documents, to be filed with the Court upon the Court's approval of the Term
                Sheet and allowing senior secured post petition financing, which, if approved
                on a final basis, would consist of:

                (a)     a senior secured super priority, non-amortizing revolving credit facility
                        of up to $12.3 million ,in aggregate principal amount, subject to
                        various terms and conditions as set forth in DIP Loan Document and
                        Term Sheet herein pursuant to the terms of that senior secured priming
                        lien and Superpriority Debtor-In-Possession Agreement in
                        substantially the form attached at **EXHIBIT A** , as the same may be
                        amended, restated, supplemented, or otherwise modified from time to
                        time, the "DIP Agreement", among each of the Borrowers, on all of the

8

Debtor's assets, including, (1) without limitation, the assets of any subsidiaries thereof and (2) superpriority administrative claims customarily in transactions of this type pursuant to §364, including, fully perfected liens and security interests priming the liens securing the existing senior secured bank loans of the existing bank debt and any further lien obligations on Debtor's properties.

(B) A further condition is the entry of a Final Order approving the Final loan documentation. Thus, in order for Debtor to obtain the requested financing, the Court must approve the loan terms and conditions, and then approve the loan documents.

Concise Statement pursuant to Bankruptcy Rule 4001(c)(1)(B)

Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are the material provisions of the DIP Term Sheet[1]:

| Borrowers | **Saguaro Ranch Development Corporation** , an Arizona corporation ("**SRDC**") |
| --- | --- |
| | **Saguaro Guest Ranch Managment Corporation**, an Arizona Corporation ("**SGRM**") |
| | **Saguaro Ranch Investments, LLC**, an Arizona limited liability company ("**SRI**") |
| | **PCC Investments, LLC,** an Arizona limited liability company (" **PCC**") |
| | **Saguaro Ranch Real Estate Corporation** , an Arizona corporation ("**SREA**") |
| **Agent** | **Loanvest XIV, L.P.**, an Arizona limited partnership |
| **DIP Facility Lender** | **Loanvest XIV, L.P.**, an Arizona limited partnership |
| **The Loan** | Up to an aggregate of $12,325,000, in senior secured notes |

---

[1]In the event of any inconsistency between the terms and conditions described in this Motion and those described in the Term Sheet and Commitment Letter, the Term Sheet and Commitment Letter shall govern.

| | |
|---|---|
| **Use of the DIP Facility** | Completion of infrastructure and construction improvements upon the subject property as detailed in the Budget, including completion of the infrastructure for sale of residential lots within the subject property, construction of a Guest Ranch complex, and marketing of the subject property. |
| **Interest Rate** | The Loan will bear interest on the full Principal Amount from and after the Closing of the Loan (as defined in the Loan Documents), less any permitted repayments of principal from time to time, and independent of the amount as may be outstanding from time to time, at an annual rate of 12.50% per annum. On and after an Event of Default, interest shall accrue at the rate of 17.50% per annum. The Interest Rate shall not exceed the maximum interest rate permitted under applicable law. |
| **Payment Terms** | Provided no Event of Default has occurred, Interest shall be payable monthly, in cash, in arrears, calculated on an actual/360 day basis, during the term of the Loan, with all principal and other costs and expenses due on or prior to the Maturity Date. Upon the occurrence of an Event of Default, all principal, accrued and unpaid interest, and other costs and expenses shall be immediately due and payable. |
| **Loan Fees** | The Loan shall expressly provide for the following non-refundable fees to be paid to Collateral Agent on behalf of Lender as consideration for the Loan, such fees to be paid upon the Closing of the Loan or upon the closing of a loan transaction with another person or entity, as the case may be, as follows:<br><br>Closing & Underwriting Fee to Loanvest     $812,875<br>Closing , Legal, Title, Loan Servicing     $225,000<br>Interest Reserve     $1,540,625<br>Woodside Partners Fee     $246,500<br><br>Break-Up Fee: In the event that Debtors procure a loan from any person or entity other than Loanvest in an amount (whether individually or in the aggregate, and whether by one or a series of transaction) approximating $10,000,000 and/or for purposes of providing Debtors with working-capital needs and/or satisfying post-petition costs and expenses incurred by the bankruptcy estates of Debtors, then upon the closing of such loan transaction or transactions, as the case may be, Debtors shall pay to Collateral Agent a break-up fee in the amount of $350,000. |
| **Maturity** | All obligations under the Loan shall mature and be due and payable in full on the earlier of the following (the "**Maturity Date**"): (i) December 15, 2011 or such later date as consented to in writing by the Collateral Agent; (ii) the sale of any portion of the Collateral; or (iii) the occurrence of an Event of Default as defined below The Maturity Date may be extended, provided no Event of Default has occurred, by the mutual consent of Debtor and Collateral Agent for 2 additional consecutive calendar quarters; provided, however, that Debtor shall, as a condition of such extension, pay to Collateral Agent for the benefit of Lender an additional one point (1%) of the Principal Amount for each such calendar quarter so extended. |

| | |
|---|---|
| **Conditions to the Loan** | Lender's obligation to make the Loan as provided herein is conditioned upon:<br><br>(1) Debtors filing by no later than December 24, 2009 all pleadings, motions, filings and other documents with the Bankruptcy Court to obtain a final, non-appealable order from the Bankruptcy Court approving, among the terms and conditions of the Commitment Letter and this Term Sheet, including, by way of illustration and not of limitation, (i) the Underwriting and Expense Reimbursement Fee, and (ii) the Break-up Fee;<br><br>(2) The entry of a final, non-appealable order of the Bankruptcy Court approving the terms and conditions of the Commitment Letter and this Term Sheet, including, by way of illustration and not of limitation, (i) the Underwriting and Expense Reimbursement Fee, (ii) the Break-up Fee, by no later than February 10, 2010, which order contains terms and conditions satisfactory to the Collateral Agent in its sole and absolute discretion (the "**Term Sheet Approval Order**");<br><br>(3) Debtors, Lender and Collateral Agent entering into definitive documents (including, without limitation, certificates, instruments and agreements in connection therewith) mutually acceptable to Lender, Collateral Agent and Debtors and incorporating the material business terms and conditions of this Term Sheet (collectively, the "**Loan Documents**") by no later than forty-five (45) days following the entry of the Term Sheet Approval Order; and<br><br>(4) The entry of a final, non-appealable order of the Bankruptcy Court approving the Loan Documents (the "**Final Documentation Approval Order**") by no later than ninety (90) days following the entry of the Term Sheet Approval Order, which Final Documentation Approval Order contains terms and conditions satisfactory to the Collateral Agent in its sole and absolute discretion, including, without limitation, the approval of the Underwriting and Expense Reimbursement Fee and the Break-Up Fee . By way of illustration and not of limitation, each of the Term Sheet Approval Order and the Final Documentation Approval Order shall include, among other things: (i) findings regarding the good faith of the Collateral Agent and the Lender; and (ii) the protections of 11 U.S.C. §364(e). |

| | |
|---|---|
| **Budget** | 1.  The proceeds of the Loan will be used solely to pay post-petition expenses of the Debtors as expressly set forth in the budget (the "**Budget**"), which Budget has been mutually agreed to by Collateral Agent and Debtors both as to line items/amounts and conditions for disbursement of such funds from time to time.<br><br>2.  All funds to be provided to Debtors pursuant to the Budget will be held by Collateral Agent in its account pending disbursement (including, without limitation, the interest reserve) as expressly provided pursuant to the Budget and Loan Documents.<br><br>3.  Any proposed modifications to the Budget must be approved in advance and in writing, by the Collateral Agent in its sole and absolute discretion.<br><br>4.  Debtors shall not, for any line item set forth in the Budget, and for the total expenses set forth in the Budget, exceed such amount by 5%; provided, however, that Debtor may be permitted to have a variance of up to 10% from specific line-item matters set forth in the Budget if (a) such variance reflects a readjustment from certain line-item costs to hard cost budget items to cover overruns in such hard-cost budget line items, and (b) such variance is approved in advance in writing by Collateral Agent in its sole and absolute discretion. Debtor shall prepare and deliver to the Collateral Agent no later than the fifth (5th) day of every calendar month during the period from the commencement of the Loan through the Maturity Date, a report detailing the actual results for each line item as set forth in the Budget, and for the aggregate total expenses under the Budget, compared to the projected results for each line item of the Budget and the aggregate amount of total expenses as projected in the Budget, respectively, in form and substance acceptable to Collateral Agent.<br><br>5. As more fully set forth below, Collateral Agent shall make all disbursements of Loan proceeds to Debtors from time to time pursuant to satisfaction of specified requirements to such disbursements as set forth in the Loan Documents and the Budget. |
| **Closing Date** | Proceeds from the Loan shall be made available to Debtors from and after the Closing Date (as defined in the Loan Documents), which shall occur pursuant to the Loan Documents no later than ten (10) days following the entry of the Final Documentation Approval Order.  Any distribution of proceeds pursuant to the Loan shall be made following satisfaction of all conditions precedent for funding of such amounts as expressly set forth in the Loan Documents. |

| Priority and Security | The Loan and all other obligations to the Lender and the Collateral Agent shall be secured by the following (collectively, the "**Liens**"): (1) fully perfected first-priority liens and security interests on all of the Debtors' assets, including, without limitation, the assets of any subsidiaries thereof (hereinafter the "**Collateral**"), and (2) super priority administrative claims customary in transactions of this type pursuant to 11 U.S.C. §364, including, without limitation, fully perfected liens and security interests priming the liens securing the existing senior secured bank loans (the "**Existing Bank Debt**"). <br><br> The Liens of Lender and those securing the Existing Bank Debt shall be subject to a Carve-Out for: (i) all reasonable professional fees and expenses accrued prior to the Maturity Date, but only up to the amounts and as to the line items identified in the Budget; (ii) all reasonable professional fees and expenses for the Debtors' employed professionals accrued after the Maturity Date, but only up to the amounts and as to the line items identified in the Budget; and (iii) all U.S. Trustee fees. The Carve-Out shall not include any claims of providers of post-petition goods or services to the Debtors, including without limitation, any holders of claims under any subsection of 11 U.S.C. §503(b). |
|---|---|
| **Adequate Protection** | There shall be no cash adequate protection arrangements for the benefit of the Existing Bank Debt. |
| **Tax Payments** | Debtors shall pay post-petition returns and taxes on a timely basis, as required by 28 U.S.C. Section 960. Debtors shall promptly identify and turn over any withholding tax, lodging facility use tax and other tax trust funds to the federal, state or local governmental authority, as applicable, including, without limitation, tax trust funds currently held for the benefit of the State of Arizona to the Arizona Department of Revenue. |
| **Disbursements and Reserve Funds** | The Loan shall be disbursed in one or more increments pursuant to the terms and conditions of the Loan Documents and pursuant to the Budget; provided, however, that all Loan proceeds will remain in Collateral Agent's account(s) pending disbursement pursuant to the terms and conditions of the Budget and Loan Documents. |

| **Guest Ranch Membership Dues** | (1) Guest Ranch Management Corporation ("SGRMC") is the designated manager for the Guest Ranch amenities, which includes the spa, and is an affiliated entity of the Debtors—SGRMC and Debtors are under common ownership. By way of illustration and not of limitation, SGRMC is solely responsible for setting the monthly dues associated with the Guest Ranch amenities (the "Guest Ranch Membership Dues").

(2) All lot owners ("Lot Owners") and such other persons or entities who shall be permitted to join the Guest Ranch from time to time) (collectively, with the Lot Owners, the "Members") are required to pay the Guest Ranch Membership from and after the issuance of the "Certificate of Occupancy" with respect to the spa facility.

(3) As required pursuant to purchase agreements entered into by each Lot Owner in connection with the acquisition of such Lot Owner's real estate, each Lot Owner shall execute and deliver, and cause any of its lenders to execute and deliver, and to obligate its purchasers and their lenders to execute and deliver, a Declaration, in form and substance reasonably acceptable to Collateral Agent, imposing a lien for all dues and assessments for the Guest Ranch in favor of Debtors ("Spa Assessment Lien") on such Lot Owner's real estate (each, a "Purchased Lot" and collectively, the "Purchased Lots").

(4) As a condition of the Loan: (a) Debtors shall assign, pledge, convey and transfer all Spa Assessment Liens to Lender to secure payment of such Guest Ranch Membership Dues; (b) Debtors shall represent, warrant and covenant to Lender that (i) it has validly and properly perfected the Spa Assessment Lien, and as a result thereof, has a first priority perfected security interest in and to each Purchased Lot by reason of such Spa Assessment Lien, (ii) it has not transferred, assigned, sold, conveyed or otherwise pledged any interest in and to the Spa Assessment Lien, and (iii) it shall not take any action to limit, inhibit or interfere in any manner with the Spa Assessment Lien and the pledge of such lien in favor of Lender; and (c) Debtors and SGRMC shall require that all such Guest Ranch Membership Dues be paid directly to Collateral Agent in an initial amount of $750 per month per Member upon the issuance of the Certificate of Occupancy, as such amount may be adjusted from time to time as directed in writing from time to time by Collateral Agent.

(5) As a condition of the Loan: (a) SGRMC shall grant to Collateral Agent a lien in and to all of its assets to secure the payment of the Guest Ranch Membership Dues, and in connection therewith, shall execute and deliver a pledge of all of its stock or other equity interests to secure its obligations in connection therewith; (b) SGRMC shall join the Loan Documents for purposes of agreeing to be bound by the terms and conditions as set forth herein; and (c) SGRMC shall represent, warrant and covenant to Lender that (i) it is duly authorized and has all right, title and authority to set the amount and receive the Spa Dues, free and clear of any and all liens, claims or encumbrances except as provided herein, and otherwise manage the affairs associated with the Spa Amenities and the Spa Dues, (ii) it will not take any action inconsistent with the terms and conditions of the provisions set forth in this Section, (iv) in the event that it receives any funds relating to the Spa Dues, its shall promptly forward such funds directly to Collateral Agent, and (v) it and the Debtors shall execute and deliver, and take such further actions as reasonable and appropriate, and as otherwise may be requested from time to time in writing by Collateral Agent with respect to the provisions as set forth herein.

Provided no event of default has occurred with respect to this Section by Debtors and/or SGRMC, all such sums actually received by Lender shall reduce Debtors' obligation to Lender under the Loan. |

| | |
|---|---|
| **130 Residential Lots** | Debtors shall not be permitted to any partial re-conveyance of the commercial lot (See **Attachment C** (of the Term Sheet) for legal description) or to transfer, sell, assign or convey any right, interest or title in the other Collateral; provided, however, that Debtors may attempt to sell certain 130 residential lots comprising the Collateral (the "**Residential Lots**"), subject to such terms and conditions as acceptable to Collateral Agent in its sole and absolute discretion, which conditions precedent for any sale of Residential Units shall include, by way of illustration and not of limitation: (1) achieving the Benchmarks as set forth below, (2) Collateral Agent receiving from such sale the greater of (i) $350,000 per unit after the payment of the Lot Participation Payment, or (ii) 92% of the gross sales price per unit after reduction for the Lot Participation Payment; provided, however, that in the event that the actual commission for such sale is less than 7%, the 92% of gross sales price per unit due hereunder shall be increased by an amount equal to the difference of (x) 7% of the gross sales price per unit (the anticipated commission) less (y) the actual commission paid with respect to such sale (the "**Minimum Sale Price**"). In addition, as a condition of any sale of a Residential Lot, Debtors will waive their right to assert any claim for release of the lien under 11 U.S.C. §363. Lender shall, upon satisfaction of all conditions precedent to the sale of a Residential Lot, release its Lien in and to such Residential Lot, provided, however, that Lender expressly retains its Lien in all proceeds generated from any such sale. |
| **Additional Consideration** | Lot Participation Payment. With respect to each Residential Unit sold pursuant to the terms and conditions as set forth above, Debtors shall convey to Collateral Agent on behalf of Lender from the closing escrow an amount equal to (i) if the gross sales price is less than $400,000 per Residential Lot, 8% of the gross sale price of such lot, or (ii) if the gross sales price is equal to or greater than $400,000 per Residential Lot, $32,000; provided, however, that such amount shall not be less than $25,000 per sold lot (the "**Lot Participation Payment**"). The Lot Participation Payment is in addition to, and not a part of, the Loan, and Lot Participation Payments received by Lender shall not be applied against the Loan or otherwise reduce the outstanding obligations owing under the Loan Documents. |

| | |
|---|---|
| **Benchmarks** | The Debtors shall be required to satisfy the following benchmarks (the "**Benchmarks**") as a condition of the sale of any Residential Unit:<br><br>　1. Benchmark A: Borrower shall attain the full legal right from all relevant political jurisdictions to sell to any third party all the Residential Lots apart from those Residential Lots that are part of Phase II-B (see **Attachment B** of the Term Sheet) ); and<br><br>　2. Benchmark B: Borrower shall have sold and received full payment in cash for at least six lots and an average sales price of Four Hundred Thousand Dollars ($400,000) within seven months of origination; provided, however, that Benchmark B shall not apply with respect to otherwise permitted advances under the Loan for the first six (6) line items as set forth in the Budget.<br><br>Satisfying Benchmark A shall also be a condition precedent to disbursing from the Budget the One Million Five Hundred Thousand Dollars ($1,500,000) in funds related to funding the construction associated with Phase III-b lots. |
| **Mandatory pre-payments** | Debtors shall promptly pay to Collateral Agent 100% of the net cash proceeds received or receivable from a Liquidity Event.  For purposes hereof, (1) a "**Liquidity Event**" shall include:  (a) asset sales or other dispositions of Collateral by Debtors (including proceeds from the sale of stock of any subsidiary of the Debtors and insurance and condemnation proceeds); provided, however, that solely with respect to a sale of the Residential Lots (as provided above), Debtors shall promptly pay to Collateral Agent the greater of (i) $350,000 or (ii) 94% of the gross sales price per unit after reduction for the Lot Participation Payment; (b) issuances, offerings or placements of debt obligations, equity or other security interests of Debtors and/or their subsidiaries; (c) extraordinary receipts (including tax refunds, indemnity payments, pension reversions, acquisition purchase price adjustments and insurance proceeds not included as proceeds of asset dispositions); and (d) other amounts that are usual and customary for debtor-in-possession financings, and (2) "**net cash proceeds**" shall include any and all reasonable and appropriate out-of-pocket cash expenses payable to non-affiliated third parties in connection with such events. |

| | | |
|---|---|---|
| **Conditions precedent to the obligation to make advances under the loan** | The conditions to advances under the Loan, and more specifically, with respect to specified line item matters as set forth in the Budget, will be specified in the Loan Documents. The conditions to advance proceeds under the Loan Documents will include, by way of illustration and not of limitation, the following: | |

1. The Guest Ranch Membership Fee Obligation shall be expressly provided for in the Loan Documents and approved by the Bankruptcy Court in the Approval Order;

2. By no later than ninety (90) days following the entry of the Term Sheet Approval Order, the Bankruptcy Court shall have entered the Final Documentation Approval Order: (i) authorizing and approving the Loan on a final basis and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests and Liens, the payment of all fees referred to herein, and (ii) lifting the automatic stay to permit (A) the Debtors to perform their obligations under the Loan Documents and (B) the Collateral Agent and the Lender to exercise their rights and remedies with respect to the Loan as set forth in the Approval Order and Loan Documents; and (iii) providing a release and waiver of any surcharge on the collateral for the Loan. All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Loan shall be in form and substance satisfactory to the Collateral Agent in its sole discretion;

3. The Debtors will agree (and any successor to any Debtor shall be bound by such agreement, including, without limitation, any bankruptcy trustee): (a) to refrain from seeking to prime the Loan and (b) to broad releases of the Collateral Agent and the Lender, except with regard to willful misconduct on the part of the Collateral Agent and the Lender;

4. Except for the filing of the Cases, there shall have occurred no material adverse effect on any of (i) the operations, performance, prospects, business, assets, properties, or condition (financial or otherwise) of the Debtors (on a per Debtor basis or an aggregate Debtors basis) based on information provided by or on behalf of the Debtors to the Collateral Agent since the Effective Date, (ii) the ability of any Debtor to perform its obligations under the Loan Documents, or (iii) the ability of the Collateral Agent and the Lender to enforce the loan documentation; (any of the foregoing being a **"Material Adverse Change"**);

5. There shall exist no Event of Default;

6. The representations and warranties of the Debtors in the Loan documentation shall be true and correct immediately before, and after giving effect to, funding, except to the extent that any such representation or warranty expressly relates only to an earlier date;

7. All fees and expenses (including, without limitation, reasonable fees and expenses of counsel) of the Collateral Agent and/or the Lender permitted pursuant to the Budget, the Loan Documents and/or any other instrument or agreement between Debtors and Collateral Agent on behalf of Lender entered into in connection therewith, have been paid in full;

8. The Debtors shall have operated (including as to revenues, expenditures and accruals) in accordance with the Budget for each Budget period prior to such advance; and

9. Debtors will have performed all actions required as a condition of an advance under the Loan Documents, including, without limitation, delivering such documents, instruments, certificates and agreements as expressly provided in the Loan Documents.

In connection with the restaurant, general store, post office and spa, there shall be binding leases in place, in form and substance acceptable to Collateral Agent and/or Lender, together that are consistent with the rent roll attached as **Exhibit D of Term Sheet**.

| | |
|---|---|
| **Events of Default** | The Loan Documents shall include customary and otherwise appropriate events of default, including, without limitation, any one or more of the following (each an **"Event of Default"**): |

1.  If the Final Documentation Approval Order shall not have been entered by no later than ninety (90) days following the entry of the Term Sheet Approval Order,;
2.  Any failure to satisfy a Benchmark as of the later of (i) the date required above, or (ii) the extension date as agreed to in advance in writing by Collateral Agent in its sole and absolute discretion;
3.  The breach by Debtors of any representation, warranty, covenant and/or agreement in the Loan Documents and/or the Approval Order;
4.  The conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code;
5.  Debtors file a plan which was not approved in advance by Collateral Agent in its reasonable discretion;
6.  The settlement of any estate claims and/or causes of action of Debtors, including, without limitation, avoidance actions, on terms and conditions not reasonably acceptable to Collateral Agent;
7.  The appointment of an examiner (other than an examiner whose duties and powers are confined to investigating pre-petition transactions of the Debtors or their affiliates) or of a chapter 7 or chapter 11 trustee, receiver, chief restructuring officer or similar fiduciary with expanded powers in the Cases;
8.  The entry of an order of the Bankruptcy Court confirming a plan of reorganization in any Case or approving a transaction with a Person other than Lender, pursuant to which a sale of all or substantially all of the assets of any Debtors is contemplated, pursuant to section 363 of the Bankruptcy Code (a **"Sale Transaction"**), which does not (i) contain a provision for the payment in full in cash of all obligations of the Debtors to the Lender on or before the effective date of such plan or such sale upon entry thereof, and (ii) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Lender and priorities until such plan's or Sale Transaction's effective date;
9.  The entry of an order by the Bankruptcy Court dismissing any Case that does not contain a provision for the payment in full in cash of the Loan upon entry thereof;
10. The entry by the Bankruptcy Court of an order with respect to any Case that (i) revokes, reverses, stays, modifies, supplements or amends the Approval Order, except as consented to by the Lender in writing, (ii) permits any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Collateral Agent and the Lender, not in accordance with the terms of this Term Sheet and the Approval Order, or (iii) grants or permits the grant of a lien on any Collateral not in accordance with the terms of this Term Sheet and the Approval Order and/or otherwise impairs Lender's rights under the Loan Documents or with respect to the Collateral. The preceding provisions of this paragraph (10) shall not be deemed to prevent Debtors from seeking Court approval of professional fees for those fees and expenses of counsel for the Debtors in Possession in such amounts as may be determined by the Bankruptcy Court to be reasonable and appropriate, provided, however, that the amount of such professional fees and expenses shall not exceed the amount of such professional fees and expenses as set forth in the Budget;
11. The entry of an order by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Debtors with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate (other than workers' compensation claims that are fully covered by insurance in the ordinary course of business) or permitting foreclosure on any material asset of any Debtors;
12. (i) The Debtors or any official committee appointed in the Cases shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Collateral Agent or Lender, claims or rights against such person/entity (**"Person"**) or to subject any Collateral to assessment or surcharge pursuant to 11 U.S.C. §506(c), (ii) any lien or security interest created by the Approval Order or the Loan Documents shall, for any reason, cease to be valid, or (iii) any action is commenced by (x) any Debtors, or (y) any other Person, if such action is not contested diligently and in good faith by the Debtors, which contests the validity, perfection or enforceability of any of the Liens and security interests of the Collateral Agent in favor of the Lender, and which, as to subsection (12)(iii)(y), Debtors are not able to obtain a complete dismissal within forty-five (45) days from the commencement of such action;
13. The determination of any Debtors, whether by vote of such Debtor's board of directors or otherwise, to suspend the operation of such Debtor's business in the ordinary course, or the filing of a motion or other application in any Case, seeking authority to do any of the foregoing;
14. The indictment , or the threatened indictment of any Debtor, under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against any Debtor, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any governmental authority or any material property of such person.

| Representations and Warranties | The Loan Documents will require customary representations and warranties as required by the Collateral Agent. By way of illustration and not of limitation, the Loan Documents will include the following representations and warranties and covenants of Debtors in favor of the Collateral Agent and the Lender (applicable upon execution and at the Closing):<br><br>1. Due Authorization; No Conflict<br>2. Due Organization and Qualification; No Subsidiaries<br>3. Good Title; No Encumbrances; Location of Collateral<br>4. Compliance with Applicable Laws; Environmental Compliance<br>5. Compliance with Material Agreements<br>6. No Additional Consents<br>7. No Material Adverse Changes; No Liquidity Events<br>8. Complete Disclosure<br>No Tax Liability; No Third-Party Claims |
|---|---|
| Covenants | The Loan Documents will require customary covenants as required by the Collateral Agent. By way of illustration and not of limitation, the Loan Documents will include the following covenants of Debtors in favor of the Collateral Agent and the Lender (applicable upon execution and at the Closing):<br><br>1. Maintenance of Insurance; Third Party Beneficiary<br>2. Accounting System; Books and Records<br>3. Financial Statement; Collateral reporting<br>4. Right to Inspect<br>5. Further assurances<br>6. Maintenance of Properties<br>7. Payment of Taxes<br>8. Compliance with Laws<br>9. Existence and disclosure updates<br>10. No transfers of collateral; no liens<br>11. Restrictions on fundamental changes<br>12. Indemnification to Debtors<br>13. Certain Bankruptcy matters, including:<br><br>   A. Debtors shall file all pleadings, motions, filings and other documents with the Bankruptcy court to obtain a final non-appealable order from the bankruptcy court approving, among other things, (1) the underwriting fee, (2) the Expense Reimbursement, and (3) the Break-up fee set forth herein;<br><br>   B. Debtors shall deliver all pleadings, motions, or filings and other documents filed with the bankruptcy court to the collateral agent, the lender, and their Counsel;<br><br>   C. Debtors shall not file, support, or endorse any plan of reorganization inconsistent with the terms of this Term Sheet or propose or support any action outside the ordinary course of business that has not been approved in advance by the Collateral Agent, and;<br><br>   D. Debtors shall not make or permit to be made any change to the Approval Order without the prior consent of the Collateral Agent. |

| | |
|---|---|
| **Expenses** | The Debtors shall pay, subject to such Bankruptcy Court approval as may be required, all (i) reasonable out of pocket costs and expenses of the Collateral Agent and the Lender (including, without limitation, all reasonable fees, expenses and disbursements of outside counsel and consultants) in connection with the preparation, execution and delivery of this Term Sheet, the loan documentation and the funding of all drawings under the Loan, the administration of the Loan and any amendment or waiver of any provision of the loan documentation; (ii) reasonable out of pocket costs and expenses of the Collateral Agent and the Lender as counsel to the Collateral Agent and Lender and any additional counsel) in connection with the enforcement or protection of any of their rights and remedies under the Loan Documents and in connection with the Cases. |
| **Governing Law** | This Term Sheet, the Loan Documents, the Transaction contemplated herein, and all matters arising out of or related thereto will be governed by the laws of the State of Arizona. |
| **Counterparts** | This Term Sheet may be executed in one or more counterparts, all of which shall constitute one and the same document, and shall become effective on the date set forth below (the "**Effective Date**"). For purposes hereof, a facsimile signature shall be deemed an original. |
| **Maximum Interest Rate** | In no event shall the interest rates payable under the Loan Documents exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Debtors and Lender intend legally to agree upon the rate or rates of interest and manner of payment stated within it and that Arizona law shall govern this matter; provided, however, that, anything contained in the Loan Documents to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of the Loan Documents, Debtors are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Debtors in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loan to the extent of such excess. |
| **Confidentiality** | Prior to filing motions seeking Bankruptcy Court approval for the Loan on the terms and conditions as set forth in this Term Sheet, Debtors, including, without limitation, their respective officers, directors, managers, members, employees, agents, affiliates, subsidiaries, accountants, agents and representatives, shall hold in strict confidence the terms of this Term Sheet and any and all confidential information exchanged between the parties, regardless of the consummation of the Transaction as contemplated herein. |
| **Commitment Letter; Right to Withdraw** | Lender shall submit a commitment letter (the "Commitment Letter") concerning the Loan, which Commitment Letter reflects Lender's commitment to make a loan to Debtors pursuant to the term and conditions contained herein, to the Bankruptcy Court for its approval The Commitment Letter shall expressly provide, among other things, that the Term Sheet, and the commitment by Lender to fund the Loan and be obligated pursuant to the terms and conditions of the Commitment Letter and this Term Sheet, may be withdrawn at any time by Lender in its sole and absolute discretion prior to the hearing (including, without limitation, any continuations thereto) by the Bankruptcy Court for the Final Documentation Approval Order, such withdrawal to be immediately effective upon written notice by Lender to Debtors as provided in the Commitment Letter. |

Future of Debtor

22.      Assuming Court approval of DIP financing, Debtor will initiate an extremely aggressive pricing and marketing plan for sales of lots and casitas. Debtor will establish a pricing plan that will expand its potential market by several levels and allow it to sell 35 to 40 estate lots and 15 to 24 casitas in the next 2 years. Debtor has over 3000 prospects that have expressed an interest in Saguaro Ranch. Debtor will start sale efforts by contacting all of them. As soon as Debtor has sold 12 to 15 lots at the deeper discounted prices it will start raising prices. The pricing, plus clarification of Debtor's situation (bankruptcy) combined with the new marketing approach will spur more sales. The construction activity involved in bringing phase IIIA on a line and completion of the Spa will create a sense of security to prospective buyers that Debtor has weathered the worst times and is moving forward with success.

Use of Monies

23.      It is Debtor's intention to sell all 130 remaining estate lots and 63 casitas by the end of 2017. With a moderate return of the luxury market and with new pricing plans allowing Debtor to greatly expand the size of its market, pricing, and product offering Debtor's intentions are not only achievable but realistic. Debtor should be able to average a minimum of $850,000 per lot over the next 7 years. Phase I work will involve the completion of Old Ranch Road, Adobe Ruins, Tarver Place, and the areas around the General Store including, landscaping, pathways, garden areas, pavers, raising manhole covers, water vales, asphalt paving and marking. It will also involve completion of the Tunnel and Gatehouse lighting, signage, and trails. Phase II work will allow Debtor to complete Ranhiem Way. This work includes water, power, gas, and communication lines, guardrails, pioneering select driveways, asphalt paving and marking. Phase III work will allow Debtor to complete an additional 51 lots. The work will include all bridges, below grade infrastructure and horizontal work for home sites. This work will be completed in two phases, IIIA-26 lots and IIIB-25 lots. HR lots will also need to be completed which involves work that will be done to

1    complete an additional 5 lots. This work is minor in scope because the utility lines

2    needed can be accessed from the existing Phase I infrastructure. Finally, monies will

3    be used for construction of a 5000 sq. ft. Spa/ Wellness and Fitness Center.

4    Current Value of Project and Enhanced Value from Improvement

5    24.    Debtor has recently obtained an appraisal from James Brady of AXIA Appraisers in

6    Tucson, AZ which shows a current market value of Debtor's properties on an as is

7    condition of $63,800,000.00, and a completed value with improvements, provided by

8    the DIP financing, of $90,000,000.00. A copy of the appraisal will be filed as a

9    separate document (due to size) with the Court as **EXHIBIT D**. Debtor has provided

10   proof of Mr. Brady's and AXIA's extensive qualifications at **EXHIBIT E**.

11   **II. DIP LOAN**

12   25.    Debtor seeks up to an additional $12.325 million from Loanvest XIV, LP in order to

13   continue operations during the course of the bankruptcy and to complete the roads

14   and infrastructure for new lots, for new buyers and other projects.

15   26.    The loan from Loanvest XIV, LP ("Loanvest") will be secured by valid and properly

16   perfected first priority position lien on the Debtor's real estate inventory,

17   homeowners' fees and other collateral set forth herein. However, for credit to be

18   extended, Loanvest has required that it be granted a senior priority lien against the

19   real property assets owned by Debtor as authorized by 11 U.S.C. §364(d). The new

20   loan from Loanvest will be capped at $12,325,000.00, unless further authorization is

21   granted by this Court. The new priming lien will secure whatever debt is outstanding

22   with Loanvest. The mortgage debt of Kennedy Funding AND ALL OTHER

23   CREDITORS WITH LIENS AGAINST THE PROPERTY, VOLUNTARY OR

24   INVOLUNTARY, as set forth in the Title Report as **EXHIBIT B**, will be

25   subordinated to a second position lien against the real estate until Loanvest is paid.

26   Such funds are necessary to complete renovations on the properties and start up sales.

27

28

<u>Adequate Protection</u>

27. There is no lack of adequate protection to Kennedy's interest in the estate as the Debtor's properties have a substantial equity cushion. Kennedy is owed approximately $27 million. The current as is value of the Debtor is $63,800,000.00 with a value after loan proceeds and improvements at over $90,000,000.00. Therefore, the equity in Debtor's property adequately protects the interests of Kennedy as the first lien on the properties, and, all other secured creditors.

28. Loanvest and Debtor have agreed to terms in concept, but, as of the date of this Motion, documents evidencing the loans from Loanvest to the Debtor have not been completed. Loanvest requires court approval of the Terms Sheet (**EXHIBIT A**) prior to completing final documentation. Debtor will submit the negotiated loan documents, evidencing the loan prior to finalizing the loan documents for Court approval.

<u>Other monies not available</u>

29. Debtor has attempted to obtain other credit as set forth in the separately submitted *Declaration of Stephen Phinny in Support of Lending Motion.* Debtor, prior to the filing of this Motion, had requested additional monies from Kennedy to complete portions of the project which was not forthcoming. Debtors have been unable to obtain credit on more favorable terms than those proposed in this Motion. Phinny;s Declaration sets forth efforts to obtain favorable financing. Debtor has acted in good faith in negotiating the terms of the DIP Financing for which approval is sought.

**III. LEGAL ANALYSIS**

30. 11 U.S.C. §364(d) provides:

> The Court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by senior or equal lien on property of the estate that is subject to a lien only if-
>
> i. The trustee is unable to obtain such credit otherwise; and

ii. There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

31. The debtor has two burdens to meet before the Court can authorize lending, in exchange for the granting of a super priority lien under §364(d). "First, the debtor has to prove that there was no other financing available. Second, the debtor has to demonstrate the existence of adequate protection." *In re: Plabell Rubber Products, Inc.*, 137 B.R. 897, 901 (Bankr. N.D. Ohio 1992); *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). Debtor easily meets both requirements.

## A. Credit Alternatives

32. As explained above, and in the supporting Declaration of Stephen Phinny, the Debtors in possession have demonstrated that there was no other financing available under the circumstances. Credit markets have substantially tightened and the Debtors find themselves unable to locate an alternate lender, willing to extend credit on an unsecured basis. Debtors have approached counsel for Kennedy to obtain consent to this financing of Debtor, obtaining new monies from Loanvest, and to enable the continued operation and development of Debtor's businesses. However, Kennedy has expressed an unwillingness to agree to this new request.

## B. Adequate Protection

33. Moreover, as explained above, if the requested Debtor in possession loan is granted, the interests of all the junior secured creditors would remain more than adequately protected by the equity cushion in Debtor's assets. In fact, appraisal reports issued in December of 2009 by AXIA of Tucson, AZ show collateral values for the properties with values in excess $64,000,000 as is and after completion of projects the value exceeds $90,000,000.00, resulting in an increased equity cushion of $13,675,000.00 if the DIP financing is approved. (*See* **EXHIBIT D**).

34.     According to the Ninth Circuit Court of Appeals: "[a]lthough the existence of an
        equity cushion as a method of adequate protection is not specifically mentioned in
        §361, it is the classic form of protection for secured debt justifying the restraint of lien
        enforcement by a bankruptcy court." *Pistole v. Mellor (In re Mellor),* 734 F .2d 1396,
        1400 (9th Cir. 1984). "In fact, it has been held that the existence of an equity cushion,
        standing alone, can provide adequate protection." *Id.*; *Mutual Life Insurance*
        *Company of New York v. Patrician St. Joseph Partners, LP (In re Patrician St.*
        *Joseph Partners, LP)*, 169 B.R. 669, 677 (D. Ariz. 1994). According to the analysis
        provided, a 50 percent equity cushion already exists which provides adequate
        protection to the interest of Kennedy, and approval of the DIP financing will further
        increase the equity cushion which adequately protects Kennedy.

**C. Business Judgment Standard**

35.     After appropriate investigation and analysis, Debtor's management has concluded that
        the proposed loan is the best alternative available under the circumstances.
        Bankruptcy courts routinely defer to the debtor's business judgment on most business
        decisions, including the decision to borrow money. *See, Group of Institutional*
        *Investors v. Chicago Mil. St. P. and PAC. RY.,* 318 U.S. 523, 550 (1943); *In re*
        *Simasko Products Company,* 47 B.R. 444, 449 (D. Colo. 1985). "Business judgment
        should be left to the board room and not to this Court." *In re Lifeguard Industries,*
        *Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the
        administration of the debtor's estate and increase its costs, interfere with the
        Bankruptcy Code's provision for private control of administration of the estate, and
        threaten the Court's ability to control a case impartially." *Richmond Leasing Co. v.*
        *Capital Bank, N.A.,* 762 F. 2d 1303, 1311 (5th Cir. 1985).

36.     In general, a bankruptcy court should defer to a Debtor in possession's business
        judgment regarding the need for a proposed use of funds, unless such decision is
        arbitrary and capricious. *In re Curlew Valley Associates,* 14 B.R. 506, 511-513
        (Bankr. D. Utah 1981). Courts, generally, will not second guess a debtor-in-

possession's business decision when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its]authority under the Code." *Id.* at 513-514.

37.    Because Debtor has exercised sound business judgment in determining that the Loanvest DIP Loan is appropriate, it has satisfied the legal prerequisites to borrow under such loan. The terms of the DIP loan are fair and reasonable, and may in fact be at a below market rate. As a result, and because the loan is essential for the continued operation, development and reorganization of Debtor's businesses, and the continued employment of over 30 individuals in Tucson, Arizona, who currently work for Debtor, Debtor should be granted authority to enter into the Loanvest loan, on the secured, first priority basis described above, pursuant to §364(d) of the Bankruptcy Code.

## **CONCLUSION**

WHEREFORE, Debtor respectfully requests that this Honorable Court grant this Motion for an Order authorizing Debtor:

(i) to enter into agreement for post petition financing under 11 U.S.C. 364,

(ii) authorizing Debtor to utilize cash collateral,

(iii) finding adequate protection for pre-filing secured creditors,

(iv) approval of the Term Sheet in its entirety,

(v) approval of the Commitment Letter,

(vi) setting a Final Hearing regarding the Loan Documentation,

(vii) approval of the Break Up Fee,

(viii) approval of all other fees and costs provided in the Terms Sheet,

(ix) finding that

   (a) holders of all secured claims are adequately protected after being "primed",

   (b) that Loanvest is a lender in good faith,

   (c) Debtors need the funds to complete the project,

1   (d) completion of project will add substantial value to the Estates, and

2   (e) completion of the projects will result in an increase of adequate protection to existing secured

3   creditors

4   (x) and any further relief ths Court deems necessary.

5       RESPECTFULLY SUBMITTED:  February 8, 2010.

6                                   LAW OFFICES OF
                                    ERIC SLOCUM SPARKS, P.C.
7

8                                   /s/ Sparks AZBAR # 11726
                                    Eric Slocum Sparks
9                                   Attorney for Debtor

10

11  COPIES of the foregoing
    Mailed/delivered/faxed
12  February 8, 2010, to:

13  Ilene J. Lashinsky
    Christopher J. Pattock
14  UNITED STATES TRUSTEE
    230 N. First Ave. #204
15  Phoenix, Arizona 85003

16  Benjamin Bauer, Esq.
    Fennemore Craig
17  One South Church Ave
    Tucson, AZ 85701
18  *Attorney/s for Kennedy Funding, Inc.*

19  Official Committee of Unsecured Creditors:

20  Arizona Restaurant Supply, Inc.
    Attn: Tom Carr
21  6077 N. Travel Center Drive
    Tucson, Arizona 85741
22

    Linthicum Corp.
23  Attn: Clayton Boop
    20789 N. Pima Road, #250
24  Scottsdale, Arizona 85255

25  Rick Engineering Company, Inc.
    Attn: Paul Iezzi
26  3945 E. Fort Lowell Road, #111
    Tucson, Arizona 85712-1046
27

28

Three Architecture, Inc.
Attn: Jack Baines
4040 N. Central Expressway, #1200
Dallas, TX 75204

Earth-Scrapes Excavating, Inc.
Attn: Jody Mott
P.O. Box 69576
Oro Valley, AZ 85737

Terri A. Roberts, Esq.
German Yusufov, Esq.
PIMA COUNTY ATTORNEY'S OFFICE
32 North stone Avenue
Suite 2100
Tucson, AZ 85701
Attorneys for Pima County

Neil Eckel, Esq
DURAZZO & ECKEL, P.C.
45 North Tucson Boulevard
Tucson, Arizona 85716
Attorneys for Amanti Electric, Inc.

Alan M. Levinsky
BUCHALTER NEMER
16435 North Scottsdale Road
Suit 440
Scottsdale, Arizona 85254
Attorneys for Ford Motor Credit Company LLC

Dewain D. Fox, Esq.
FENNEMORE CRAIG, PC
3003 N. Central Ave.
Suite 2600 Phoenix, AZ 85012
Attorney for Kennedy Funding (SGRMC)

Michael W. Baldwin, Esq.
LAW OFFICE OF MICHAEL BALDWIN, PLC
P.O. Box 35487
Tucson, AZ 85740-5487
Attorney for: Theresa Chamberlain; Steven Blomquist;
Sharyl Cummings and Timothy Blowers

Robert J. Spurlock, Esq.
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
2901 North Central Avenue
Suite 100
Phoenix, AZ 85012
Attorney for Deere & Company

| | |
|---|---|
| 1 | Linda Boyle |
| | 10475 Park Meadows Drive |
| 2 | Suite 400 |
| | Littleton, CO 80124 |
| 3 | Representing TW Telecom Inc. |
| 4 | Scott D. Gibson, Esq. |
| | GIBSON, NAKAMURA & GREEN, P.L.L.C. |
| 5 | 2329 North Tucson Boulevard |
| | Tucson, AZ 85716 |
| 6 | Attorney for Katherine B. Phinny |
| 7 | George O. Krauja |
| | Fennemore Craig, PC 1 S. Church Ave. |
| 8 | Suite 1000 |
| | Tucson, AZ 85701-1627 |
| 9 | Attorneys for Kennedy Funding, Inc. |
| | And Anglo-American Financial, LLC |
| 10 | |
| 11 | Kevin J. Blakely, Esq. |
| | GAMMAGE & BURNHAM, P.L.C. |
| 12 | Two North Central Avenue |
| | 18th Floor |
| 13 | Phoenix, AZ 85004 |
| | Attorneys for Arizona Labor Force, Inc. |
| 14 | |
| 15 | Daniel R. Warner, Esq. |
| | LAW OFFICES OF J. PHILLIP GLASSCOCK, P.C. |
| 16 | 13430 North Scottsdale Road |
| | Suite 106 |
| 16 | Scottsdale, AZ 85254 |
| 17 | Attorney for Mobile Mini, Inc. |
| 18 | Gerard R. O'Meara, Esq. |
| | GUST ROSENFELD, PLC |
| 19 | 1 South Church Avenue |
| | Suite 1900 |
| 20 | Tucson, AZ 85701-1627 |
| | Attorney for Tapestry Properties III, L.L.C. |
| 21 | |
| | **\*All parties in interest on the** |
| 22 | **Master Mailing Matrices.** |
| 23 | |
| 24 | /s/    T. Fontes |
| 25 | |
| 26 | |
| 27 | |
| 28 | |