**EXHIBIT A**

<u>TERMS SHEET</u>

<u>*(PART I)*</u>

# EXHIBIT A
## LOAN TERM SHEET

(see attached)

| | |
|---|---|
| **Collateral Agent** | Loanvest ("Collateral Agent"). Collateral Agent shall manage the distribution and collection of the Loan proceeds pursuant to the terms of the Loan Documents, and in accordance with the Budget, and act as agent for the Lender, as applicable. |
| **Principal Amount** | Up to $12,325,000 due by Debtors during the term of the Loan, as may be adjusted as set forth below. |
| **Interest Rate** | The Loan will bear interest on the full Principal Amount from and after the Closing of the Loan (as defined in the Loan Documents), less any permitted repayments of principal from time to time, and independent of the amount as may be outstanding from time to time, at an annual rate of 12.50% per annum. On and after an Event of Default, interest shall accrue at the rate of 17.50% per annum. The Interest Rate shall not exceed the maximum interest rate permitted under applicable law. |
| | In the event that each of Lender, Collateral Agent and Debtors agree, in each of their sole and absolute discretion, that certain items and amounts set forth in the Budget comprising the Loan are no longer needed or appropriate, upon Lender's prior written consent, the Principal Amount shall be reduced accordingly, and, by way of illustration and not of limitation, (1) the amount of Interest due under the Loan shall be adjusted accordingly, provided, however, that any and all Interest due prior to such adjustment date shall remain due and payable, notwithstanding any abatement with respect to Interest due from and after such date, and (2) the parties shall execute and deliver such further documentation, certificates, instruments, notes and agreements, as reasonable and appropriate to effectuate and/or memorialize such adjustment to the Principal Amount of the Loan. |
| **Payment Terms** | Provided no Event of Default has occurred, Interest shall be payable monthly, in cash, in arrears, calculated on an actual/360 day basis, during the term of the Loan, with all principal and other costs and expenses due on or prior to the Maturity Date. Upon the occurrence of an Event of Default, all principal, accrued and unpaid interest, and other costs and expenses shall be immediately due and payable. |

**Loan Fees**

The Loan shall expressly provide for the following non-refundable fees to be paid to Collateral Agent on behalf of Lender as consideration for the Loan, such fees to be paid upon the Closing of the Loan or upon the closing of a loan transaction with another person or entity, as the case may be, as follows:

1. <u>Underwriting and Expense Reimbursement Fee</u>: Upon the Closing of the Loan, an underwriting fee plus reimbursement of all reasonable expenses incurred by Collateral Agent in connection with the procurement of the Loan and the Loan approval process, with such underwriting and expense reimbursement fee to be fixed in an amount equal to $250,000; and

2. <u>Break-Up Fee</u>: In the event that Debtors procure a loan from any person or entity other than Loanvest in an amount (whether individually or in the aggregate, and whether by one or a series of transaction) approximating $10,000,000 and/or for purposes of providing Debtors with working-capital needs and/or satisfying post-petition costs and expenses incurred by the bankruptcy estates of Debtors, then upon the closing of such loan transaction or transactions, as the case may be, Debtors shall pay to Collateral Agent a break-up fee in the amount of $350,000.

The fees set forth herein shall be in addition to any and other compensation to which Collateral Agent and/or the Lender may be expressly entitled to receive under the Loan or otherwise.

**Maturity**

All obligations under the Loan shall mature and be due and payable in full on the earlier of the following (the "**Maturity Date**"): (i) December 15, 2011 or such later date as consented to in writing by the Collateral Agent; (ii) the sale of any portion of the Collateral; or (iii) the occurrence of an Event of Default as defined below  The Maturity Date may be extended, provided no Event of Default has occurred, by the mutual consent of Debtor and Collateral Agent for 2 additional consecutive calendar quarters; provided, however, that Debtor shall, as a condition of such extension, pay to Collateral Agent for the benefit of Lender an additional one point (1%) of the Principal Amount for each such calendar quarter so extended.

| Commitment Letter | Lender shall submit a commitment letter (the "**Commitment Letter**") concerning the Loan, executed by Lender and Debtors, which Commitment Letter reflects Lender's commitment to make a loan to Debtors pursuant to the term and conditions contained therein and herein, to the Bankruptcy Court for its approval. The Commitment Letter shall expressly provide, among other things, that the Term Sheet, and the commitment by Lender to fund the Loan and be obligated pursuant to the terms and conditions of the Commitment Letter and this Term Sheet, may be withdrawn at any time and from time to time by Lender in its sole and absolute discretion prior to the hearing, including, without limitation, any continuations thereto, by the Bankruptcy Court, for the Final Documentation Approval Order (as defined below). |
| --- | --- |
| **Conditions to Loan** | Lender's obligation to make the Loan as provided herein is conditioned upon: |

(1) Debtors filing by no later than December 24, 2009 all pleadings, motions, filings and other documents with the Bankruptcy Court to obtain a final, non-appealable order from the Bankruptcy Court approving, among the terms and conditions of the Commitment Letter and this Term Sheet, including, by way of illustration and not of limitation, (i) the Underwriting and Expense Reimbursement Fee, and (ii) the Break-up Fee;

(2) The entry of a final, non-appealable order of the Bankruptcy Court approving the terms and conditions of the Commitment Letter and this Term Sheet, including, by way of illustration and not of limitation, (i) the Underwriting and Expense Reimbursement Fee, (ii) the Break-up Fee, by no later than February 10, 2010, which order contains terms and conditions satisfactory to the Collateral Agent in its sole and absolute discretion (the "**Term Sheet Approval Order**");

(3) Debtors, Lender and Collateral Agent entering into definitive documents (including, without limitation, certificates, instruments and agreements in connection therewith) mutually acceptable to Lender, Collateral Agent and Debtors and incorporating the material business terms and conditions of this Term Sheet (collectively, the "**Loan Documents**") by no later than forty-five (45) days following the entry of the Term Sheet Approval Order; and

(4) The entry of a final, non-appealable order of the Bankruptcy Court approving the Loan Documents (the "**Final Documentation Approval Order**") by no later than ninety (90)

days following the entry of the Term Sheet Approval Order, which Final Documentation Approval Order contains terms and conditions satisfactory to the Collateral Agent in its sole and absolute discretion, including, without limitation, the approval of the Underwriting and Expense Reimbursement Fee and the Break-Up Fee. By way of illustration and not of limitation, each of the Term Sheet Approval Order and the Final Documentation Approval Order shall include, among other things: (i) findings regarding the good faith of the Collateral Agent and the Lender; and (ii) the protections of 11 U.S.C. §364(e).

**Budget**

1.  The proceeds of the Loan will be used solely to pay post-petition expenses of the Debtors as expressly set forth in the budget attached hereto as **Exhibit B** (the "**Budget**"), which Budget has been mutually agreed to by Collateral Agent and Debtors both as to line items/amounts and conditions for disbursement of such funds from time to time.

2.  All funds to be provided to Debtors pursuant to the Budget will be held by Collateral Agent in its account pending disbursement (including, without limitation, the interest reserve) as expressly provided pursuant to the Budget and Loan Documents.

3.  Any proposed modifications to the Budget must be approved in advance and in writing, by the Collateral Agent in its sole and absolute discretion.

4.  Debtors shall not, for any line item set forth in the Budget, and for the total expenses set forth in the Budget, exceed such amount by 5%; provided, however, that Debtor may be permitted to have a variance of up to 10% from specific line-item matters set forth in the Budget if (a) such variance reflects a readjustment from certain line-item costs to hard cost budget items to cover overruns in such hard-cost budget line items, and (b) such variance is approved in advance in writing by Collateral Agent in its sole and absolute discretion. Debtor shall prepare and deliver to the Collateral Agent no later than the fifth (5th) day of every calendar month during the period from the commencement of the Loan through the Maturity Date, a report detailing the actual results for each line item as set forth in the Budget, and for the aggregate total expenses under the Budget, compared to the projected results for each line item of the Budget and the aggregate amount of total expenses as projected in the Budget, respectively, in form and substance acceptable to Collateral Agent.

| | |
|---|---|
| **Budget (continued)** | 5.   As more fully set forth below, Collateral Agent shall make all disbursements of Loan proceeds to Debtors from time to time pursuant to satisfaction of specified requirements to such disbursements as set forth in the Loan Documents and the Budget. |
| **Closing Date** | Proceeds from the Loan shall be made available to Debtors from and after the Closing Date (as defined in the Loan Documents), which shall occur pursuant to the Loan Documents no later than ten (10) days following the entry of the Final Documentation Approval Order.   Any distribution of proceeds pursuant to the Loan shall be made following satisfaction of all conditions precedent for funding of such amounts as expressly set forth in the Loan Documents. |
| **Priority and Security** | The Loan and all other obligations to the Lender and the Collateral Agent shall be secured by the following (collectively, the "**Liens**"): (1) fully perfected first-priority liens and security interests on all of the Debtors' assets, including, without limitation, the assets of any subsidiaries thereof (hereinafter the "**Collateral**"), and (2) super priority administrative claims customary in transactions of this type pursuant to 11 U.S.C. §364, including, without limitation, fully perfected liens and security interests priming the liens securing the existing senior secured bank loans (the "**Existing Bank Debt**"). |
| | The Liens of Lender and those securing the Existing Bank Debt shall be subject to a Carve-Out for: (i) all reasonable professional fees and expenses accrued prior to the Maturity Date, but only up to the amounts and as to the line items identified in the Budget; (ii) all reasonable professional fees and expenses for the Debtors' employed professionals accrued after the Maturity Date, but only up to the amounts and as to the line items identified in the Budget; and (iii) all U.S. Trustee fees.   The Carve-Out shall not include any claims of providers of post-petition goods or services to the Debtors, including without limitation, any holders of claims under any subsection of 11 U.S.C. §503(b). |
| **Adequate Protection** | There shall be no cash adequate protection arrangements for the benefit of the Existing Bank Debt. |

**Tax Payments**
Debtors shall pay post-petition returns and taxes on a timely basis, as required by 28 U.S.C. Section 960. Debtors shall promptly identify and turn over any withholding tax, lodging facility use tax and other tax trust funds to the federal, state or local governmental authority, as applicable, including, without limitation, tax trust funds currently held for the benefit of the State of Arizona to the Arizona Department of Revenue.

**Disbursements and Reserve Funds**
The Loan shall be disbursed in one or more increments pursuant to the terms and conditions of the Loan Documents and pursuant to the Budget; provided, however, that all Loan proceeds will remain in Collateral Agent's account(s) pending disbursement pursuant to the terms and conditions of the Budget and Loan Documents.

**Guest Ranch Membership Dues**
(1) Guest Ranch Management Corporation ("SGRMC") is the designated manager for the Guest Ranch amenities, which includes the spa, and is an affiliated entity of the Debtors— SGRMC and Debtors are under common ownership. By way of illustration and not of limitation, SGRMC is solely responsible for setting the monthly dues associated with the Guest Ranch amenities (the "Guest Ranch Membership Dues").

(2) All lot owners ("Lot Owners") and such other persons or entities who shall be permitted to join the Guest Ranch from time to time) (collectively, with the Lot Owners, the "Members") are required to pay the Guest Ranch Membership from and after the issuance of the "Certificate of Occupancy" with respect to the spa facility.

(3) As required pursuant to purchase agreements entered into by each Lot Owner in connection with the acquisition of such Lot Owner's real estate, each Lot Owner shall execute and deliver, and cause any of its lenders to execute and deliver, and to obligate its purchasers and their lenders to execute and deliver, a Declaration, in form and substance reasonably acceptable to Collateral Agent, imposing a lien for all dues and assessments for the Guest Ranch in favor of Debtors ("Spa Assessment Lien") on such Lot Owner's real estate (each, a "Purchased Lot" and collectively, the "Purchased Lots").

(4) As a condition of the Loan: (a) Debtors shall assign, pledge, convey and transfer all Spa Assessment Liens to Lender to secure payment of such Guest Ranch Membership Dues; (b)

**Guest Ranch Membership Dues**

**(continued)**

Debtors shall represent, warrant and covenant to Lender that (i) it has validly and properly perfected the Spa Assessment Lien, and as a result thereof, has a first priority perfected security interest in and to each Purchased Lot by reason of such Spa Assessment Lien, (ii) it has not transferred, assigned, sold, conveyed or otherwise pledged any interest in and to the Spa Assessment Lien, and (iii) it shall not take any action to limit, inhibit or interfere in any manner with the Spa Assessment Lien and the pledge of such lien in favor of Lender; and (c) Debtors and SGRMC shall require that all such Guest Ranch Membership Dues be paid directly to Collateral Agent in an initial amount of $750 per month per Member upon the issuance of the Certificate of Occupancy, as such amount may be adjusted from time to time as directed in writing from time to time by Collateral Agent.

(5) As a condition of the Loan: (a) SGRMC shall grant to Collateral Agent a lien in and to all of its assets to secure the payment of the Guest Ranch Membership Dues, and in connection therewith, shall execute and deliver a pledge of all of its stock or other equity interests to secure its obligations in connection therewith; (b) SGRMC shall join the Loan Documents for purposes of agreeing to be bound by the terms and conditions as set forth herein; and (c) SGRMC shall represent, warrant and covenant to Lender that (i) it is duly authorized and has all right, title and authority to set the amount and receive the Spa Dues, free and clear of any and all liens, claims or encumbrances except as provided herein, and otherwise manage the affairs associated with the Spa Amenities and the Spa Dues, (ii) it will not take any action inconsistent with the terms and conditions of the provisions set forth in this Section, (iv) in the event that it receives any funds relating to the Spa Dues, its shall promptly forward such funds directly to Collateral Agent, and (v) it and the Debtors shall execute and deliver, and take such further actions as reasonable and appropriate, and as otherwise may be requested from time to time in writing by Collateral Agent with respect to the provisions as set forth herein.

Provided no event of default has occurred with respect to this Section by Debtors and/or SGRMC, all such sums actually received by Lender shall reduce Debtors' obligation to Lender under the Loan.

| | |
|---|---|
| **130 Residential Lots** | Debtors shall not be permitted to any partial re-conveyance of the commercial lot (See **Attachment C** for legal description) or to transfer, sell, assign or convey any right, interest or title in the other Collateral; provided, however, that Debtors may attempt to sell certain 130 residential lots comprising the Collateral (the "**Residential Lots**"), subject to such terms and conditions as acceptable to Collateral Agent in its sole and absolute discretion, which conditions precedent for any sale of Residential Units shall include, by way of illustration and not of limitation: (1) achieving the Benchmarks as set forth below, (2) Collateral Agent receiving from such sale the greater of (i) $350,000 per unit after the payment of the Lot Participation Payment, or (ii) 92% of the gross sales price per unit after reduction for the Lot Participation Payment; provided, however, that in the event that the actual commission for such sale is less than 7%, the 92% of gross sales price per unit due hereunder shall be increased by an amount equal to the difference of (x) 7% of the gross sales price per unit (the anticipated commission) less (y) the actual commission paid with respect to such sale (the "**Minimum Sale Price**"). In addition, as a condition of any sale of a Residential Lot, Debtors will waive their right to assert any claim for release of the lien under 11 U.S.C. §363. Lender shall, upon satisfaction of all conditions precedent to the sale of a Residential Lot, release its Lien in and to such Residential Lot, provided, however, that Lender expressly retains its Lien in all proceeds generated from any such sale. |
| **Additional Consideration** | Lot Participation Payment. With respect to each Residential Unit sold pursuant to the terms and conditions as set forth above, Debtors shall convey to Collateral Agent on behalf of Lender from the closing escrow an amount equal to (i) if the gross sales price is less than $400,000 per Residential Lot, 8% of the gross sale price of such lot, or (ii) if the gross sales price is equal to or greater than $400,000 per Residential Lot, $32,000; provided, however, that such amount shall not be less than $25,000 per sold lot (the "**Lot Participation Payment**"). The Lot Participation Payment is in addition to, and not a part of, the Loan, and Lot Participation Payments received by Lender shall not be applied against the Loan or otherwise reduce the outstanding obligations owing under the Loan Documents. |

| | |
|---|---|
| **Benchmarks** | The Debtors shall be required to satisfy the following benchmarks (the "**Benchmarks**") as a condition of the sale of any Residential Unit: |

(1)  Benchmark A: Borrower shall attain the full legal right from all relevant political jurisdictions to sell to any third party all the Residential Lots apart from those Residential Lots that are part of Phase II-B (see **Attachment B**); and

(2)  Benchmark B: Borrower shall have sold and received full payment in cash for at least six lots and an average sales price of Four Hundred Thousand Dollars ($400,000) within seven months of origination; provided, however, that Benchmark B shall not apply with respect to otherwise permitted advances under the Loan for the first six (6) line items as set forth in the Budget.

Satisfying Benchmark A shall also be a condition precedent to disbursing from the Budget the One Million Five Hundred Thousand Dollars ($1,500,000) in funds related to funding the construction associated with Phase III-b lots.

| | |
|---|---|
| **Mandatory Prepayments** | Debtors shall promptly pay to Collateral Agent 100% of the net cash proceeds received or receivable from a Liquidity Event.  For purposes hereof, (1) a "**Liquidity Event**" shall include: (a) asset sales or other dispositions of Collateral by Debtors (including proceeds from the sale of stock of any subsidiary of the Debtors and insurance and condemnation proceeds); provided, however, that solely with respect to a sale of the Residential Lots (as provided above), Debtors shall promptly pay to Collateral Agent the greater of (i) $350,000 or (ii) 94% of the gross sales price per unit after reduction for the Lot Participation Payment; (b) issuances, offerings or placements of debt obligations, equity or other security interests of Debtors and/or their subsidiaries; (c) extraordinary receipts (including tax refunds, indemnity payments, pension reversions, acquisition purchase price adjustments and insurance proceeds not included as proceeds of asset dispositions); and (d) other amounts that are usual and customary for debtor-in-possession financings, and (2) "**net cash proceeds**" shall include any and all reasonable and appropriate out-of-pocket cash expenses payable to non-affiliated third parties in connection with such events. |

| Conditions Precedent to the Obligation to Make Advances under the Loan | The conditions to advances under the Loan, and more specifically, with respect to specified line item matters as set forth in the Budget, will be specified in the Loan Documents. The conditions to advance proceeds under the Loan Documents will include, by way of illustration and not of limitation, the following: |
|---|---|

(1) The Guest Ranch Membership Fee Obligation shall be expressly provided for in the Loan Documents and approved by the Bankruptcy Court in the Approval Order;

(2) By no later than ninety (90) days following the entry of the Term Sheet Approval Order, the Bankruptcy Court shall have entered the Final Documentation Approval Order: (i) authorizing and approving the Loan on a final basis and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests and Liens, the payment of all fees referred to herein, and (ii) lifting the automatic stay to permit (A) the Debtors to perform their obligations under the Loan Documents and (B) the Collateral Agent and the Lender to exercise their rights and remedies with respect to the Loan as set forth in the Approval Order and Loan Documents; and (iii) providing a release and waiver of any surcharge on the collateral for the Loan. All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the Loan shall be in form and substance satisfactory to the Collateral Agent in its sole discretion;

(3) The Debtors will agree (and any successor to any Debtor shall be bound by such agreement, including, without limitation, any bankruptcy trustee): (a) to refrain from seeking to prime the Loan and (b) to broad releases of the Collateral Agent and the Lender, except with regard to willful misconduct on the part of the Collateral Agent and the Lender;

(4) Except for the filing of the Cases, there shall have occurred no material adverse effect on any of (i) the operations, performance, prospects, business, assets, properties, or condition (financial or otherwise) of the Debtors (on a per Debtor basis or an aggregate Debtors basis) based on information provided by or on behalf of the Debtors to the Collateral Agent since the Effective Date, (ii) the ability of any Debtor to perform its obligations under the Loan Documents, or (iii) the ability of the Collateral Agent and the Lender to enforce the loan documentation; (any of the foregoing being a "Material Adverse Change");

**Conditions Precedent to the Obligation to Make Advances under the Loan (continued)**

(5) There shall exist no Event of Default;

(6) The representations and warranties of the Debtors in the Loan documentation shall be true and correct immediately before, and after giving effect to, funding, except to the extent that any such representation or warranty expressly relates only to an earlier date;

(7) All fees and expenses (including, without limitation, reasonable fees and expenses of counsel) of the Collateral Agent and/or the Lender permitted pursuant to the Budget, the Loan Documents and/or any other instrument or agreement between Debtors and Collateral Agent on behalf of Lender entered into in connection therewith, have been paid in full;

(8) The Debtors shall have operated (including as to revenues, expenditures and accruals) in accordance with the Budget for each Budget period prior to such advance; and

(9) Debtors will have performed all actions required as a condition of an advance under the Loan Documents, including, without limitation, delivering such documents, instruments, certificates and agreements as expressly provided in the Loan Documents.

(10) In connection with the restaurant, general store, post office and spa, there shall be binding leases in place, in form and substance acceptable to Collateral Agent and/or Lender, together that are consistent with the rent roll attached as **Exhibit D**.

**Events of Default**

The Loan Documents shall include customary and otherwise appropriate events of default, including, without limitation, any one or more of the following (each an "**Event of Default**"):

(1) If the Final Documentation Approval Order shall not been entered by no later than ninety (90) days following the entry of the Term Sheet Approval Order,;

(2) Any failure to satisfy a Benchmark as of the later of (i) the date required above, or (ii) the extension date as agreed to in advance in writing by Collateral Agent in its sole and absolute discretion;

(3) The breach by Debtors of any representation, warranty, covenant and/or agreement in the Loan Documents and/or the Approval Order;

(4) The conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code;

(5) Debtors file a plan which was not approved in advance by Collateral Agent in its reasonable discretion;

(6) The settlement of any estate claims and/or causes of action of Debtors, including, without limitation, avoidance actions, on terms and conditions not reasonably acceptable to Collateral Agent;

(7) The appointment of an examiner (other than an examiner whose duties and powers are confined to investigating pre-petition transactions of the Debtors or their affiliates) or of a chapter 7 or chapter 11 trustee, receiver, chief restructuring officer or similar fiduciary with expanded powers in the Cases;

(8) The entry of an order of the Bankruptcy Court confirming a plan of reorganization in any Case or approving a transaction with a Person other than Lender, pursuant to which a sale of all or substantially all of the assets of any Debtors is contemplated, pursuant to section 363 of the Bankruptcy Code (a "**Sale Transaction**"), which does not (i) contain a provision for the payment in full in cash of all obligations of the Debtors to the Lender on or before the effective date of such plan or such sale upon entry thereof, and (ii) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Lender and priorities until such plan's or Sale Transaction's effective date;

(9) The entry of an order by the Bankruptcy Court dismissing any Case that does not contain a provision for the payment in full in cash of the Loan upon entry thereof;

(10) The entry by the Bankruptcy Court of an order with respect to any Case that (i) revokes, reverses, stays, modifies, supplements or amends the Approval Order, except as consented to by the Lender in writing, (ii) permits any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Collateral Agent and the Lender, not in accordance with the terms of this Term Sheet and the Approval Order, or (iii) grants or permits the grant of a lien on any Collateral not in accordance with the terms of this Term Sheet and the Approval Order and/or otherwise impairs Lender's rights under the Loan Documents or with respect to the Collateral. The preceding provisions of this paragraph (10) shall not be deemed to

| **Events of Default** (continued) | prevent Debtors from seeking Court approval of professional fees for those fees and expenses of counsel for the Debtors in Possession in such amounts as may be determined by the Bankruptcy Court to be reasonable and appropriate, provided, however, that the amount of such professional fees and expenses shall not exceed the amount of such professional fees and expenses as set forth in the Budget; |
| --- | --- |

(11) The entry of an order by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Debtors with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate (other than workers' compensation claims that are fully covered by insurance in the ordinary course of business) or permitting foreclosure on any material asset of any Debtors;

(12) (i) The Debtors or any official committee appointed in the Cases shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Collateral Agent or Lender, claims or rights against such person/entity ("**Person**") or to subject any Collateral to assessment or surcharge pursuant to 11 U.S.C. §506(c), (ii) any lien or security interest created by the Approval Order or the Loan Documents shall, for any reason, cease to be valid, or (iii) any action is commenced by (x) any Debtors, or (y) any other Person, if such action is not contested diligently and in good faith by the Debtors, which contests the validity, perfection or enforceability of any of the Liens and security interests of the Collateral Agent in favor of the Lender, and which, as to subsection (12)(iii)(y), Debtors are not able to obtain a complete dismissal within forty-five (45) days from the commencement of such action;

(13) The determination of any Debtors, whether by vote of such Debtor's board of directors or otherwise, to suspend the operation of such Debtor's business in the ordinary course, or the filing of a motion or other application in any Case, seeking authority to do any of the foregoing;

(14) The indictment, or the threatened indictment of any Debtor under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against any Debtor, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any governmental authority of any material portion of the property of such Person.

| | |
|---|---|
| **Representations and Warranties** | The Loan Documents will require customary representations and warranties as required by the Collateral Agent. By way of illustration and not of limitation, the Loan Documents will include the following representations and warranties and covenants of Debtors in favor of the Collateral Agent and the Lender (applicable upon execution and at the Closing): |

(1) Due Authorization; No Conflict
(2) Due Organization and Qualification; No Subsidiaries
(3) Good Title; No Encumbrances; Location of Collateral
(4) Compliance with Applicable Laws; Environmental Compliance
(5) Compliance with Material Agreements
(6) No Additional Consents
(7) No Material Adverse Changes; No Liquidity Events
(8) Complete Disclosure
(9) No Tax Liability; No Third-Party Claims

| | |
|---|---|
| **Covenants** | The Loan Documents will require customary covenants as required by the Collateral Agent. By way of illustration and not of limitation, the Loan Documents will include the following covenants of Debtors in favor of the Collateral Agent and the Lender (applicable upon execution and at the Closing): |

(1) Maintenance of Insurance; Third Party Beneficiary
(2) Accounting System; Books and Records
(3) Financial Statement; Collateral Reporting
(4) Rights To Inspect
(5) Further Assurances
(6) Maintenance of Properties
(7) Payment of Taxes
(8) Compliance With Laws
(9) Existence and Disclosure Updates
(10) No Transfers of Collateral; No Liens
(11) Restrictions on Fundamental Changes
(12) Indemnification by Debtors
(13) Certain Bankruptcy Matters, including:

a. Debtors shall file all pleadings, motions, filings and other documents with the Bankruptcy Court to obtain a final, non-appealable order from the Bankruptcy Court approving, among other things, (i) the Underwriting Fee, (ii) the Expense Reimbursement, and (iii) the Break-up Fee as set forth herein;

| **Covenants (continued)** | b. Debtors shall deliver all pleadings, motions, filings and other documents filed with the Bankruptcy Court to the Collateral Agent, the Lender and their counsel; |
| | c. Debtors shall not file, support or endorse any plan of reorganization inconsistent with the terms of this Term Sheet or propose or support any action outside the ordinary course of business that has not been approved in advance in writing by Collateral Agent; and |
| | d. Debtors shall not make or permit to be made any change to the Approval Order without the prior written consent of the Collateral Agent. |
| **Expenses** | The Debtors shall pay, subject to such Bankruptcy Court approval as may be required, all (i) reasonable out of pocket costs and expenses of the Collateral Agent and the Lender (including, without limitation, all reasonable fees, expenses and disbursements of outside counsel and consultants) in connection with the preparation, execution and delivery of this Term Sheet, the loan documentation and the funding of all drawings under the Loan, the administration of the Loan and any amendment or waiver of any provision of the loan documentation; (ii) reasonable out of pocket costs and expenses of the Collateral Agent and the Lender as counsel to the Collateral Agent and Lender and any additional counsel) in connection with the enforcement or protection of any of their rights and remedies under the Loan Documents and in connection with the Cases. |
| **Governing Law** | This Term Sheet, the Loan Documents, the Transaction contemplated herein, and all matters arising out of or related thereto will be governed by the laws of the State of Arizona. |
| **Counterparts** | This Term Sheet may be executed in one or more counterparts, all of which shall constitute one and the same document, and shall become effective on the date set forth below (the "**Effective Date**"). For purposes hereof, a facsimile signature shall be deemed an original. |
| **Maximum Interest Rate** | In no event shall the interest rates payable under the Loan Documents exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Debtors and Lender intend legally to agree upon the rate or rates of interest and manner of payment stated within it and that Arizona law shall govern this matter; provided, however, that, anything contained in the Loan Documents to the |

| Maximum Interest Rate (continued) | contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of the Loan Documents, Debtors are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Debtors in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loan to the extent of such excess. |
|---|---|
| Confidentiality | Prior to filing motions seeking Bankruptcy Court approval for the Loan on the terms and conditions as set forth in this Term Sheet, Debtors, including, without limitation, their respective officers, directors, managers, members, employees, agents, affiliates, subsidiaries, accountants, agents and representatives, shall hold in strict confidence the terms of this Term Sheet and any and all confidential information exchanged between the parties, regardless of the consummation of the Transaction as contemplated herein. |
| Commitment Letter; Right To Withdraw | Lender shall submit a commitment letter (the "Commitment Letter") concerning the Loan, which Commitment Letter reflects Lender's commitment to make a loan to Debtors pursuant to the term and conditions contained herein, to the Bankruptcy Court for its approval. The Commitment Letter shall expressly provide, among other things, that the Term Sheet, and the commitment by Lender to fund the Loan and be obligated pursuant to the terms and conditions of the Commitment Letter and this Term Sheet, may be withdrawn at any time by Lender in its sole and absolute discretion prior to the hearing (including, without limitation, any continuations thereto) by the Bankruptcy Court for the Final Documentation Approval Order, such withdrawal to be immediately effective upon written notice by Lender to Debtors as provided in the Commitment Letter. |

**[SIGNATURE PAGE IMMEDIATELY FOLLOWING]**

**ACCEPTED AND AGREED:**

**DEBTORS:**

**Saguaro Ranch Development Corporation**, an Arizona corporation, as a Borrower

By: _(signature)_
Name: STEPHEN D. PHINNY
Title: PRES/CEO

**Saguaro Ranch Investments, LLC,** an Arizona limited liability company, as a Borrower

By: _(signature)_          its Manager

By: _____
Name: STEPHEN D. PHINNY
Title: MANAGING MEMBER

**PCC Investments, LLC,** an Arizona limited liability company, as a Borrower

By: _(signature)_          its Manager

By: _____
Name: STEPHEN D. PHINNY
Title: MANAGING MEMBER

**Saguaro Ranch Real Estate Company**, an Arizona corporation, as Borrower

By: _(signature)_
Name: STEPHEN D. PHINNY
Title: PRES

**LENDER:**

**Loanvest XIV, L.P.**, an Arizona limited partnership

By: South Bay Real Estate Commerce Group, LLC,
    a California limited liability company

By: _John F Sullivan_
    John F. Sullivan, its authorized agent

Execution Date: ___12-16___, 2009

**COLLATERAL AGENT:**

**Loanvest XIV, L.P.**, an Arizona limited partnership

By: South Bay Real Estate Commerce Group, LLC,
    a California limited liability company

By: _John F Sullivan_
    John F. Sullivan, its authorized agent

Execution Date: ___12-16___, 2009

**EXHIBIT B.**   Saguaro Ranch - Loanvest Loan - Budget

| Budget | Amount |
|---|---|
| **Residential Lot Construction** | |
| Architecture and Engineering | $350,000 |
| Unfinished Items Phase I (See Attachment B-1) | $750,000 |
| 5 Lots HR Phase (Lots A-E) (See Attachment B-2) | $50,000 |
| 2 Lots Phase I (Lots 37,47) | $0 |
| 4 Lots Phase II A (Lots 53,55-57) (See Attachment B-3) | $100,000 |
| 26 Lots Phase IIIA (Lots 68,70-76,78,80-96) (See Attachment B-4) | $2,200,000 |
| 25 Lots Phase IIIB (Lots 97-109, 112-123) (see Attachment B-5) | $1,500,000 |
| Pioneer Driveways HR,IIA,IIIA,IIIB (See Attachments B-2, B-3, B-4, B-5) | $100,000 |
| | |
| **Guest Ranch Complex Construction** | |
| Complete Spa Construction (See Attachment C-1) | $1,500,000 |
| | |
| **Marketing, Property Management, G & A** | |
| Disbursements in monthly increments of $94,000 for first 2 months and $46,000 | $1,200,000 |
| for remainder of loan term. | |
| | |
| **Taxes** | |
| Property Taxes | $1,500,000 |
| | |
| **Disbursements to Loanvest & Consultants** | |
| Closing & Underwriting Fee to Loanvest | $812,875 |
| Closing , Legal, Title, Loan Servicing | $225,000 |
| DIP Administration Expenses | $250,000 |
| Interest Reserve | $1,540,625 |
| Woodside Partners Fee  (Investment Banking & Real Estate Advisory Services) | $246,500 |
| **Total Loan Amount** | **$12,325,000** |

Attachment B

Residential Lots

Attachment B-1

Phase I - Unfinished Items



LOCATION MAP

A PORTION OF SECTION 23 & TH. 11 S., R. 12 E.
& A OF
TOWN OF MARANA
PIMA COUNTY, ARIZONA

SCALE: 3" = 1 MILE

THIS PROJECT

## DEDICATION

I, THE UNDERSIGNED, HEREBY WARRANT THAT I AM (WE ARE) THE ONLY PARTY HAVING ANY RECORD TITLE INTEREST IN THE LAND SHOWN AND SUBDIVIDED BY THIS PLAT, AND I CONSENT TO THE SUBDIVISION OF SAID LAND IN THE MANNER SHOWN HEREON.

I, THE UNDERSIGNED, HEREBY GRANT TO THE TOWN OF MARANA, PIMA COUNTY, AND ALL UTILITY COMPANIES ALL PUBLIC EASEMENTS AS SHOWN HEREON FOR THE CONSTRUCTION, INSTALLATION AND MAINTENANCE OF UTILITIES AND PUBLIC SEWERS AS DESIGNATED BY THIS PLAT.

## DEDICATION (CONTINUED)

BY: PURSUANT TO A.R.S. SECTION 33-404(3), THE NAME AND ADDRESS OF THE BENEFICIARY OF TRUST NO. 816 DISCLOSED ABOVE IS AS FOLLOWS:
AN ARIZONA CORPORATION

SAGUARO RANCH DEVELOPMENT CORPORATION
C/O: SAGUARO RANCH INVESTMENTS, LLC
TUCSON, AZ 85737-9202

STATE OF ARIZONA }
COUNTY OF PIMA }

## BASIS OF BEARING

## WATER ADEQUACY

## ASSURANCES

## PIMA COUNTY APPROVAL

## MARANA APPROVAL

## RECORDING DATA

STATE OF ARIZONA }
COUNTY OF PIMA }

## SEE SHEET 2 FOR INDEX MAP AND GENERAL NOTES

TOWN OF MARANA
PROJ#:PRV04-043
ZONE: SEE NOTE #5
Adm. Address:
13230 N THORNYDALE RD

## LEGEND

## CERTIFICATION OF SURVEY


RICK
ENGINEERING COMPANY



[S]
SAGUARO RANCH
SOUTH AMENDED

LOTS 1–31, PARCEL "A", BLOCK "A" & COMMON AREAS "A", "B", "C"

PRV-04043F

BOOK 59 PAGE 69-1 SHEET 1 OF 14

# SAGUARO RANCH
## SOUTH AMENDED

LOTS 1-31, BLOCKS "A", "B", "C", "D", "E" & "F"
COMMON AREAS "A" - "C"

A RESUBDIVISION OF A PORTION OF SECTION 29 & 30 & LOTS 1-31, BLOCK "A"...
A RESUBDIVISION OF LOTS 1-31, BLOCKS "A", "B", "C", PARCEL "A"...
...SECTIONS 29 AND 30, T11S, R12E, G&SRB&M,
COMMON AREAS "A" - "C", RECORDED...
TOWN OF MARANA, PIMA COUNTY, ARIZONA.

22 APR 2005   09:23

PRV-040-03F

SHEET 2 OF 14

## INDEX MAP

SCALE 1" = 200'



## GENERAL NOTES

## GENERAL NOTES - CONTINUED

RICK Engineering Company





# SAGUARO RANCH
## SOUTH AMENDED

LOTS 1–31, BLOCK "A", "B", "C" & COMMON AREAS "A", "B", "C"

A SUBDIVISION OF A PORTION OF SECTIONS 20 & 29, T. 11 S., R. 13 E., G. & S.R.B. & M., A RESUBDIVISION OF LOTS 1 THRU 31, BLOCK 1, 2, 3, 4, 5, PARCEL "B", & COMMON AREAS "A", "B" AS RECORDED IN BOOK 53, PG. 24, M & P, TOWN OF MARANA, PIMA COUNTY, ARIZONA

PRV-0404SF

13700-N.

3200-W.

BLOCK "A"
899654 Sq. Ft.
20.650 Acres

N. OLD RANCH HOUSE ROAD

184119 Sq. Ft.
4.227 Acres

27

13672

13647

181164 Sq. Ft.
4.159 Acres
22

13680

13600-N.

3360-W.

180392 Sq. Ft.
4.140 Acres
23

26

TOWN OF MARANA
PIMA COUNTY

SELLERT ESTATES DRIVE

SPARTLEN
KURT R.
KAREN SUE
DKT 12043, PG 4263

STEVEN JEROME
& CUMMINGS
SHARYL VIRGINIA
DKT 7984, PG 144

BLOMQUIST
& CUMMINGS
MENDOZA DENNIS W
DKT 12065, PG 646

21

20

30

31

LARSON, JON M
DKT 12193, PB 3061

RICK

SEE SHEET 6

SEE SHEET 8

SAGUARO RANCH
SOUTH AMENDED

LOTS 1-31, PARCEL "A", BLOCK "A", & BLOCK "B"
COMMON AREAS

BLONDQUIST,
STEVEN JEROME
& DIANNING,
SHARYL VIRGINIA
DKT 7938, PG 144

SCHWEBELL, JAMES R & MARY LOUISE
DKT 7525, PG 362

TOWN OF MARANA
PIMA COUNTY

13600-N.

BLOCK "A"
899064 Sq. Ft.
20.620 Acres

3200-W.

SEE SHEET 5

N. OLD RANCH HOUSE ROAD

21
180967 Sq. Ft.
4.154 Acres

22

3300-W.

20
181803 Sq. Ft.
4.174 Acres

CA. "Y"

TOWN OF MARANA
PIMA COUNTY

LARSON, JON M
DKT 12159, PG 30

30

N. OLD RANCH HOUSE ROAD

16

SEE SHEET 8

SEE SHEET 7

18

PRV-00043F

RICK
ENGINEERING COMPANY



SEE SHEET 6

SCALE: 1" = 40'

PIMA COUNTY / TOWN OF MARANA

13500-N

3400-W

3500-W

3600-N

## SAGUARO RANCH
### SOUTH AMENDED

LOTS 1-31, PARCEL "A", BLOCK "A" &
COMMON AREA "A", "B", "C"

A SUBDIVISION OF A PORTION OF SECTIONS 22 & 29, T.11 S, R.12 E, AND
A RESUBDIVISION OF LOTS 9-31, PARCEL "A", "B", "C" & PARCEL "A"
COMMON AREA "A" "B" "C" AS RECORDED IN BOOK 59, PG. 77, S.11 GNA,
TOWN OF MARANA, PIMA COUNTY, ARIZONA

SHEET 8 OF 14

PRV-0404F

LARSON, JOHN M
DKT 12159; PG 3061

WILKINSON, ELBRIDGE
DKT 7180; PG 1225

BRUGMAN, JOHN L & SUSAN M
DKT 6403; PG 669

ANDERSON,
JACK EDWIN &
SUSAN ROGERS
DKT 11342;
PG 2780

MOORE, GENE & CHARLOTTE A
DKT 10122, PG 2148

SEE SHEET 8

OLD RANCH HOUSE ROAD

N OLD RANCH HOUSE ROAD

30
180697 Sq. Ft.
4.154 Acres

28
180417 Sq. Ft.
4.142 Acres

29
181069 Sq. Ft.
4.157 Acres

13500

349

3489

16

15

14

13

10

9

5

20

21

19

RICK
ENGINEERING COMPANY



BOOK 59 PAGE 69-10

SAGUARO RANCH
SOUTH AMENDED

LOTS 1-31, PARCEL "A", BLOCK "A" &
COMMON AREAS "A", "B", "C" & "D"

A SUBDIVISION OF A PORTION OF SECTIONS 21 & 22, T.11 S., R.11 E., AND
A RESUBDIVISION OF LOTS 9-16, BLOCK "A" & COMMON AREAS "A" & "B"
OF SAGUARO RANCH SOUTH RECORDED IN BOOK 55, PG. 84, T.12 S., R.11 E.,
GILA AND SALT RIVER BASE & MERIDIAN, BOOK 57, PG. 84-87, G.& S.R.B.&M.,
TOWN OF MARANA, PIMA COUNTY, ARIZONA

PRV-04043F

SHEET 10 OF 14

BOOK 59 PAGE 69-10

WILLINGHAM
ADAM A. DANN
DKT 11077,
Pg 3171

TOWN OF MARANA
PIMA COUNTY

13400-N.

3400-W.

3500-W.

15

14

13

12

11
162345 Sq. Ft.
4.186 Acres

ADOBE RUINS PLACE

10

9

8
R-166
RD-18D

2

MBIC-IV, LLC
DKT 11518, PG 107

MBIC-III, LLC
DKT 11518, PG 104

MBIC-II, LLC
DKT 11518, PG 101

MBIC-I, LLC
DKT 11518, PG 98

SEE SHEET 9

SEE SHEET 12







SAGUARO RANCH
SOUTH AMENDED

LOTS 1-31, PARCEL "A", BLOCK "A", "B", "C" &
COMMON AREAS "A", "B", & "C"

A SUBDIVISION OF A PORTION OF SECTIONS 9 & 10, T. 12 S., R. 14 E.,
& A RESUBDIVISION OF LOTS 1-31, BLOCK 1, 2, 3, PARCEL "A", &
OF SAGUARO RANCH (LOTS 4-31), BOOK 58, PAGE 18, AS RECORDED IN
BOOK 58, PAGE 18, T. 12 S., R. 14 E., G&SRM,
TOWN OF MARANA, PIMA COUNTY, ARIZONA

SHEET 14 OF 14

BOOK 59 PAGE 69-14

PRV-04043F

N-13800

3200-W.

BLOCK "A"
838634 Sq. Ft.
20.430 Acres

N-13700

192334 Sq. Ft.
4.415 Acres

154119 Sq. Ft.
4.227 Acres

BLOCK "A"
838634 Sq. Ft.
20.630 Acres

N-13600

N. OLD RANCH HOUSE ROAD
(PRIVATE)

SCALE 1" = 40'

25

26

27

23

22

21

20

19    18

RICK
ENGINEERING COMPANY

Phase I Infrastructure Completion Cost
June 1, 2009

## THORNYDALE ROAD

| | | |
|---|---|---|
| Guard rail | | |
| Thornydale driveway and curbs, North of sales trailer | | |
| Cleanout crossing at Moore/Thornydale | | |
| Hydro seed Thornydale | | |
| Removal of Poles on Thornydale | | |
| Repair the scar over the pass | | |

## TUNNEL & GATEHOUSE
### Lighting in the tunnel

| | | |
|---|---|---|
| Write contract | | |
| Order lights | | |
| Install underground to the tunnel | | |
| Install fixtures | | |
| Adjust fixtures | | |
| | | |
| Cameras in tunnel | | |
| Landscaping at the tunnel | | |
| Lighting at the Gatehouse (included in tunnel lighting bid) | | |

## ADOBE RUIN

| | | |
|---|---|---|
| Drainage at bottom of Adobe Ruins | | |
| Chink the boulder retaining wall on Adobe Ruin | | |
| Asphalt paving and shoulder stabilization | | |
| RPM's along the shoulder of Adobe Ruin | | |

## PHASE I ROAD

| | | |
|---|---|---|
| Complete shoulder work, should be completed using decomposing granite | | |
| Raise all water valve manhole covers to the new asphalt surface/install survey monuments | | |
| Install street signs, and traffic signage | | |
| Resolve ponding issue at swale across for the Horse Ranch | | |
| Repair walls at the wash crossing | | |
| Complete the catch basin and gutter work leading to the wash; on going | | |
| Repair the erosion of the rip rap walls on the east side of the road leading from Old Ranch House Rd. to Tarver's Place | | |
| Complete the gutter work from the reservoir up to the Ranch House on the cut side of the road | | |
| Complete the gutter and shoulder work on the east side of the road from Bruce's house to Tarver Place  W | | |
| Complete asphalt road and decomposed granite shoulders to the General Store parking lot W | | |

## TARVER'S PLACE

| | | |
|---|---|---|
| Pave road, raise valves and manhole covers | | |
| Install survey monuments | | |
| Install lighted RPM's | | |
| Construct gutters to minimize the erosion on the sholders | | |
| Stabilize the rock walls by chinking rock into the face | | |
| Street signs and traffic signs | | |
| | | |
| | | |

Attachment B-2

HR Phase – 5 Lots

(Lots A-E)

