Fennemore Craig, P.C.
George O. Krauja (No. 10964)
One South Church Avenue, Suite 1000
Tucson, AZ 85701-1627
Telephone: (520) 879-6800
Email: gkrauja@fclaw.com

Fennemore Craig, P.C.
Laurel E. Davis (Nevada Bar No. 3005)*
300 South Fourth Street, Suite 1400
Las Vegas, NV 89101
Telephone: (702) 692-8000
Email: ldavis@fclaw.com

Attorneys for Kennedy Funding, Inc. and Anglo-American Financial, LLC

*Pro Hac Vice Application Pending

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SAGUARO RANCH DEVELOPMENT CORPORATION,<br><br>Debtor. | Jointly Administered Under Case No. 4:09-bk-02490-EWH<br>Chapter 11 |
| In re:<br><br>PCC INVESTMENTS, LLC,<br><br>Debtor. | Case No. 4:09-bk-02484-EWH<br>Chapter 11 |
| In re:<br><br>SAGUARO GUEST RANCH MANAGEMENT CORPORATION,<br><br>Debtor. | Case No. 4:09-bk-02489-EWH<br>Chapter 11 |
| In re:<br><br>SAGUARO RANCH INVESTMENTS, LLC,<br><br>Debtor. | Case No. 4:09-bk-02492-JMM<br>Chapter 11 |

In re:

SAGUARO RANCH REAL ESTATE CORPORATION,

Debtor.

Case No. 4:09-bk-02494-EWH
Chapter 11

**KENNEDY FUNDING AND ANGLO-AMERICAN FINANCIAL'S OPPOSITION TO DEBTORS' MOTION SEEKING FINAL ORDERS:
(1) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING;
(2) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL;
(3) MAKING A FINDING OF ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDER; AND (4) SCHEDULING FINAL HEARINGS**

Secured Creditors, Kennedy Funding, Inc. and Anglo-American Financial, LLC (collectively "Kennedy Funding") oppose Debtors' February 8, 2010 Motion Seeking Final Orders (1) Authorizing Debtors to Obtain Post-Petition Financing; (2) Authorizing Debtors to Utilize Cash Collateral; (3) Making a Finding of Adequate Protection to Pre-Petition Secured Lender; and (4) Scheduling Final Hearings (Docket No. 199). Kennedy Funding's opposition is made and based upon the following Memorandum of Points and Authorities, the accompanying Declarations of Kevin Wolfer ("Wolfer Declaration") and Gladstone E. Gregg, MAI ("Gregg Declaration"), the exhibits, pleadings, papers and other records on file in this matter, the argument and any further evidence presented to this Court at the time of the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT.

Debtors' Motion is a *sub rosa* plan predicated upon faulty and unproven assumptions without providing the necessary adequate protection to approve placement of a superpriority lien to prime Kennedy Funding's first priority lien of just under $34 million, which encumbers collateral worth $14.7 million, not the $64 million valuation alleged by the Debtors. The Motion must be denied, because the Debtors have failed to satisfy their burdens of proof under Sections 364(d) and 1129(b) of the Bankruptcy Code and Fed.R.Bankr.P. 4001(c).

## II. PROCEDURAL HISTORY AND RELEVANT FACTS.

### A. Jurisdiction, Venue, and Procedural History.

1. Debtors' summary of jurisdiction, venue, and procedural history is

generally accurate, but it is incomplete.

2. The record is littered with Debtors' failure to satisfy their duties and responsibilities as Debtors in Possession. They include: (a) Saguaro Ranch Development Corp.'s failure to file its February through November 2009 Monthly Reports until January 13, 2010 (Docs. 183-192); (b) Debtors' failure to file tax returns and pay post-petition taxes, forcing the Arizona Attorney General's Office to file a motion for sanctions (Doc. 150); and (c) Debtors' failure to pay U.S. Trustee fees until faced with a motion to dismiss or convert (Doc. 175).

3. The Court has ordered the Debtor to file a Disclosure Statement and Plan by March 1, 2010, or face dismissal of these cases (Doc. 198).

**B. The Debtors' Loan With Kennedy Funding.**

4. On or about December 28, 2005, Debtors Saguaro Ranch Investments, LLC and Saguaro Ranch Development Corporation obtained a loan from Kennedy Funding in the maximum principal sum of $50 million (the "Loan"). (*See Wolfer Declaration* at ¶¶ 1 and 3.) Uses of the initial funding included paying existing creditors of the borrowers, such as National Bank of Arizona ($5,984,582.74), Hallco ($9,347,164.95), Palanski/TSA ($224,000), Robert and Maureen Kline ($105,104.80) and James and Nancy Carpenter ($87,630.36). *Id*. at ¶ 3.

**C. The Debtors' Default on the Loan.**

5. The Note[1] and Loan require monthly interest payments. *Id*. at ¶¶ 4-7.

6. After making a partial payment of interest of $100,000 on October 28, 2008, and a partial payment of principal of $150,000 on June 3, 2008, the Debtors have not made any payments on the Note and Loan, and they failed to pay the Note in full when it matured on December 31, 2008. The Debtors' available financial disclosures reveal they lose money each month, and they have not sold any lots for nearly two years. As a result, the Debtors do not appear capable of making any payments towards any loan. *Id*. at ¶¶ 8, 9, 12.

**D. The Outstanding Balance Owed on the Loan.**

7. As of January 31, 2010, Kennedy Funding is owed **$33,944,874**, consisting

---

[1] Terms are used herein as defined in the Wolfer Declaration. The Loan documents are exhibits to the Wolfer Declaration.

of $23,899,754 in principal, $188,457 in costs to be added to principal, $5,673,998 in interest, and $4,182,665 in additional interest at the default rate. Interest accrues at the rate of $301,103 per month (non-default rate) or $501,838 per month (default rate). *Id*. at ¶¶ 10, 11.

**E. The Debtors Have No Equity in the Collateral.**

8. In February 2010, Gladstone E. Gregg of CB Richard Ellis Valuation and Advisory Services ("CBRE") prepared a Summary Appraisal Report (the "Appraisal Report"), dated February 18, 2010 of the Collateral (*see Gregg Declaration*, at Exhibit 1).

9. The Appraisal Report establishes an "**As-Is" Value of $14,700,000 as of February 4, 2010,** based on its highest and best use, which is to hold as a speculative investment, with a long term outlook for development as a mixed use master planned community when economic conditions return. *Id*. at 4.

**F. Debtors' Proposed Loan Commitment Is Illusory.**

10. While Debtors repeatedly refer to a prospective "loan," and a "commitment," they have ***no loan commitment***. The purported new lender (Loanvest XIV, L.P.) has a unilateral right to withdraw:

> "***Lender may withdraw*** this Commitment Letter, including, without limitation, withdrawing the offer contained herein and/or withdrawing and/or terminating its obligations in connection with this commitment Letter the Loan Term Sheet and/or under the Loan Documents ***at any time prior to*** the hearing (including without limitation, any continuations thereto, by the Bankruptcy Court), for ***the Final Documentation Approval Order,*** upon written notice by Lender to Debtors as provided herein." *See* Document 199-3, at p. 4 of 7, "Right To Withdraw." (Emphasis added.)

Loanvest's unilateral right to withdraw continues until the Final Document Approval Order, which at best would be some 90 days after any order granting the pending Motion. *See Motion*, at p. 11, ll. 14-20. Debtors have no actual loan commitment.

11. At least two of Loanvest's stated conditions in making the proposed loan have not been satisfied: (1) no later than December 24, 2009, the Debtors were required to file all pleadings and motions (Debtors did not file the Motion until February 8, 2010); and (2) Loanvest conditions any loan on the Court's entry of a final, non-appealable order approving the terms and conditions of the Commitment Letter and the Term Sheet no later than February 10, 2010. *See*

Doc 199, *Motion* at p.11, ll. 2-5, 6-9.

12. The proposed DIP loan is replete with defects and deficiencies, including:

a. There is no evidence that Loanvest[2] has $12,235,000. *Id.*, Doc 200.

b. At most, only about $9.5 million could ever go to Debtors. The loan proceeds are "held by [Loanvest] in its account," to be disbursed to Debtors "from time to time pursuant to satisfaction of specified requirements to such disbursements as set forth in the Loan Documents [none provided] and the Budget." *Id.* at p. 12. Loanvest and Debtors could reduce the proposed loan amount at any time, meaning the promised development may never be completed. Doc. 200, *Term Sheet*, at p. 3 of 40, Interest Rate Section.

c. Non-refundable fees[3], reserves and closing costs[4] paid at closing eat up the rest:

| | |
|---|---|
| Fees to Loanvest (no detail provided) | $ 812,875 |
| Closing, Legal, Title & Loan Servicing | 225,000 |
| Interest Reserve | 1,540,625 |
| Fee to Woodside Partners[5] | 246,500 |
| | $2,825,000 |

Doc. 199, *Motion*, at p. 10.

d. Comparison of the Debtors' unsubstantiated, internal estimates of costs (Doc. 200, *Term Sheet*, at p. 21 of 40), with cost estimates from project engineer Rick Engineering, demonstrates that Debtors' estimates are grossly inadequate:

---

[2] The principals who own and control Loanvest XIV, L.P are not disclosed. (Doc. 199, *Motion* at p. 9; and Doc. 200, *Term Sheet*, at 3 of 40.) This information is essential to assess the viability of a loan proposal containing so many contingencies, and to understand the history and the track record of this purported lender.

[3] The Carve-Out provision proposed for Loanvest's liens refers to a variety of fees, with no information on the amount of fees. (Doc. 200, *Term Sheet*, at p. 7 of 40.) In addition, Loanvest receives a $350,000 Break-Up Fee if Debtors close another loan. (*Id*. at p. 4 of 40.)

[4] The Commitment Letter and Term Sheet are not consistent. Total underwriting and expense fee is capped at a total of $250,000 in one (Doc. 200, *Term Sheet*, at p. 4 of 40), but in the other, Loanvest's costs are to be paid without limitation. (*Id*. at p. 17 of 40.)

[5] Debtors provide no explanation of the $246,500 fee to Woodside Partners.

| Phase | Debtors' Cost Estimates (Doc. 200, at p. 21 of 40) | Rick Engineering Cost Estimates (Gregg Declaration, *Appraisal Report*, at p. 65) |
|---|---|---|
| IIA | $100,000 | $628,415[6] |
| IIB | None Listed | 1,513,000 |
| IIIA | 2,200,000 | 5,020,178 |
| IIIB | 1,500,000 | 4,103,000 |

e. A viable sales plan is essential to evaluate the project's ability to support the financing, and the Debtors have provided none. (Doc. 199, *Motion*, at pp. 9-20.) ***No lot sales have occurred*** since April 4, 2008, and only one lot sale closed in 2008. (*Gregg Declaration, Appraisal Report*, at p. 15.)

f. Debtors fail to address payment of other liens and encumbrances. The proposed new debt would be repaid from lot sales, with no showing how the existing Kennedy Funding debt will be paid (Doc. 200, *Term Sheet*, at p. 10 of 40), or how they can meet the requirement for first position liens in favor of the Guest Ranch Management Corporation from all existing lot owners (*Id*., p. 8 of 40, Guest Ranch Membership Dues Section, at ¶¶ 2-3), or obtain consent of all lot owners because some lots have already been sold to third parties, and some of those have been the subject of foreclosure sales.

g. Debtors omit critical information regarding the Spa project. The Debtors provide no detailed construction cost information to support the $1.5 million estimate (*Id*. at p. 21 of 40; and Doc. 201, at pp. 50-56), nothing to establish the feasibility of operating the Spa, and no details of operation or payment of construction and land acquisition costs. (Doc. 201, at pp. 50-56.)

h. There is no evidence supporting minimum lot release prices of $350,000 (or 94% of sales price), and Lot Participation Payments to Loanvest equal to at least $25,000 for each lot, in addition to principal and interest to be paid to Loanvest. Doc. 200, *Term Sheet*, at p. 11 of 40, and p. 10 of 40. Indeed, Debtors provide no explanation how Lot

---

[6] The cost is $928,415, toward which a $300,00 deposit is credited. *Gregg Declaration*, at **Exhibit 1**, p. 65.

Participation Payments are appropriate, when Kennedy Funding receives no payments. *Id.*

i. Debtors provide no evidence to establish how six lots will be sold at an average price of $400,000 within seven months of loan origination, which is a contingency to loan funding for Phase IIIB construction ($1.5 million) and for Spa construction ($1.5 million). *Id.* at p. 11 of 40 and p. 21 of 40. Debtors' own appraisal projects only three lot sales in all of 2010, and only four lot sales in all of 2011. (Doc 202, at p. 51 of 76.)

j. Debtors provide no detail for the monthly payments to Debtors for marketing, property management and G&A of at least $46,000, and as much as $94,000. Doc. 200, *Term Sheet*, at p. 21 of 40.

k. Debtors provide no explanation of how $1.5 million will be applied to pay delinquent property taxes or that it is sufficient to keep taxes current during the term of the Loan. *Id.* Delinquent property taxes are $522,725, and 2009 unpaid but not yet delinquent taxes are $516,043. *Gregg Declaration, Exhibit 1*, at p. 63.

13. The Debtors give only conclusory statements and inadequate information regarding alleged efforts to obtain less burdensome financing, providing no information regarding lenders approached, and no information on any alternative proposals, failing to satisfy the Debtors' Section 364(d)(1) burden of proof. (Doc. 212, *Phinny Declaration*, at ¶¶ 13-15.)

14. The Debtors have failed to sustain their Section 364(d)(2) burden of proof that Kennedy Funding is adequately protected.

## III. LEGAL ANALYSIS.

### A. Debtors Have Failed to Establish Adequate Protection.

#### 1. There is No Equity Cushion.

Kennedy Funding holds a pre-petition, first priority secured claim in the principal amount of at least $23.9 million. As of January 31, 2010, the aggregate amount of Kennedy Funding's first priority secured claim is just under $34 million, and it continues to accrue approximately $10,000 non-default interest on a daily basis. The Debtor's real property (the "Real Property"), which collateralizes Kennedy Funding's first priority lien, has recently been appraised as having an "as is" value of $14.7 million. As such, the Debtor's assertion an alleged "equity cushion"

somehow provides Kennedy Funding with adequate protection is absurd. *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 567 (3d Cir. 1994) ("The law does not support the proposition that a creditor, particularly one … undersecured by many millions of dollars, may be adequately protected when a superpriority lien is created without the provision of additional collateral by the debtor").

Assuming, *arguendo*, the Debtor's "as is" valuation of $64 million is accurate (which it is not), this alleged "equity cushion" still fails to provide Kennedy Funding with adequate protection. "[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." *Swedeland*, 16 F.3d at 564 (internal quotations and citations omitted). "Accordingly, a proposal depending upon a pre-petition lender having adequate protection, no matter its form, should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *Id.* "In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Id.*

**2. Hoped For Property Improvements Do Not Provide Adequate Protection.**

The Debtors' assertion approval of DIP financing will guarantee completion of construction and increase sales is speculative, and also fails to provide Kennedy Funding with adequate protection. "In the first place, continued construction based on projections and improvements to the property does not alone constitute adequate protection." *Swedeland*, 16 F.3d at 566. "Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." *Id.* Therefore, the Court should "reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable." *Id.*

Courts should reject post-petition financing where the assumptions are speculative and unrealistic, and are not supported by the record. *In the Matter of St. Petersburg Hotel Associates, Ltd.*, 44 B.R. 944, 946 (Bankr. N.D. Fla. 1985). The Debtors make conclusory and unsupported

statements alleging a hypothetical increase in the Collateral's value would adequately protect secured creditors. The hoped for increase in value offered as adequate protection does not provide the indubitable equivalent of the creditors' present secured interest, which already covers all the Collateral. *In re Strugg Division, LLC*, 380 B.R. 505, 515 (Bankr. N.D. Ill. 2008); and *Swedeland*, 16 F.3d at 556 (continued construction based on projections and improvements to the property is not an acceptable form of adequate protection).

This general principle rises to a greater level of importance when considering the Debtors' own statements that, despite being in bankruptcy for more than one year, they have yet to "initiate" a marketing plan or begin contacting parties who have allegedly expressed an interest in portions of the Real Property. *See Motion*, ¶ 22 ("Assuming Court approval of DIP financing, Debtor ***will initiate*** an extremely aggressive pricing and marketing plan for sales of lots and casitas. … [Additionally,] Debtor ***will start*** sale efforts by contacting parties who have expressed an interest in Saguaro Ranch.") (emphasis added). Despite this failure, the Debtors assume approval of the financing will allow construction to proceed in a timely manner, which will provide "a sense of security to prospective buyers…." *Id*. These contingencies, however, are not within the Debtors' control and do not, in any form or fashion, provide adequate protection to Kennedy Funding. *See In re St. Petersburg Hotel Assocs.*, 44 B.R. at 946 (denying a DIP financing motion which granted the post-petition lender a super-priority lien where "[a]n examination of the assumptions relied on by the Debtor [in regard to adequate protection] reveals that the assumptions are mere expectations, many of which are highly speculative and unrealistic."). Instead, the Debtors' assumptions should not be considered in determining whether adequate protection exists. *See In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y. 1996).

In *Mosello*, the debtor sought court approval to obtain post-petition financing on a superpriority basis in order to complete construction and development of real property in downtown Manhattan. The debtors claimed the projected increase in value of the property after construction constituted adequate protection to the pre-petition secured lender. The court disagreed, finding the "debtors' development scheme is beset by uncertainty and risk, and the ultimate outcome of the project is a matter of speculation based upon assumptions which cannot

be quantified or verified by objective evidence." *Id*. at 290. The court found that (i) "the market may be hostile, for reasons which are neither predictable nor within the debtors' control;" (ii) the engineering costs assumed under the debtors' projections were mere estimates and not proposals or contracts, thereby creating the possibility that such costs may be substantially higher; (iii) the timeframe to complete construction "depends primarily on the weather and the seasons during which the work must be done," factors which are not within the debtors' control; and (iv) the time necessary to market the properties "depends upon economic conditions and supply and demand in the local real estate market," factors which are not within the debtors' control. *Id*. at 290-91.[7] In denying the post-petition financing due, in relevant part, to the debtors' failure to provide the pre-petition lender with adequate protection, the court noted that "[a] finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis." *Id*. at 292. *See Swedeland*, 16 F.3d at 567 ("Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects.").

As stated by one bankruptcy court, "adequate protection, for a lender … for land, even raw land partly developed by roads, sewer and water, is a leverage of 40% to 50% of the market value." *Diversified Mortgages Inv. V. Lake Tahoe Land Co., Inc. (In re Lake Tahoe Land Co., Inc.)*, 5 B.R. 34 (Bankr. D. Nev. 1980). Kennedy Funding contests the Debtor's valuation of the real property, and has evidence to establish no equity cushion exists.[8] Even if the Court could find an equity cushion is available, however, the Court should also consider the following factors before concluding such an equity cushion constitutes adequate protection:

---

[7] In denying the post-petition financing proposal, the *Mosello* court found the DIP financing proposal was "illusory" since the funding agreement stated "unequivocally that loans will be advanced 'at the consent of the Funder' … and 'at its sole discretion'…." 195 B.R. at 292. Although the Debtors have failed to file a copy of any actual loan documents, the Term Sheet similarly reflects Loanvest has the ability to withdraw its financing proposal at any time at its sole discretion. *Supra*, at p. 4.

[8] Kennedy Funding objects to Debtors' appraisal, and if any valuation hearing is held, requests the opportunity to depose the appraiser. Debtors' appraiser has made extraordinary assumptions in his report that are not typical and have an enormous impact on valuation, including, but not limited to: (1) the ability to construct 63 casitas, when only 28 have received governmental approval; (2) stabilized operations are assumed for the general store, restaurant and spa; (3) rather than using market data or comparable sales, the $9.8 million value for the Guest Ranch was determined by adding the developer's cost of improvements ($7 million) and residential lot values ($1.8 million); and (4) accepting Debtors' cost projections with no review when actual engineering estimates are far higher. Doc. 202 at pp. 3, 4, and 59 [of 76].

1. <u>“Does the accrual of interest erode the equity cushion…?”</u> *In re Timber Prods., Inc.*¸125 B.R. 433, 433 (Bankr. W.D. Pa. 1990). Here, the answer is a definitive “yes,” in the daily amount of approximately $10,000.

2. <u>“Is the property depreciating or increasing in value…?”</u> *Id*. at 434. Depreciating. According to the Debtors’ schedules, filed February 13, 2009, Debtors alleged the Real Property had an aggregate value of approximately $135 million. One year later, the Debtors value the Real Property at $64 million, and Kennedy Funding values it at $14.7 million.

3. <u>“Has the Debtor shown an inability to obtain refinancing since the filing…?”</u> *Id*. As set forth in more detail below, Kennedy Funding disputes the claim the Debtors have made an adequate showing less onerous financing is not available from alternative sources.

4. <u>“Has the debtor offered any other method of adequate protection…?”</u> *Id.* No.

5. <u>“Do current economic conditions suggest no realistic prospect for successful rehabilitation or reorganization under Chapter 11…?”</u> *Id.* Yes. The real estate market in Arizona has been seriously affected by the national credit crunch, the alarming rise of foreclosures, and the downward trend of the national economy. Indeed, “[t]he current uncertainties in Arizona’s real estate market does not bode well for future predictions of value, especially in the short term.” *In re Tempe Land Company, LLC,* 2009 Bankr. LEXIS 1137 (Bankr. D. Arizona 2008). This alone weighs against the prospects of the Debtors achieving a successful reorganization. The Debtors’ most recent monthly operating report reflects $0 in lot sale revenue, and the assumptions presented in the Debtors’ Motion reveal the Debtors do not project to earn any revenue until months, if not years, in the future. On these facts, there is no realistic prospect for a successful reorganization.

6. <u>“Has the Debtor’s conduct of the litigation been more than a deliberate delaying tactic…?”</u> *In re Timber Prods., Inc.*¸ 125 B.R. at 434. Debtors filed their Motion a few days prior to the one year anniversary of the filing date for their Chapter 11 petitions. The docket is very sparse, and as noted above, the Debtors have failed to satisfy timely their duties and obligations as Debtors in Possession. Only upon threat of sanctions did they file monthly operating reports, pay U.S. Trustee fees, and file tax returns and pay taxes. The lack of activity

in this case has resulted in a Court-imposed deadline to propose a chapter 11 plan of reorganization by March 1, 2010. These facts tend prove the Debtors' conduct has been a deliberate delaying tactic.

Application of the relevant factors shows the claim of an alleged "equity cushion," even when utilizing the Debtors' grossly overstated figures, fails to provide Kennedy Funding with the adequate protection required under Section 364(d). Debtors' Motion should be denied.

**B. <u>Debtors' Proposed DIP Financing is a Sub Rosa Plan.</u>**

"While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender." *Superx of Arizona v. Official Unsecured Creds. Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992). "Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *Id.* "The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *Id.*[9]

In a Fifth Circuit case, the debtor sought a court order approving superpriority financing in order to convert its only asset, an office building, into a hotel/convention space. *In re First South Sav. Assoc.*, 820 F.2d 700, 702 (5th Cir. 1987). Over the pre-petition secured lender's objection, the bankruptcy court granted the debtor's financing request, finding the pre-petition secured lender was adequately protected. The bankruptcy court's ruling relied on the debtor's assumptions increased value and profit would come after conversion of the building, the renovation of which Debtors premised on it being consolidated with an adjacent hotel and garage owned by unaffiliated entities. After being denied a stay pending appeal, the pre-petition secured lender sought, and received, a writ of mandamus from the Fifth Circuit. In granting a limited

---

[9] In *Defender Drug Stores*, the 9th Circuit BAP recognized debtors cannot avoid confirmation requirements under the guise of section 364, although on its facts found "this is not a case where the bankruptcy court, under the guise of section 364, approved financing arrangements that amounted to a plan of reorganization." 145 B.R. at 318.

mandamus, the Fifth Circuit implicitly found the DIP financing motion amounted to a "sub rosa" plan of reorganization. Specifically, the Fifth Circuit found "the assumption that the project would be operated on a consolidated basis … [is] the kind of assumption[] that [is] usually part of a plan of reorganization." *Id*. at 713. The Fifth Circuit held "[w]here the estimates that form the basis of the bankruptcy court's finding that [the pre-petition lender] would be adequately protected are grounded on assumptions that appear to be part of an overall plan of reorganization whose terms are not disclosed and which obviously have not been tested under the standards applicable to plans, it would be error for the bankruptcy court to rely on such evidence." *Id*. at 714. "If that evidence is taken out of consideration, there is *no evidence* to support the bankruptcy court's authorization of super priority financing under section 364(d)." *Id.*

When faced with a *sub rosa* plan in the form of a DIP financing motion, court should view the motion as a request for cram-down, resulting in disapproval of a DIP financing proposal that subordinates a secured creditor's lien through a priming lien that is not available at plan confirmation. *In re Chevy Devco*, 78 B.R. 585, 589 (Bankr. C.D. Cal. 1987). In *Chevy Devco*, the debtor's sole asset was a shopping center. Guaranty Savings held a note, secured by a first lien position, with an unpaid amount of approximately $2,750,000. The debtors sought an order approving a construction loan of $1,200,000, including granting a first lien on the property as security. *Id*. at 586-87. The court first reviewed adequate protection standards, and found the debtor did not meet the test. On facts strikingly similar to the facts of this case, the court found the proposed construction loan would be barely enough, or perhaps not even enough, to finance the proposed improvements. Further, even assuming successful completion of the improvements, the projections did not demonstrate enough cash flow to repay creditors. *Id*. at 589. In addition to the adequate protection problems, the *Chevy Devco* court held the debtor's financing proposal "is the equivalent to its plan of reorganization." *Id*. The debtor conceded it was not proposing a plan of reorganization, because Section 1129 of the Code does not give debtors the tools provided by Section 364(d). *Id*. Only through the use of Section 364(d) could the debtor force the secured lender to subordinate its lien, but not give up its ownership interest. Because the scheme being requested by the debtor was essentially its plan of reorganization, the court found the secured

lender's opposition to the priority lien "should be viewed almost as if it were a cram-down situation. Is a senior lienor being given less than full protection so that a junior creditor or interest can benefit from it? If so, the subordination should not be allowed." *Id*. The *Chevy Devco* court denied the request for approval of the loan, finding both it failed to provide adequate protection to the creditor to be subordinated, and it did not meet the cram-down requirements of Section 1129(b), although it essentially was a plan of reorganization. *Id*. at 590.

This Court should follow the *Chevy Devco* Court and reach the same result. Here, the Debtors' intricate, but highly contingent financing proposal, would be the backbone of its plan of reorganization. Just as in *Chevy Devco*, the secured lender:

> "[I]s being asked to risk its money on the hope that there is a profit to be made. If there is a failure, the creditor has no protection against loss. But unlike an investor, the creditor will not share in the gain if the project is successful. The debtor wants the best of all worlds - - to use this creditor's money without risk and to keep the profits for itself."

*Id*. at 590. Debtors' Motion should be denied.

**C. <u>Debtors Have Not Met Their Burden of Proof Under Section 364(d)(1).</u>**

Section 364(d)(1) "requires the debtor affirmatively to demonstrate, not merely assume, that less onerous post-petition financing was unavailable." *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 690 (E.D.N.C. 2009). *See also, In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 899 (Bankr. N.D. Ohio 1992) ("one contact is insufficient"). Instead of affirmatively "demonstrating" that less onerous financing is not available, Debtors summarily state all requests to obtain financing were either rejected or offered on terms similar to the one currently being proposed by Loanvest. *See* Doc 212, *Phinny Declaration*, ¶ 14. This conclusory statement fails to satisfy the Debtors' burden under Section 364(d)(1).

In *Suntrust Bank*, although the court stated "a debtor's testimony alone may be sufficient" in satisfying the section 364(d)(1) burden, the court noted the cases which have so held involved facts "where the debtors identified at least some of the unreceptive alternative sources they approached." *Id*. at 692. Therefore, where the debtor "identified no specific investor or lending institution it approached except for" the pre-petition lender and the proposed post-petition lender,

the *Suntrust Bank* court held the debtor failed to satisfy its burden under Section 364(d)(1). *Id.* In reaching this conclusion, the court recognized "a court considering a debtor's application for approval of a priming, post-petition loan must be guided by the express terms of the governing statute, together with the judicial interpretation of § 364(d)(1) as being appropriate in bankruptcy proceedings as a matter of 'last resort.'" *Id.* at 693 (internal citations omitted).

The Debtors have not satisfied their burden of proof under Section 364(d)(1). Debtors' Motion should be denied.

**D. Debtors Similarly Fail to Satisfy Fed.R.Bankr.P. 4001.**

**1. Rule 4001(c)(1).**

Bankruptcy Rule 4001(c)(1)(A) provides that "[a] motion for authority to obtain credit … shall be accompanied by a copy of the credit agreement and a proposed form of order." FED. R. BANKR. P. 4001(c)(1)(A). Bankruptcy Rule 4001(d)(1)(A)(i) provides a similar requirement with regard to "an agreement to provide adequate protection…." FED. R. BANKR. P. 4001(d)(1)(A)(i). Debtors did not file a copy of the credit agreement with the Court (according to the Term Sheet, loan documents will not even be prepared until court approval of the Motion), and the Debtors have failed to comply with the Bankruptcy Rules. The Motion should be denied.

Bankruptcy Rule 4001(c)(1)(B) provides a motion for authority to obtain credit "shall consist of or (if the motion is more than five pages in length) begin with a concise statement of the relief requested, not to exceed five pages, that lists or summarizes, and sets out the location within the relevant documents of, all material provisions of the proposed credit agreement…." FED. R. BANKR. P. 4001(c)(1)(B).[10] Bankruptcy Rule 4001(d)(1)(B) provides a similar requirement with regard to, among other things, "an agreement to provide adequate protection…." FED. R. BANKR. P. 4001(d)(1)(B). Again, because the Debtors did not file and serve a copy of the credit agreement, the Debtors have failed to comply with these statutory mandates. Specifically, the Debtors' Motion fails to cite to the provisions of an actual credit

[10] Similarly, Local Rule 4001-4(b) provides the first page shall include, in the first or second paragraph, a brief statement relating to the terms of the credit agreement, including the priming of a lien and/or a carve-out for professionals. As set forth above, the Motion fails to do this.

agreement (much less the term sheet) where material provisions are located. Further, the Debtors did not provide the concise summary at the beginning of the DIP Financing Motion as required by the Bankruptcy Rules. Instead, Debtors have merely pasted ten single-spaced pages of terms in the middle of their Motion, thereby improperly shifting the burden on creditors to sift through to find material provisions relating to the financing proposal. As such, the Debtors' Motion fails to comply with the Bankruptcy Rules, and it should be denied.

**2. Rule 4001(c)(2).**

Bankruptcy Rule 4001(c)(2) allows emergency hearings only upon a showing of immediate and irreparable harm. FED. R. BANKR. P. 4001(c)(2). In their emergency motion, the Debtors fail to satisfy this standard. The Debtors simply note "[i]t is urgent that the hearing be scheduled as early as possible because Debtor is seeking postpetition funding." Doc. 209, *Motion for Expedited Hearing*, p. 2. This statement, alone, fails to satisfy the Debtors' burden under Bankruptcy Rule 4001(c)(2) to prove immediate and irreparable harm absent an emergency hearing. *See* Local Bankruptcy Rule 9013-1(h)(3)(B) (a motion requesting an emergency hearing shall contain "[f]acts showing the existence and nature of the claimed emergency….").

The Debtors' actions weigh against a finding an emergency hearing is required. The DIP Financing documents state a condition precedent to funding is the Debtors' filing of a DIP Financing motion on or prior to December 24, 2009. The Debtors apparently did not feel the impending burden of "immediate and irreparable harm," because they did not file the Motion until February 8, 2010. *See* Local Bankruptcy Rule 9013-1(h) ("Motions to accelerate hearings or reduce notice periods are disfavored and should not result from delay or inadvertence by the moving party or its counsel.").

**E. <u>Debtors have Failed to Satisfy Their Burdens Regarding Cash Collateral</u> .**

As a prerequisite to their use of Kennedy Funding's cash collateral, Debtors must prove by a preponderance of the evidence Kennedy Funding's interests are adequately protected. Such protection must not be illusory, and particularly in the context of the use of cash collateral, must be "of the most indubitable equivalence." *In re New Batt Rental Corp.*, 205 B.R. 104, 107 (Bankr. N.D. Ohio 1997). In ruling on a debtor's motion for authority to use cash collateral, a

court should not focus on "whether or not it is in the best interest of the Debtor and the secured creditor, but whether or not the Debtor carries its burden to show that its use of cash collateral will not reduce the value of creditors' interest in the property without providing adequate protection – the indubitable equivalent of the creditors' interest in the property." *In re Glasstream Boats, Inc.*, 110 B.R. 611, 613 (Bankr. M.D. Ga. 1990). The Debtors have not met their burden.

On April 10, 2009, by agreement of Debtors and Kennedy Funding, this Court entered an Order authorizing Debtors' interim use of cash collateral. (Doc. 56.) The Order required Debtors, among other things, to furnish secured lenders with copies of a weekly revenue report; monthly operating reports showing actual revenues and expenses with a comparison to budget; and the level of inventory at the beginning of the period, amount of inventory sold, and replacement inventory required during the period, and the level of inventory at the end of the period. Despite requests, Debtors routinely have failed to provide timely weekly revenue reports, or monthly operating reports with the required level of detail. Debtors' failure to meet their existing obligations establishes the Debtors cannot be trusted to do what they say they will do, or even to do what the Court has ordered.

Debtors have not met their burden of proof for use of cash collateral. Debtors' history in this case and failure to comply with the prior Order shows they cannot be trusted. Debtors' request to use cash collateral should be denied.

## IV. CONCLUSION.

For each of the reasons set forth above, the Motion should be denied. Alternatively, if the Court is inclined to consider the Motion on the merits, an evidentiary hearing must be scheduled to determine the contested issues of fact, including value of Kennedy Funding's collateral.

DATED this 19th day of February, 2010.

FENNEMORE CRAIG, P.C.

By s/ George O. Krauja #010964
George O. Krauja

By s/ Laurel E. Davis, Nevada Bar No. 3005
Laurel E. Davis

Attorneys for Kennedy Funding, Inc. and Anglo-American Financial, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, and served the foregoing by email/U.S. mail on the following:

Eric Slocum Sparks
LAW OFFICES OF ERIC SLOCUM SPARKS, P.C.
110 S. Church Avenue, #2270
Tucson, AZ 85701
eric@ericslocumsparkspc.com
Attorney for Debtors

Ilene J. Lashinsky
Christopher J. Pattock
UNITED STATES TRUSTEE
230 N. First Avenue #204
Phoenix, AZ 85003
Ilene.j.lashinsky@usdoj.gov

Official Committee of Unsecured Creditors:

Arizona Restaurant Supply, Inc.
Attn: Tom Carr
6077 N. Travel Center Drive
Tucson, AZ 85741

Linthicum Corp.
Attn: Clayton Boop
20789 N. Pima Road, #250
Scottsdale, AZ 85255

Rick Engineering Company, Inc.
Attn: Paul Iezzi
3945 E. Fort Lowll Road, #111
Tucson, AZ 85712-1046

Three Architecture, Inc.
Attn: Jack Baines
4040 N. Central Expressway, #1200
Dallas, TX 75204

Earth-Scrapes Excavating, Inc.
Attn: Jody Mott
PO Box 69476
Oro Valley, AZ 85737

Michael W. Baldwin
LAW OFFICE OF MICHAEL BALDWIN, PLC
PO Box 35487
Tucson, AZ 85740-5487
Michael.Baldwin@azbar.org
Attorneys for Theresa Chamberlain, Steven Blomquist, Sharyl Cummings and Timothy Blowers

Kevin J. Blakley
GAMMAGE & BURNHAM, P.L.C.
Two N. Central Avenue, 18th Floor
Phoenix, AZ 85004
kblakley@gblaw.com
Attorneys for Arizona Labor Force, Inc.

Linda Boyle
10475 Park Meadows Drive, Suite 400
Littleton, CO 80124
Representing TW Telecom, Inc.

Mark L. Collins
Gerard R. O'Meara
GUST ROSENFELD, P.L.C.
One S. Church Avenue, Suite 1900
Tucson, AZ 85701-1627
mcollins@gustlaw.com
Attorneys for Tapestry Properties, III, LLC

Neal A. Eckel
DURAZZO & ECKEL, P.C.
45 N. Tucson Blvd.
Tucson, AZ 85716
neal@durazzo-eckel.com
Attorneys for Amanti Electric, Inc.

Denise Faulk
Office of the Arizona Attorney General
400 W. Congress Street, #N0223
Tucson, AZ 85701-1367
Denise.Faulk@azbar.org
Attorneys for Arizona Department of Revenue

Jeffrey H. Greenberg
STUBBS & SCHUBART, P.C.
PO Box 50547
Tucson, AZ 85703-0547
jgreenberg@StubbsSchubart.com
Attorneys for Courtland Gettel

Alan M. Levinsky
BUCHALTER NEMER
16435 N. Scottsdale Road, #440
Scottsdale, AZ 85254
alevinsky@buchalter.com
Attorneys for Ford Motor Credit Company, LLC

Terri A. Roberts
German Yusufov
PIMA COUNTY ATTORNEY'S OFFICE
32 N. Stone Avenue, Suite 2100
Tucson, AZ 85701
Terri.roberts@pcao.pima.gov
Attorneys for Pima County

Thomas P. Sarb
ecfsarbt@millerjohnson.com
Attorneys for Sally Phinny

Robert J. Spurlock
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
2901 N. Central Avenue, Suite 100
Phoenix, AZ 85012
bspurlock@bffb.com
Attorneys for Deere & Company

Daniel R. Warner
LAW OFFICES OF J. PHILLIP GLASSCOCK, P.C.
13430 N. Scottsdale Road, Suite 106
Scottsdale, AZ 85254
drw@jpglaw.com
Attorneys for Mobile Mini, Inc.

Stephen M. Weeks
WEEKS & LAIRD, PLLC
2223 E. Speedway Blvd.
Tucson, AZ 85719
Weeks@WeeksLaird.com
Attorneys for Steven Blomquist, Timothy Blowers, Theresa Chamberlain, and Sharyl Cummings

s/ Sherry Haase