Eric Slocum Sparks
Arizona State Bar No. 11726
LAW OFFICES OF ERIC SLOCUM SPARKS, P.C.
110 South Church Avenue, #2270
Tucson, Arizona 85701
Telephone (520) 623-8330
Facsimile (520) 623-9157
eric@ericslocumsparkspc.com
Attorney for Debtors

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Jointly Administered Under |
| SAGUARO RANCH DEVELOPMENT CORPORATION, | Case No. 4:09-bk-02490-EWH Chapter 11 |
| Debtor. | |
| In re: | |
| PCC INVESTMENTS, LLC, | Case No. 4:09-bk-02484-EWH Chapter 11 |
| Debtor. | |
| In re: | |
| SAGUARO GUEST RANCH MANAGEMENT CORPORATION, | Case No. 4:09-bk-02489-EWH Chapter 11 |
| Debtor. | |
| In re: | Case No. 4:09-bk-02492-JMM Chapter 11 |
| SAGUARO RANCH INVESTMENTS, LLC, | |
| Debtor. | |
| In re: | Case No. 4:09-bk-02494-EWH Chapter 11 |
| SAGUARO RANCH REAL ESTATE CORPORATION, | |
| | NOTICE OF SUBMISSION OF DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT DATED July 15, 2010 FOR ITS FIRST AMENDED AND MODIFIED PLAN OF REORGANIZATION DATED June 30, 2010 |
| Debtor. | |

The Jointly Administered Debtors as captioned above, abbreviated as follows. Saguaro Ranch

Development Corporation ("SRD"), Saguaro Guest Ranch Management Corporation ("SGRM"), Saguaro Ranch Investments LLC ("SRI"), PCC Investments LLC, ("PCC") and Saguaro Ranch Real Estate Corporation ("SRRE"), Debtors, Debtors-in-possession (hereinafter "the Debtor" and/or "Saguaro Ranch"), submitted its proposed Disclosure Statement in connection with the "Debtor's First Amended Plan of Reorganization" dated February 26, 2010. After various rulings by the Court the debtor set out to amend and modify Debtors First Amended Disclosure Statement and Plan of Reorganization. The debtor hereby submits its Second Amended and Modified Disclosure Statement and First Amended and Modified Plan of Reorganization dated June 30, 2010. The Disclosure Statement is submitted in compliance with 11 U.S.C. Section 1125 and Bankruptcy Rule 3017. It has not been approved by the Bankruptcy Court and is filed solely to enable the Court and parties-in-interest to evaluate the adequacy of the information contained herein as required of the Bankruptcy Code. Moreover, the Disclosure Statement refers to information contained herein as required by the Bankruptcy Code. The Disclosure Statement refers to information and facts that the Debtor anticipates will be accurate or will occur on or prior to the date of the hearing to consider the Disclosure Statement. Therefore, certain information and facts contained in the Disclosure Statement may not be completely accurate as of the date hereof.

The Debtor believes that a form of Disclosure Statement in substantially the form as that which is attached hereto contains information of a kind, and in sufficient detail, as far as is reasonably practical in light of the nature and history of the Debtor, that would enable a reasonable investor, typical of the holders of claims and interests in each class of claims and interest in the Plan, to make an informed judgment about the Plan. Nevertheless, all readers are cautioned that the Debtor may file further modifications of the Plan and of the Disclosure Statement prior to the hearing to consider the Disclosure Statement.

*THE FILING AND ANY DISSEMINATION OF THE DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN DESCRIBED THEREIN.*

DATED: July 15, 2010.

LAW OFFICES OF
*ERIC SLOCUM SPARKS, P.C.*

 /s/ Sparks AZBAR #11726
Eric Slocum Sparks
Attorney for Debtor

# TABLE OF CONTENTS
## FOR
## DISCLOSURE STATEMENT DATED
### July 15, 2010

| SECTION I | | INTRODUCTION | 2 |
|---|---|---|---|
| | | Court's Minute Entry | 3 |
| | | Supplemental Objection of Kennedy Funding, Inc. and Anglo-American Financial, LLC | 6 |
| | | Objection of Pima County, Arizona | 8 |
| | | Objection of Katherine Phinny | 9 |
| | | Objection of David McCanse | 9 |
| | 1.1 | Overview of Chapter 11 | 9 |
| | 1.2 | Confirmation Hearing and Voting Instructions | 12 |
| | 1.3 | Voting | 12 |
| SECTION II | | HISTORY OF DEBTOR AND FACTORS LEADING TO THE FILING OF THE CHAPTER 11 | 16 |
| | 2.1 | History of Debtor and Events Leading to Filing Ch. 11 | 16 |
| | 2.2 | Current Management | 22 |
| | 2.3 | Properties of the Debtor/Assets of the Estate | 23 |
| | 2.4 | Plan of Reorganization | 23 |
| | 2.5 | Obligations as of Date of Filing | 23 |
| | 2.6 | Current Litigation and Seizure | 24 |
| | 2.7 | Plan of Repayment | 24 |
| | 2.8 | 11 U.S.C. § 1111(b)(2) Election | 25 |
| SECTION III | | INCOME PROJECTIONS OF THE PROPERTY | 25 |
| SECTION IV | | SUMMARY OF PLAN OF REORGANIZATION | 26 |
| | 4.1 | Plan | 26 |
| | 4.2 | Segregation of Classes | 27 |
| | 4.3 | Value of Secured Claims | 27 |
| | 4.4 | Cash Collateral Litigation | 27 |
| | 4.5 | Description of Assets - Values | 28 |
| | 4.6 | Anticipated Future of Debtor - Competitive Market | 28 |

| | | |
|---|---|---|
| 4.7 | Source of Information | 28 |
| 4.8 | Condition and Performance of Debtor in Chapter 11 | 28 |
| 4.9 | Cash Collateral Agreement | 28 |
| 4.10 | Information Regarding Claims Against Estate | 29 |
| 4.11 | Liquidation Analysis | 29 |
| 4.12 | Future Management of Debtor | 29 |
| 4.13 | Non-Bankruptcy Litigation | 29 |
| 4.14 | Avoidable Transfers | 29 |
| 4.15 | Breach of Contract | 29 |
| 4.16 | New Capital Contribution | 29 |
| SECTION V | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS[1] | 30 |
| 5.1 | Class 1 - Administrative Claims | 30 |
| 5.2 | Class 2 - Employee Priority Claims | 30 |
| 5.3 | Class 3 - Claims of Governmental Units | 32 |
| 5.4 | Class 4 - Secured Ad Valorem Tax Claims | 32 |
| 5.5 | Class 5 - Secured Claim of Kennedy Funding, Inc. & Anglo-American Financial, LLC | 33 |
| 5.6 | Class 6 - Secured Claim of Mollie Cohen | 35 |
| 5.7 | Class 7 - Secured Claim of Ford Motor Credit ("Ford") | 36 |
| 5.8 | Class 8 - Secured Claim of Ford Motor Credit ("Ford") | 36 |
| 5.9 | Class 9 - Secured Claim of Ford Motor Credit ("Ford") | 37 |
| 5.10 | Class 10 - Secured Claim of Ford Motor Credit ("Ford") | 38 |
| 5.11 | Class 11 - Secured Claim of Amanti Electric Co. | 38 |
| 5.12 | Class 12 - Secured Claim of Arizona Labor Force Inc. | 39 |
| 5.13 | Class 13 - Secured Claim of Earhart Equipment Corporation | 40 |
| 5.14 | Class 14 - Secured Claim of Tucson Tractor Company | 40 |
| 5.15 | Class 15 - Unsecured and Deficiency Claims | 41 |
| 5.16 | Class 16 - Interest of Equity Holders | 41 |

---

[1]The joint debtors are abbreviated as follows. Saguaro Ranch Development Corporation ("SRD"), Saguaro Guest Ranch Management Corporation ("SGRM"), Saguaro Ranch Investments LLC ("SRI"), PCC Investments LLC, ("PCC") and Saguaro Ranch Real Estate Corporation ("SRRE").

| | | |
|---|---|---|
| 5.17 | Class 17- Contingent, Unliquidated and Disputed Claims | 42 |
| 5.18 | Class 18 - Participating Investors | 42 |
| SECTION VI | POST-CONFIRMATION MANAGEMENT | 42 |
| SECTION VII | INCOME TAX CONSEQUENCES OF REORGANIZATION | 42 |
| 7.1 | Disclaimer | 43 |
| 7.2 | Consummation | 43 |
| SECTION VIII | FEASIBILITY | 43 |
| SECTION IX | LIQUIDATION ANALYSIS | 44 |
| SECTION X | ACCEPTANCE AND CONFIRMATION | 45 |
| 10.1 | What is Necessary for Court Approval of a Plan | 45 |
| 10.2 | Alternatives to the Plan | 46 |
| 10.3 | Specific Consideration in Voting | 47 |
| 10.4 | Risk Factors | 47 |
| 10.5 | Disclosure Required by the Code | 48 |
| SECTION XI | OTHER PROVISIONS OF THE PLAN | 48 |
| 11.1 | Retention of Jurisdiction | 48 |
| 11.2 | Retention of Causes of Action | 49 |
| 11.3 | Retention or Rejection of Executory Contracts and Leases | 49 |
| 11.4 | Amendments to Plan | 49 |
| 11.5 | Offer, Issuance and Resale of Plan Securities | 49 |
| 11.6 | Provisions for Filing Reports and Payments of Fees to U.S. Trustee | 50 |
| SECTION XII | RECOMMENDATION OF THE DEBTOR | 50 |
| SECTION XIII | CONCLUSION | 50 |

## LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT A | First Plan of Reorganization Dated June 30, 2010 |
| EXHIBIT B | Ballot |
| EXHIBIT C | Revised Liquidation Analysis listing Assets and their Value |
| EXHIBIT D | Anticipated Income and Expense |
| EXHIBIT E | Sources and Uses of Cash |
| EXHIBIT F | Kennedy Funding Repayment Schedule. |

| EXHIBIT G | Available Assets and Value |
|-----------|---------------------------|
| EXHIBIT H | Saguaro Ranch Organization Chart |
| EXHIBIT I | Biography of Stephen Phinny |
| EXHIBIT J | Resume of William Romancho |
| EXHIBIT K | Resume of Ted Anderson |
| EXHIBIT L | Resume of John Gasper |
| EXHIBIT M | Resume of Michael Conlin |

1   Eric Slocum Sparks
    Arizona State Bar No. 11726
2   LAW OFFICES OF ERIC SLOCUM SPARKS, P.C.
    110 South Church Avenue #2270
3   Tucson, Arizona 85701-3031
    Telephone (520) 623-8330
4   Facsimile (520) 623-9157

5   Attorney for Debtor

6

7           IN THE UNITED STATES BANKRUPTCY COURT

8                  FOR THE DISTRICT OF ARIZONA

9   In re:                          )
                                    )   Jointly Administered Under
10  SAGUARO RANCH DEVELOPMENT       )   Case No. 4:09-bk-02490-EWH
    CORPORATION,                    )   Chapter 11
11                                  )
              Debtor.               )
12  _____)
    In re:                          )
13                                  )
    PCC INVESTMENTS, LLC,           )   Case No. 4:09-bk-02484-EWH
14                                  )   Chapter 11
              Debtor.               )
15  _____)
    In re:                          )
16                                  )
    SAGUARO GUEST RANCH             )   Case No. 4:09-bk-02489-EWH
17  MANAGEMENT CORPORATION,         )   Chapter 11
                                    )
18            Debtor.               )
    _____)
19  In re:                          )
                                    )   Case No. 4:09-bk-02492-JMM
20  SAGUARO RANCH INVESTMENTS,      )   Chapter 11
    LLC,                            )
21                                  )
    _____)
22  In re:                          )
                                    )   Case No. 4:09-bk-02494-EWH
23  SAGUARO RANCH REAL ESTATE       )   Chapter 11
    CORPORATION,                    )
24                                  )   DEBTOR'S SECOND AMENDED
                                    )   DISCLOSURE STATEMENT DATED
25                                  )   July 15, 2010
                                    )   FOR ITS FIRST AMENDED AND
26            Debtor.               )   MODIFIED PLAN OF REORGANIZATION
                                    )   DATED June 30, 2010
27  _____)

28                                  1

*INTRODUCTION*

The jointly administered debtors are abbreviated as follows. Saguaro Ranch Development Corporation ("SRDC"), Saguaro Guest Ranch Management Corporation ("SGRM"), Saguaro Ranch Investments LLC ("SRI"), PCC Investments LLC, ("PCCI") and Saguaro Ranch Real Estate Corporation ("SRRE"), Debtors, Debtors-in-possession, (hereinafter "the Debtor" and/or "Saguaro Ranch"), through its undersigned attorney, hereby submits its Second Amended Disclosure Statement dated July 15, 2010 pursuant to 11 U.S.C. § 1125 (the "Disclosure Statement"). The purpose of this Disclosure Statement is to provide adequate information to the holders of claims or interests in this matter so that they may make an informed judgement in exercising their right to vote for acceptance or rejection of the First Plan of Reorganization dated June 30, 2010 (the "Plan") filed by Saguaro Ranch. Debtor has amended and modified the Disclosure Statement and Plan of Reorganization, a copy of which is listed as **Exhibit A** and is filed concurrently herewith as a separate document and incorporated herein by reference. THE DEBTOR RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN IN ORDER TO MAXIMIZE THE RECOVERY OF YOUR CLAIM, HOWEVER, CREDITORS ALSO HAVE THE OPTION OF VOTING AGAINST OR REJECTING THE PLAN.

Capitalized terms used in this Disclosure Statement will correspond to terms defined in the Plan and the Bankruptcy Code. Terms used in this Disclosure Statement that are also defined in the Plan are defined solely for convenience; and, the Debtor does not intend to change the definitions of those terms from the Plan. If there is any inconsistency between the Plan and this Disclosure Statement, the Plan is, and will be, controlling.

This court entered a Minute Entry Order on July 1, 2010, requiring Debtor to make a number of amendments to the Debtor's First Amended and Modified Disclosure Statement dated June 30, 2010. Additionally, Debtor has received objections to the First Amended and Modified Disclosure Statement Dated June 30, 2010 which will also be addressed herein.

1. Description of Available Assets and Value

_____Please see list of available assets and values attached as **Exhibit "G".**

2. Present Condition of the Debtor in Chapter 11

Debtor is focusing all of its efforts and time into emerging from Chapter 11 as a viable healthy company and business plan. Areas of focus include:

1. Business Planning: Debtor has spent significant time reformulating the business plan in the new economy. Specific areas of focus have been on product offerings, pricing, cost reduction, sales & marketing optimization, amenity offerings and programming and corporate efficiency. The Development Plan has been reformulated to offer a wide variety of product types, including the built-product Casita programs, and greater price variation on estate lots. Debtor has updated construction cost bidding every 30 days since the Petition Date to achieve most efficient pricing for construction and operations.

2. Sales and Marketing: Debtor and associates have spent significant time cultivating sales leads and providing communication to the over 3,000 prospective buyers in the company's database. Debtor has seven (7) sales contracts currently equaling $3.5 million dollars in gross sales. Debtor has five estate lots in escrow with Title Security in Tucson. Debtor has another two lots that will be placed in escrow by the end of July, 2010. The estate lots contract selling prices are as follows: Lot 55 - $550,000.00; Lot 56 - $550,000.00; Lot 53 - $485,000.00; Lot 82 - $500,000.00; Lot 75 - $400,000.00; Lot 47 - $550,000.00, and Lot 81 - $550,000.00.

All of these contracts are subject to Plan confirmation. These contracts will gross in excess of $3,500,000.00 and represent one half of the first year's projected sales activity.

Debtor has another four or five prospective buyers that are close to making a purchase decision. Most of the prospective buyers have expressed a strong interest in acquiring either an estate lot or a Casita but want to see the Plan confirmed and be assured that the project is moving forward.

3. Company Organization: Debtor has restructured the Board of Director and Organizational Chart of the Company, adding significant experience and efficiencies to the operations, including the Casita sales/marketing, programming and construction.

4. Revenues: Gross revenues from restaurant operations were $826,636 in fiscal year 2009. Year to Date 2010 gross revenues through June were $463,066. The restaurant has posted a slight operating loss during this period.

3. Liquidation Analysis

      A revised liquidation analysis is attached as **Exhibit "C"**.

4. Identity of Accountant and Process Used to Value the Properties

      William Romancho, CFO, oversees all accounting functions for Saguaro Ranch. See resume attached as **Exhibit "J"**. Roberts and Associates provides tax preparation service. Property value was obtained from an appraisal prepared by Gladstone Gregg of CBRE Valuation and Advisory Services. Cost basis records from Saguaro Ranch were used to value other personal property. Market values for vehicles were obtained from sources such as Kelly Blue Book.

5. Future Management of Debtor

The debtor has restructured the corporations as per the Organizational Chart attached as **Exhibit "H"**. The revised structure expands the overall experience for the project and creates additional operational efficiencies and economies of scale.

The CEO, Stephen Phinny, will receive a salary of $100,000.00 yearly. See Mr. Phinny's biography attached as **Exhibit "I"**.

Board members Ted Anderson and John J. Gasper will be paid salaries of $75,000.00 each. See Mr. Anderson's resume attached as **Exhibit "K"** and Mr. Gasper's resume attached as **Exhibit "L"**.

CFO William Romancho will receive a salary of $60,000 per year. Mike Conlin, Sales & Marketing Director, is paid on a commission-only basis. See Mr. Conlin's resume attached as **Exhibit "M"**.

6. Financial Information Relevant to a Creditor's Decision Whether to Accept/Reject

4

Interested parties should refer to **Exhibits "C"** and **"G"**.

7. Existence, Likelihood, and possible success of non-bankruptcy litigation

Debtor was involved in four State Court proceedings at the time the Chapter 11 was filed. Debtor removed all four cases to this Court over the objections of various parties to the litigation. These four cases are:

(1) *Tapestry Properties III, LLC v. Buchan et al*,

(2) *Gettel and CGTS, LLC v. Title Security Agency of Arizona and Saguaro Ranch Development Corporation, 4:09-ap-00524*

(3) *Gettel v. Saguaro Ranch Development Corporation, 4:09-ap-00525*

(3) *Blomquist et al v. Saguaro Ranch Development Corporation, 4:09-ap-01257*

Debtor has settled the *Tapestry* case. Debtor will receive $100,000.00 as its part of the settlement and will waive any rights to use dirt roads which were adjacent to Saguaro Ranch. Debtor is not currently utilizing workers that need to utilize these roads.

*Gettel* Litigation - Gettel purchased two lots from Debtor. Debtor did a carry back on the lots. Gettel defaulted on monies owed Debtor and claimed Debtor misrepresented that the Saguaro road was private and the public did not have a right to utilize roads in Saguaro Ranch.

*Blomquist* - The Town of Marana and a small group of Pima County residents are engaged in a dispute over the Town's right to abandon easements within the town of Marana. The Town abandoned any rights of the public to the property known as Saguaro Ranch and recognized it as a private gated community at a public meeting of the Mayor and Town Council in May of 2009. More specifically the only thing public ever held, if anything, was an easement. Arizona law does not require a government to take fee title in order to abandon a public easement. To the extent it was ever public, the easement is no longer public.

8. The Disclosure Statement must account for any 1111(b) election by Kennedy Funding, Inc.

See Section 2.8, page 25.

5

1. <u>Supplemental Objection of Kennedy Funding, Inc. and Anglo-American Financial, LLC</u>

    *A.  The Proposed DIP Lender's termination of its offer for proposed DIP financing.*

This Court's denial of Debtor in Possession financing gave the DIP lender the right to terminate the proposed Debtor in Possession financing.

    *B.  On March 11, 2010, Kennedy Funding filed a notice that it was making an election to be treated as a fully secured creditor under section 1111(b) of the Bankruptcy Code.  To the extent Kennedy Funding is undersecured, this section 1111(b) election will have a substantial effect on the distributions allocated to the Debtors' other unsecured creditors.*

    See Section 2.8, page 25.`

    *C.  Instead of providing any identifying information regarding the sources of the information provided in the Disclosure Statement, the Disclosure Statement merely makes reference to unidentified "third parties".*

The source of information in this Second Amended Disclosure Statement was obtained from Stephen Phinny, Bill Romancho, John Gasper, Ted Anderson, and Michael Conlin.  Resumes of each are attached.

    *D.  The Debtors fail to further note that their exclusivity and solicitation periods have expired, thereby allowing creditors, such as Kennedy Funding, to file competing claims of reorganization.*

Kennedy Funding believes that the exclusivity period for Debtor has expired.  Debtor has filed Amended and modified Disclosure Statement and Plan of Reorganization.  No other creditor has proposed a Plan of Reorganization.

    *E.  The Disclosure Statement is lacking in any discussion regarding what cost-cutting measures the Debtors intend to employ, the number of employees currently employed, and their proposed strategy for reducing any employee workforce.*

Saguaro Ranch Operational Efficiencies and Cost Cutting Measures:

1. Reorganized Board of Directors and key Managers to strengthen experience level in all aspects of master-planned community development including business planning, sales and marketing, engineering, construction, architecture and casita programming and construction.  They also added experience with regards to resort operations and development.

2. Restructured pay scale to offer incentivized compensation plan tied to lot/casita sales to align goals of managers and employees with that of selling real estate and paying of creditors.

3. Renegotiated employment plans with managers and employees.

4. Streamlined restaurant operations with staffing reduced from 30 employees as of February 13, 2009 to the current level of 20.

5. Renegotiated COS and vendor contracts in restaurant.  Implemented increased bulk purchasing discount programs.

6. Reduced Saguaro Ranch Development employees from 19 to 10 over the period February 2009 to present.

7. Implemented targeted sales, marketing, website and PR efforts to reduce cost and add efficiency to sales closing ration.

8. Eliminated unused equipment leases and car rental.

9. Reduced size of Development Office and Sales and Marketing Center.

10. Created strategic relationships with Real Estate development, casita construction, resort operations, finance, sales and marketing, architecture and engineering experts.

11. Perform periodic re-bidding of construction services and supplies.

12. Reduced development office overhead to reduce costs while adding experience and efficiencies to the operation.

G. *The Disclosure Statement generically notes that "potential buyers" still tour the Real Property on a regular basis, yet no purchases have been made since such buyers have adopted a "lets wait and see what happens" approach.*

See "Present Condition of the Debtor", page 3.

H. *Debtors fail to provide any information, much less discuss, any of the several pre-petition*

*cases in which it is involved and as disclosed in Question 4 of the Debtors' statement of financial affairs.*

See "Existence, likelihood, and possible success of non-bankruptcy litigation", page 5.

*I. The Disclosure Statement fails to provide any information regarding these adversary proceedings or the impact such proceedings will have on creditors and the bankruptcy estate.*

See "Existence, likelihood, and possible success of non-bankruptcy litigation" on page 5.

*J. The Disclosure Statement fails to mention, or request, that a date certain be set as the last day for creditors to file proofs of claim in these bankruptcy cases.*

A date for the filing of claims will be set by this Court after Disclosure Statement is approved.

*K. In light of Kennedy Funding's section 1111(b) election, the proposed plan is not fair and equitable and unfairly discriminates against Kennedy Funding.*

See Section 2.8, page 25.

2. <u>Objection of Pima County, Arizona</u>

*A. Pima County is a secured creditor with claims for personal property taxes for tax years 2008 and 2009 on the assets of the Debtor.*

Debtor's treatment allows all allowed claims to accrue interest at statutory rate until paid.

*B. Neither the Disclosure Statement nor the Plan accurately state the value of Pima County's secured claims.*

Debtor will amend its treatment to reflect all allowed claims will accrue interest at statutory rate.

*C. Debtor's Disclosure Statement and Plan designates these claims as Class 6 secured claims and vastly undervalue these claims.*

Debtor will review the claim file and make adjustments for claims.

*D. Debtor's Plan fails, as the proposed reduction of the post-petition interest rate on Class 5 claims is below the statutory rate and clearly violates both section 506(b) and section 511(a) of the Code.*

8

Debtor denies this allegation.

3. Objection of Katherine Phinny

_____*A.  The Saguaro Ranch Disclosure Statement fails to notify creditors that Katherine Phinny has a security interest in all of Stephen Phinny's interests in the Saguaro Ranch Debtors.*

Debtor acknowledges Katherine Phinny has a security interest in Stephen Phinny's interests in Saguaro Ranch.

4. Objection of David McCanse

*A.  Objection to Section 5 - Classification and Treatment of Claims and Interests.  On May 12, 2009, a claim was filed in Class 2, Employee Priority Claims.*

Debtor has provided treatment for allowed claims.-

*OVERVIEW OF CHAPTER 11*

1.1     Information Regarding the Plan and Disclosure Statement.

The objective of a Chapter 11 case is the confirmation (i.e., approval by the Bankruptcy Court) of a plan of reorganization or liquidation.  A Chapter 11 plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and equity interest in a debtor.  After a plan has been filed, the holders of claims and equity interests are permitted to vote to accept or reject the plan.   Before a debtor can solicit acceptances of its plan, however, Section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgement about the plan and about whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor and the Plan to enable you to make an informed decision in exercising your right to accept or reject the Plan.  Therefore, this Disclosure Statement provides relevant information about the Debtor, its property and financial condition, and the Plan.

This Disclosure Statement will be used to solicit acceptances of the Plan only after the

9

Bankruptcy Court has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court of this Disclosure Statement means only that the Bankruptcy Court has found that this Disclosure Statement contains sufficient information for the Debtor to transmit the Plan and Disclosure Statement to Creditors and to solicit votes to accept or reject the Plan.

After the Bankruptcy Court has granted approval of this Disclosure Statement and there has been a voting on the Plan, the Bankruptcy Court will conduct a Confirmation Hearing concerning whether the Plan should be approved. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor that will present a tally of the votes accepting or rejecting the Plan cast by those entitled to vote. Accordingly, all votes are important because they can determine whether the Plan will be confirmed. Once confirmed, the Plan is essentially a new contract between the Debtor and its Creditors and is binding on all Creditors and other parties-in-interest in the Debtor's Bankruptcy Case regardless of whether any particular Creditor voted to accept the Plan.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.
FOR THE CONVENIENCE OF CREDITORS AND HOLDERS
OF EQUITY INTERESTS, THE PLAN IS SUMMARIZED IN
THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE
QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF.
IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE
DISCLOSURE STATEMENT AND THE PLAN, THE PLAN
WILL CONTROL.

REPRESENTATION

This Disclosure Statement has not been subjected to a certified audit; however, it has been prepared in part from information compiled by the Debtor from records maintained by it in the ordinary course of its business or from information received by the Debtor from third parties. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement. Nevertheless, the inclusion of financial information in this Disclosure Statement and exhibits is subject to adjustment, and the Debtor reserves all rights to object to or challenge any Claims that are filed or asserted in the Case.

10

This is a solicitation by the Debtor only and is not a solicitation by its attorneys, agents, financial advisors, or accountants.

The Debtor believes the contents of this Disclosure Statement satisfies the requirements adopted by this Court *In re A.C. Williams Co., 25 B.R. 173 (Bankr N.D. Ohio, 1982), In re Cardinal Congregate I, 121 B.R. 760 (Bankr S.D. Ohio, 1982).* Those elements are as follows:

1. The circumstances that gave rise to the filing of the bankruptcy petition;

2. A complete description of the available assets and their value;

3. The anticipated future of the Debtor;

4. The source of the information provided in the Disclosure Statement;

5. A disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement;

6. The condition and performance of the debtor while in Chapter 11;

7. Information regarding claims against the estate;

8. A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

9. The accounting and valuation methods used to produce the financial information in the disclosure statement;

10. Information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

11. A summary of the plan of reorganization;

12. An estimate of all administrative expenses, including attorneys fees and accountant's fees;

13. The collectibility of any accounts receivable;

14. Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

15. Information relevant to the risks being taken by the creditors and interest holders;

11

16.     The actual or projected value that can be obtained from avoidable transfers;

17.     The existence , likelihood and possible success of non-bankruptcy litigation;

18.     The tax consequences of the plan; and

19.     The relationship of the debtor with affiliates.

1.2  <u>Confirmation Hearing and Voting Instructions</u>:  The Bankruptcy Court has set

_____ for a hearing on the confirmation of the Plan.  Claimants and

interest holders may vote on the Plan by filling out and mailing the accompanying Ballot for

Accepting or Rejecting the Plan to:

Eric Slocum Sparks, Esq.<br/>
ERIC SLOCUM SPARKS, P.C.<br/>
110 South Church Avenue, #2270<br/>
Tucson, Arizona 85701.

The Bankruptcy Court may confirm only one plan in this case.  The plan confirmed in the

Bankruptcy Court must meet the requirements contained in the Bankruptcy Code.

Only the Debtor or the Debtor's representatives may solicit your vote.  The cost of any

solicitation by the Debtor will be borne by the Debtor.  No other additional compensation shall be

received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

1.3     <u>Voting</u>.  If you are in one of the classes of creditors or investors whose interests

are affected by the Plan (see "Summary of the Plan" below), it is important that you vote.  If you fail

to do so, your rights may be jeopardized.

To vote to accept or reject the Plan, creditors and investors of the Reorganized Debtor in any

of the impaired classes (see the "Summary of the Plan" contained herein and the copy of the Plan

attached hereto) should indicated their acceptance or rejection on the appropriate Ballot.  A sample

ballot is attached as **Exhibit "B"**.  Any creditors or investors holding claims in more than one

impaired class must file one Ballot for each such class.  Additional Ballots may be obtained by

proper written request to:

Eric Slocum Sparks, Esq.
ERIC SLOCUM SPARKS, P.C.
110 South Church Avenue, #2270
Tucson, Arizona 85701
(520) 623-8330
Fax: (520) 623-9157

attorney for the Debtor.

You are, therefore, urged to fill in, date, sign and promptly mail the enclosed Ballot furnished to you. PLEASE BE SURE TO PROPERLY COMPLETE THE FORM AND LEGIBLY IDEN- TIFY THE NAME OF THE CLAIMANT OR INTEREST HOLDER.

EXECUTED BALLOTS MUST BE RECEIVED ON OR BEFORE THE RETURN DATE SET FORTH IN THE BALLOT.

SINCE MAIL DELAYS MAY OCCUR, IT IS IMPORTANT THAT THE BALLOT OR BALLOTS BE MAILED OR DELIVERED WELL IN ADVANCE OF THE DATE SPECIFIED. ANY BALLOTS RECEIVED AFTER THAT DATE MAY NOT BE INCLUDED IN ANY CALCULATION TO DETERMINE WHETHER THE CREDITORS AND INTEREST HOLDERS HAVE VOTED TO ACCEPT OR REJECT THE PLAN.

THIS IS A SOLICITATION BY THE DEBTOR ONLY AND IS NOT A SOLICITATION BY THE ATTORNEYS OR ACCOUNTANTS FOR THE DEBTOR, AND THE REPRESENTA- TIONS MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF SUCH ATTORNEYS OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE INDICATED.

As a claimant or interest holder, your vote is important. The Bankruptcy Court cannot consider Confirmation of the Plan until acceptance thereof has been obtained pursuant to the affirmative vote of impaired claimants by classes who hold at least two-thirds (2/3) in amount and more than one-half (½) in number of the allowed claims by class voting on the Plan. If an impaired claimant or interest holder who is entitled to vote does not, such failure to vote will bear upon the outcome.

Whether a creditor or interest holder votes on the Plan or not, or whether the creditor or interest holder votes at all, such party will be bound by the terms and treatment set forth in the Plan if

13

the Plan is accepted by the requisite majorities of creditors and interest holders and is confirmed by the Bankruptcy Court.  Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of the claim or interest will be allowed or disallowed for distribution purposes.

Following acceptance, the Bankruptcy Court will hold a hearing on the confirmation of the Plan and will enter an order of confirmation with respect to the Plan if it finds that, among other things, all payments to be made by the Debtor in connection with the case or Plan have been disclosed to the Bankruptcy Court, the identity and affiliation of post-confirmation management of the Reorganized Debtor has been fully disclosed, each class of claimants and interest holders has accepted the Plan or is not impaired by the provisions thereof, and that confirmation is not likely to be followed by the liquidation or need for further financial reorganization of the Reorganized Debtor.

In the event that the requisite acceptance of impaired classes of claims and interests are not obtained, pursuant to Section 1129 (b)(1) of the Bankruptcy Code, the Bankruptcy Court may nevertheless confirm the Plan upon the request of the proponent of the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly and accords fair and equitable treatment to the class rejecting it.

At the hearing on confirmation of the Plan, the Bankruptcy Court will hear any timely filed objections from a claimant or interest holder to confirmation of the Plan.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED OR WHICH MAY BE MADE CONCERNING THE DEBTOR, THE VALUE OF ITS ASSETS, OR THE REORGA-NIZED DEBTOR ARE THE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT.  EXCEPT AS NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN AUDIT BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT.  AN APPRAISAL OF DEBTOR'S REAL PROPERTY ASSETS WAS PREPARED BY JAMES BRADLEY OF AXIA, AN MAI REAL ESTATE APPRAISER OF TUCSON, ARIZONA. THE MAJOR SECURED CREDITOR, KENNEDY FUNDING, RETAINED APPRAISER GLADSTONE GREGG , WHO TESTIFIED

14

AND PROVIDED AN OPINION OF VALUE OF DEBTOR'S ASSETS WHICH WAS SUBSTAN-TIALLY LOWER THAN DEBTOR'S ORIGINAL OPINION OF VALUE. DEBTOR HAS ADOPTED PORTIONS OF THOSE VALUES FOR PLAN CONFIRMATION. DEBTOR UTILIZES JACK ROBERT AND ASSOCIATES, CPAs  TO PREPARE TAX RETURNS. ALL FINANCIAL RECORDS OF THE DEBTOR ARE MAINTAINED ON AN ACCRUAL BASIS. ALL EXPENSES AND INCOME ARE ON AN ACCRUAL BASIS.  FOR THAT REASON, THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.  HOW-EVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.  NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR (INCLUDING, WITHOUT LIMITATION, ITS FUTURE BUSINESS OPERATIONS) OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE WHICH ARE OTHER THAN HEREIN CON-TAINED SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE RE-PORTED TO COUNSEL FOR THE DEBTOR, WHO, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATE-MENT WERE COMPILED.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON

15

FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE, OR BE DEEMED CONCLUSIVE ADVICE ON, THE TAX OR OTHER LEGAL EFFECTS OF ANY REORGANIZATION ON HOLDERS OF CLAIMS OR INTERESTS IN CONNECTION WITH SUCH REORGANIZATION.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT, DATED_____, AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE A REASONABLE, HYPOTHETICAL INVESTOR TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A RECOMMENDATION BY THE BANKRUPTCY COURT EITHER FOR OR AGAINST THE PLAN.

IN ORDER TO BE CONSIDERED FOR PURPOSES OF SATISFYING THE BANK-RUPTCY CODE REQUIREMENTS, YOUR BALLOT MUST BE RECEIVED AT THE AD-DRESS INDICATED ON THE BALLOT NO LATER THAN 5:00 P.M. ON THE __ DAY OF

_____

A BALLOT ACCOMPANIES THIS DISCLOSURE STATEMENT FOR USE IN VOTING OF THE PLAN.

## SECTION II

*History of Debtor and Factors Leading*
*to the Filing of the Chapter 11*

_____2.1	History of the Debtor and Events Leading to Filing Chapter 11.

Stephen Phinny spent twenty years of his life developing an incredible vision and then another six years searching for the perfect site in the Tortolita Mountains and another three years acquiring thirty-six contiguous real estate parcels, installing the infrastructure of a small city, engineering a dramatic and very private 700-foot entrance tunnel and assembling just the right team of experts to bring all of the elements to life.  Phinny started assembling the properties in June of

16

2000. The assembly of thirty-six individual parcels cost $13,875,000 and took approximately 3 years to acquire. During this time Phinny and his team worked to perfect the entitlements and obtain access to City of Tucson water.  Phinny created Saguaro Ranch Development Corporation and the project known as Saguaro Ranch broke ground in late November of 2003. Saguaro Ranch successfully completed phases I and II of the project, which included 57 home sites of which 50 were sold, producing gross revenues of $61,300,000. All these funds were invested back into the project. A 700-foot entry tunnel, gatehouse, all underground utilities, infrastructure,  a general store/post office and a fine dining restaurant named McClintock's were constructed. McClintock's, owned and operated by Saguaro Ranch,  is considered Tucson's best special occasion restaurant and was recently voted by Diner's Choice Awards 3-million plus subscribers one of the  "Top 50 Most Scenic Views in America". A total of $103,000,000 has been invested in the project to date.

Saguaro Ranch is one of the finest residential communities in the country and the crowning jewel in an emerging luxury corridor fifteen miles northwest of Tucson along the Tortolita Mountain Range.

PRINCIPAL OF DEBTOR

Stephen Phinny, the son of former U.S. Ambassador Robert H. Phinny,  and grandson of Daniel F. Gerber, founder of Gerber Products Company, gained experience in several real estate developments in Western Michigan and Telluride, Colorado before setting his sights on Tucson. Stephen's father had developed shopping centers and other projects in Michigan where Stephen was raised.

 "When I first discovered this amazing property which is now Saguaro Ranch my plans to develop the real estate project I had dreamed about most of my adult life became a reality" recalls Phinny.

"Though his vision and respect for the land and wildlife, Stephen has created a truly incredible project," adds former Tucson's City Manager Mike Hein. "An unprecedented 80% of Saguaro Ranch's gorgeous; mountain landscape will remain completely undisturbed the development is a great testament towards the region's commitment to open space, environmental sensitivity and

17

Stephens's vision."

Mike Conlin, a leading Arizona Broker who leads the Saguaro Ranch sales team states, "Saguaro Ranch is without question the finest real estate I have seen anywhere, there's nothing quite like it."

"Saguaro Ranch is not just another luxury property," states Nikii Halle, Tucson's number one real estate agent. "A development the caliber of Saguaro Ranch comes around once in a lifetime. If a development this rare, this beautiful and this complete was available in the Phoenix/Scottsdale area, which it is not it would command a price several times the current asking price. Interested buyers and investors are drawn by Stephen's incredible vision for the property, but they are blown away when the actually see it in person".

SURROUNDINGS

Saguaro Ranch is surrounded by seven spectacular golf courses and bountiful arts, retail, culinary, sports and entertainment offerings of the "Old Pueblo" along with Dove Mountain and the Ritz Carlton Hotel, host of the Accenture Match Play Tournament which brings many of the world's top golfers to the Marana/Tucson area. While a rugged terrain affords sweeping 360-degree views, it also provides 360-degree protection from the encroachment of future development. This naturally protected desert environment is perfect setting for individuals to welcome family and friends as they live life to it fullest amid the privacy and undisturbed beauty of national park like setting.

Phinny has assembled an impressive array of experts from around the country to ensure that every facet of Saguaro Ranch is not only superbly crafted but carried out to its fullest potential as they were assembling the 36 individually owned parcels totaling 1,035 pristine acres. When the development is complete, there will be 180 four to five acre Estate home sites available where residents and their guests can enjoy authentic desert living amid the finest services and amenities of a magnificent Guest Ranch.

Saguaro Guest Ranch will be a central gathering place for socializing, dining, learning and entertainment. Plans include 63 Casitas, two superb restaurants, a spa and fitness center, outdoor basketball, volleyball, tennis courts, pool, an art barn featuring visiting artists, music, and literary

18

classes; a Horse Ranch, complete with ranch hands, riding instructions, and private boarding ,over 25 miles of hiking, biking, bridle trails, a General Store with Post Office, where you can grab a quick or sumptuous meal, catch-up on the latest news or simply restock the pantry.

CONSTRUCTION OF CASITAS

The Debtor plans to construct a number of casitas with construction on the model casita to be commenced as soon as Debtor's Plan of Reorganization is approved by this Court. The Casita will grace the breathtaking ridge tops of the Tortolita Mountains with spectacular views of Tucson's five mountain ranges. Each may be enjoyed as an impeccably appointed home, many with private plunge pools.

A development the caliber of Saguaro Ranch comes around once in a lifetime. Every facet of Saguaro Ranch is designed to offer residents and guests an authentic taste of The Great American West. Providing a welcoming sense of community and an environment that foments inner reflection, personal and professional enrichment and the rediscovery of ones passions and dreams.

PRESERVATION OF THE DESERT

Great care has been taken to preserve the beauty of the natural desert plant, wildlife, and archeological heritage. An amazing 80% of the property will remain completely undisturbed. Award winning architectural designs for the Guest Ranch amenities and personal residences will be carefully sited and guided to blend with the natural environment, keeping the focus on the magnificence of the land itself. Energy conservation methods are transparently employed, and the use of electric vehicles will be encouraged along road systems that follow the natural contours of the desert floor.

Saguaro Ranch is reached with ease. It is located 25 miles northwest of Tucson, 75 miles north of Mexico, 25 miles north of Tucson International Airport, 99 miles south of Phoenix Sky Harbor International Airport and 15 miles east of Marana regional airpark (accommodating private jet travel).

LOT SALES - INVENTORY

The debtor started selling lots with an in house brokerage and sales team in 2004. By the

19

spring of 2008 when the financial tsunami hit Southern Arizona; they had sold 50 of the 51 lots in phase I plus one lot in phase II. The average lot price exceeded $1.2 million per lot.  The record high sales price was $1.9 million for one lot leaving a minimal inventory. In February of 2009 the debtor filed chapter 11, and this factor combined with the then economic situation put potential buyers (who still tour on a regular basis) into a holding pattern, i.e. "lets wait and see what happens" in the Chapter 11 prior to purchasing properties.

OTHER EVENTS LEADING TO FILING

There were several factors that negatively impacted the financial status of Saguaro Ranch, leading it to file for Chapter 11 protection.

The major factor was the development loan provided by Kennedy Funding.  The terms of this loan and the untimely funding of construction draws were devastating to the financial operations of Saguaro Ranch.

Original release prices in Kennedy's security documents set a minimum sales price of $900,000 per lot or 70% of sales price which did not allow Saguaro to retain sufficient funds for operating and marketing expenses or to develop any additional lots for sale. The release price structure also eliminated any flexibility in negotiating terms with potential customers who were interested in acquiring properties.

LOAN DRAWS - CHALLENGING

Loan draws from Kennedy could only be funded if Saguaro had repaid a like or greater amount of the request through sales proceeds which were typically delayed 14 to 30 days with differing explanations provided, if a Kennedy representative could be contacted at all. These delays affected debtor's relationships with contractors and vendors causing construction delays and unfavorable pricing in costs.

With timely and more favorable financing debtor also would have been able to develop much needed lot inventory and work on other infrastructure.

A $5 million interest reserve was  part of the loan and quickly depleted, leaving a monthly interest payment in excess of $300,000 to be paid from operating funds.

20

## MONEY HARD TO FIND

Numerous attempts to refinance the loan were made by Saguaro directly and by brokers retained by Saguaro. Debtor found the credit markets frozen and other funding sources were nonexistent. During this period construction costs escalated and certain material (concrete, steel and asphalt) became difficult to obtain. These circumstances led to cost overruns and time delays, which adversely affected Debtor.

The economic downturn and particularly the collapse of the real estate market finally forced Saguaro Ranch to seek Chapter 11 protection in order to develop a plan to complete improvements at Saguaro Ranch and to obtain monies to do so.

One of the factors that the debtor considered prior to filing Chapter 11 was that it had a shortage of inventory for lot sales and would need additional capital to construct roads, a model casita, complete the spa and other projects to jump start sales. Debtor has a number of interested prospective purchasers who are waiting to see if the reorganization is successful prior to purchasing lots.

The debtor entered into an agreement subject to Court approval to borrow $12.3 million to complete the projects required to resume selling lots to pay off certain creditors from LoanVest, with the LoanVest loan taking priority over the current first lien creditor Kennedy Funding..

## DEBTOR-IN-POSSESSION FINANCING

Saguaro has obtained a commitment for DIP financing. This financing would have allowed the debtor to develop much needed additional lot inventory, make improvements to existing infrastructure and construct some enticing and needed amenities. A large backlog of interested lot buyers exists who are waiting for Saguaro to emerge from Chapter 11 to own part of the beauty and environmentally sensitive space that nature has provided and the developers have enriched.

On January 22, 2010, the debtor filed a motion to allow it to incur debt, to prime (subordi-nate) secured bankruptcy creditors to allow the new lender to provide needed monies to the debtor. See the motion and attachments filed at Docket Entry # 199-203 for more information on the terms and conditions of the proposed loan. As expected, debtor received objections from some current

creditors including Kennedy.  The Court conducted hearings where the Court denied Debtor's motion to incur Debtor-in-possession financing after Kennedy's appraiser valued the debtor's assets at $14,700,000.00 and projected debtors lot sales prices at $136,842.00 per lot.

AGGRESSIVE MARKETING PROGRAM

Debtors principals had retained the services of John Gasper to assist the debtor in restructuring a business plan for Debtor  to increase sales of lots and Casita.

PROSPECTS

 Debtor has over 3,000 prospects that have expressed an interest in Saguaro Ranch. Debtor will commence its aggressive sales efforts by contacting all of the prospects after Confirmation of Debtor's Plan of Reorganization. As soon as Debtor has sold 12 to 15 lots at the deeper discounted prices they will start raising the prices. The pricing  plus clarification of their situation (bankruptcy) combined with their new marketing approach will spur sales. The construction activity involved in bringing phase III-A on a line and the building of the Spa will definitely create a sense of security to prospective buyers that they are past the worst times and moving forward.

It is Debtor's intention to sell all 130 remaining estate lots and 63 Casita by the end of 2020. With a moderate return of the luxury market and their plan allowing them to greatly expand the size of their market, pricing, new product, and powerful marketing this is not only achievable but realistic. They should be able to average a minimum of $850,000 per lot over the next 10 years.

The goal of Saguaro after emerging from Chapter 11 is to repay creditors and vendors the allowed amount of their claim with an above market rate of interest, as well as other allowed claims. It is also their goal to continue employing Tucsonans and enhance the Metropolitan Tucson economy with a quality, environmentally friendly neighborhood and workplace.

TESTING ITS BUSINESS PLAN

Debtor has tested its revised marketing plan by reducing its prices on lots for a fixed period of time.  Debtor received during that trial period five contracts to purchase lots contingent upon Debtor's Plan confirmation.

2.2     Current Management.   The debtor is currently managed and operated by Stephen

Phinny along with the support staff.

2.3    Properties of the Debtor/Assets of the Estate.   On the Debtors' Schedules on file with the Court is a list of current physical assets of the debtor at book value.  These values do not include the ongoing value of debtor's business.  Appraisals have been ordered by Saguaro Ranch to verify the value of these assets. The Appraisals are on file with the Court as exhibits to the Debtor-in-possession Financing Motion and show that Debtor's assets have large equity.

2.4    Plan of Reorganization.   Saguaro Ranch has filed a Plan which  will result in creditors being paid those amounts set forth in Sources and Uses of Cash with an interest rate for type of claim.  See liquidation analysis attached hereto as **Exhibit "C"** and the list of assets and estimated value shown below as secured debts.

2.5    Obligations as of Date of Filing.   The following is an estimate by the Debtor of the outstanding secured obligations claimed by creditors owed by Debtor as of the date of the Petition.  These amounts may be subject to dispute, offset and other disputes as to status and validity.

| Secured Creditor | Type of Encumbrance | Estimated Amount due at Filing | Property | Estimated Value by Appraiser Gladstone Gregg on real property only |
|---|---|---|---|---|
| Kennedy Funding | DOT, Security Agreement, UCC-1, Note | $23,000,000 | real properties | $14,700,000 secured |
| Pima County | Statutory | $479,000 | real properties | $14,700,000 |
| Mollie Cohen | DOT, Note | $70,500 | real property | $400,000 |
| Ford Motor | Title Lien | $6,900 | vehicle | $10,700 |
| Ford Motor | Title Lien | $4,600 | vehicle | $7,115 |
| Ford Motor | Title Lien | $31,400 | vehicle | $20,000 |
| Amanti Elec. | Mechanic Lien | $28,133 | real properties | $14,700,000 |
| Az Labor Force | Mechanic Lien | $4,661 | real properties | $14,700,000 |
| Tucson Tractor | Mechanic Lien | $17,028 | real properties | $14,700,000 |

23

| Priority Creditor | Obligation | Amount Due at Filing | |
|---|---|---|---|
| IRS | Taxes | See Schedule D | |
| AZDOR | Taxes | See Schedule D | |
| Pima County | Taxes | See Schedule D | |

2.6    <u>Current Litigation or Seizure</u>.   This Court has set a hearing on approval of Debtor's Disclosure Statement for July 1st, 2010.

2.7    <u>Plan of Repayment</u>.   Debtor proposes to pay different secured creditors different amounts on their claims, depending on type of collateral, its current value at various interest rates. Debtor proposed to amend Kennedy's Deed of Trust and security documents to reflect a new release price equal to the price Kennedy's appraiser Gladstone Gregg ("Gregg") believed lots would sell for in the near term.

Gregg forecasted in his appraisal that Debtor would sell lots for $136,842.00 in the near term, which is the release price Debtor intends to utilize.  Additionally, Gregg valued Debtor's property at $14,700,000.00 which Debtor proposes to utilize as the secured portion of Kennedy's claim.  The balance of Kennedy's claim will be treated as unsecured under Debtor's Plan of Reorganization.

Debtor's Amended and Modified Plan will pay Kennedy six percent (6%) per annum on its secured claim until paid and one percent on its unsecured claim.  The allowed amount of Kennedy's secured claim shall be paid in full by end of sixth year.

Debtor proposes to make interest-only payments to Kennedy from lot sales and newly contributed monies until secured claim is paid in full.  In addition to monthly interest payments, Kennedy will receive $136,842.00 for each lot sold as its release price until paid in full.

The "Lot Value" or "Release Price" shall be the amount Kennedy shall be paid to release its Deed of Trust, lien, or interest in the Property being sold, which is the "Lot Value" sales price set forth in the Gregg appraisal.  Pursuant to Kennedy's appraisal, the Kennedy secured claim will be in the amount of $14,700,000.00 ("Secured Claim"), and shall be paid as follows:

1. Interest shall accrue on the unpaid Secured Claim at the rate of 6.0% per annum (or a

24

different rate if so determined by the Court to be market rate of interest, or by stipulation between the parties), commencing on the Effective Date of the Plan. Interest shall be paid monthly from monies held by Debtor.

2. From and after the Effective Date, Debtor shall make principal reduction payments as the lots are sold in the amount of $136,842.00. Kennedy shall release its Deed of Trust as to each lot sold upon payment of this Release Price.

3. On the Effective Date, the monthly interest payments based on unpaid secured claims shall be paid each month. Based on the values set forth in the Gregg appraisal, Kennedy shall release its Deed of Trust and any other lien or interest it may claim to each lot upon payment of $136,842.00. Each payment of $136,842.00 shall reduce the Kennedy secured claim, and interest will accrue at the rate of 6.0% per annum until paid.

Real Property Taxes: Debtor will pay the real property taxes as they become due post-confirmation. Pre-confirmation real property taxes shall be paid at closing from the lot sales of the Property. Interest shall continue to accrue at statutory rate until paid.

2.8 <u>11 U.S.C. § 1111(b)(2) Election.</u> Kennedy Funding has filed a notice of an 11 U.S.C. § 1111(b)(2) election in this case.

The election made by Kennedy eliminates its ability to vote its unsecured claim or receive interest on its unsecured claim. Monthly interest payments and monies from lot sales will be credited against Kennedy's secured claim and the Kennedy total claim.

For example, if Kennedy's total claim is $20,000,000.00 of which $14,700,000.00 is secured, with interest paid at 6% or a different rate set by the Court, each and every payment must be credited against the $20,000,000.00 and credited against the $14,700,000.00 secured claim. Additionally, all monies received by Kennedy from lot sales will be credited in the same manner.

### *SECTION III*

*Income Projections of the Property*

A proforma statement of the **Anticipated Income, Expenses and Sources and Uses of Cash**

25

is attached as Exhibits.

Saguaro Ranch has derived this information on the history of the operations of the business, as compiled by Stephen Phinny and other professionals working for the Debtor.

## SECTION IV

### Summary of Plan of Reorganization

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND SHOULD NOT BE RELIED ON FOR VOTING PURPOSES. THE SUMMARY DOES NOT PURPORT TO BE COMPLETE. CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE PLAN ATTACHED HERETO AS EXHIBIT "A". CREDITORS AND INTEREST HOLDERS ARE FURTHER URGED TO CONSULT WITH COUNSEL, OR WITH EACH OTHER, IN ORDER TO UNDERSTAND THE PLAN MORE FULLY.

4.1    <u>Plan</u>: The following provides a summary of the overall structure and classification of claims against or interests of or in the Debtor and is qualified in its entirety by reference to the Plan which is filed concurrently as a separate document and incorporated herein by reference. The statements in this Disclosure Statement includes summaries of the provisions contained in the Plan and the documents referred to therein. This summary does not purport to be precise or complete statements of all terms or documents referred to therein, and reference is made to the Plan for the full and complete statement of such terms. The Plan and documents referred to therein control the treatment of claims against and equity interests of and in the Debtor and other parties-in-interest. Certain of the documents that may be referred to in the Plan may not yet be executed, with execution to occur upon confirmation of the Plan or upon the Effective Date. The final form of such documents may therefore vary. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN WILL CONTROL.

Any proceeds, in conjunction with the Property's revenues will provide the necessary funds to Debtor to pay creditors under the Plan.

26

4.2    Segregation of Classes: The Plan further proposes to segregate the creditors and interest holders of the Debtor into separate classes. Of these classes, allowed administrative and priority claimants including priority tax claimants, but exclusive of those referenced in 11 U.S.C. Section 507(a)(7) will receive payments of 100% of their respective claims, in cash over time, with an above market rate of interest, as set forth in the Plan with payments to be concluded by the tenth year.

All Administrative Claims and Employee Priority Claims will be paid in full in cash as stated in the Plan. The Debtor shall retain the property and the creditors shall be paid in accordance with modifications, if any, of their applicable loan and security documents, modified as set forth herein and in the Plan of Reorganization but in no event later than one hundred and twenty months.

4.3    Value of Secured Claims: Under the Plan, the Debtor proposes to allow the secured creditors to retain their liens in the amount equal to the full amount of their allowed claim on the Petition Date.

PAYMENTS ON LIEN AMOUNTS OF SECURED CREDITORS WILL BE EVIDENCED BY A MODIFIED PROMISSORY NOTE AND SOME SECURED CLAIMS PAID IN FULL AT 6% INTEREST OR DIFFERENT RATE SET BY THE COURT, OR BY STIPULATION BE-TWEEN THE PARTIES AND WITH DIFFERENT MATURITY DATES DEPENDING ON THE TYPE OF COLLATERAL, FROM CONFIRMATION OF A FINAL, NON-APPEALABLE ORDER, CONFIRMING THE PLAN, WITH NO APPEAL THEN PENDING. THE DEBTOR SHALL CONTINUE PAYMENTS TO ALL SECURED CREDITORS FROM PROPERTY SALES AND NEW MONIES AFTER THE EFFECTIVE DATE, OR EARLIER IF THE DEBTOR AND CREDITORS HAVE SO PROVIDED IN A STIPULATION APPROVED BY THE COURT.

ANY STIPULATION ENTERED INTO BETWEEN THE SECURED CREDITOR AND THE DEBTOR SHALL SUPERSEDE ANY TREATMENT OF CREDITORS THAT MAY BE SET FORTH IN THE DEBTOR'S PLAN.

4.4    Cash Collateral Litigation: At the inception of the Debtor's Chapter 11 case debtor

27

entered into an agreement with Kennedy Funding for the Debtor's use of cash collateral from McClintock's Restaurant. The Debtor has been filing motions requesting that the Court issue an order allowing the Debtor to utilize cash collateral from other secured creditors to continue to operate the business and pay creditors. The Court has approved a Stipulation between the Debtor and Kenney Funding authorizing the Debtor's use of cash collateral to operate the business.

4.5 <u>Description of Assets - Values</u>: The estimated debts owed to secured creditors is set forth in Schedule D of Debtors' Schedules on file with the Court and in the chart above in Section 2.5.

4.6 <u>Anticipated Future of Debtor - Competitive Market</u>: Debtor believes the high end real estate market is slowly improving. Debtor anticipates it will have to reduce prices on lots in the short term and raising the prices over a period of time. Debtor believes that with its reduction of employees and cost cutting measures, it will remain competitive in the market. Debtor's cash flow projections set forth debtor's expectations for sales and profits.

4.7 <u>Source of Information</u>: The financial information contained in this Disclosure Statement is derived from a number of sources. Values ascribed to Saguaro Ranch's assets were provided by the Debtor from its employees and an appraiser retained by them. Cash flow projections, Sources and Uses of Cash and Liquidation Analysis are based on information provided by or to the Debtor. Information on claims of Creditors was obtained from the financial records of the Debtor, the Monthly Operating Reports, the Statements and Schedules on file in the Bankruptcy Court, the Proofs of Claim filed by Creditors in the Bankruptcy Court and loan documents evidencing Claims of Secured Creditors.

4.8 <u>Condition and Performance of the Debtor in Chapter 11</u>: The Debtor's business will increase once improvements to the project resume.

4.9 <u>Cash Collateral Agreement</u>: The Debtor and Kennedy Funding had entered into an agreement to allow the Debtor to utilize monies from business to continue operating its business. Those monies have not been sufficient to continue to operate Debtor's business including payments to over 27 employees. Debtor has received monies to continue to operate its business.

28

4.10 <u>Information Regarding Claims Against Estate</u>: The major secured creditor of the Debtor's business Kenney Funding,  holds notes secured by a Deed of Trust on properties of the jointly administered Debtors and personal guarantees of Stephen Phinny .  The Debtor believes Kennedy is fully secured .   Debtor believes taxes including ad valorem real property taxes will be paid in full from lot sales.  The debtor will establish a bar date for creditors to file claims.

4.11 <u>Liquidation Analysis</u>:   A liquidation analysis valuing assets of the debtor in a Chapter 7 is attached as **Exhibit "C"**.  This liquidation analysis will include any uncollected account receivables.

4.12 <u>Future Management of the Debtor</u>: Stephen Phinny will continue to manage the debtor post confirmation.

4.13 <u>Non-Bankruptcy Litigation</u>: Debtor anticipates some litigation in the bankruptcy courts will occur after confirmation of the Plan of Reorganization as all allowed claims will be dealt with in the Plan of Reorganization.  There are a number of adversary proceedings currently pending which will be decided by the Court.  Debtor believes this Court's resolution of alleged contracts and monetary amounts claimed by claimants in the pending adversary proceedings will resolve any and all claims between Debtor and such claimants.

4.14 <u>Avoidable Transfers</u>:  Debtor is unaware of any transfers of property of this estate which would allow an avoidable transfer actions.

4.15 <u>Breach of Contract</u>: Debtor believes Kennedy Funding is in breach of its contract with Debtor including failure of Kennedy to transfer properties to buyers.

4.16 <u>New Capital Contribution:</u> Debtor will receive a cash contribution upon Confirmation of its Plan in the amount of  $3,000,000.00, to be used by Debtor under its Plan of Reorganization to pay various fees and costs and to make improvements to its property to increase inventory and increase sales.

*SECTION V*

29

*Classification and Treatment of Claims and Interests*

1.    *Claim Amounts*: Because certain claims against the Debtor  may be unknown or of undetermined amounts, the amounts of claims specified in this Disclosure Statement reflect only the Debtor's best estimate at this time of the amount due.   In addition, the amounts of the claims specified in this Disclosure Statement do not include, for example, claims arising from the rejection of certain executory contracts and other contingent or unliquidated claims arising against the debtor. Disputed or unliquidated claims will be adjusted after confirmation of the plan and prior to closing the case.

2.    *Effective Date of the Plan*: The "Effective Date" of the Plan  is important in determining when performance of some of the Debtor's obligations under the Plan may commence.  The Effective Date is defined in the Plan as the first business day following the later of the following day;

(I) the date on which the Order confirming the Plan (the "Confirmation Order") becomes final and non-appealable with no appeal then pending; or

3.    *Funding Plan of Reorganization*.  Debtor shall fund its plan of reorganization from property sales as well as from capital contributions made to reorganized Debtor.

4.    *Classification*: The Plan divides claims against the Debtor  into multiple separate classes that Debtor asserts are in accordance with the Bankruptcy Code.  Unless otherwise expressly stated in the Plan, distributions to holders of allowed claims are in full satisfaction of their allowed claims.  All claims against the Debtor arising prior to confirmation will be discharged by performance of the Plan on the Effective Date to the extent that such claims are dischargeable under the Bankruptcy Code Section 1141(d).  For the purposed of the Plan, claims are classified and treated as follows:

5.1    Class 1- Administrative Claims.

A.    Classification: Class 1 consists of all claims for the cost of administration of the Debtor's bankruptcy estate.  Included in this class are claims for administrative expenses entitled to priority under Bankruptcy Code §507()(A)(1) Such as professional fees and costs, as approved by

the Bankruptcy Court of the attorneys, accountants, and other professional persons employed by the Debtor, and all actual and necessary expenses of operating the Debtor's business pursuant to Bankruptcy Code §503(b), including without limitation, all fees charged against the Debtor's business pursuant to Chapter 123 of Title 28, United States Code. Administrative claims shall include any post petition taxes due any taxing authority on the petition date. Debtor estimates these claims may exceed $300,000.00.

                B.     <u>Impairment:</u> Not impaired.

                C.     <u>Treatment</u>: The Plan provides for the payment in cash, in full, of all Allowed Administrative Claims on the later of the Effective Date or the date upon which such Claims become Allowed Claims, or as otherwise ordered by the Bankruptcy Court or agreed to by claimants. Class 1 claims will be paid from assets of the estate or from "new monies" received by the Debtor, or from its business operations, attorneys fees, costs and costs of any expert utilized by Debtor. The Debtor currently estimates that the Class 1 claims may exceed $300,000.00 and will include post-petition administrative expenses and may include fees due the United States Trustee, post-petition ad valorem real property taxes and post-petition payables for business operations. The Debtor will continue to pay all fees due the U. S. Trustee post - confirmation and to file any reports required by law. The debtor believes the fees owed to the United States Trustee are current. Any fees or costs claimed under various security agreements in favor of secured creditors shall not be treated or paid as administrative claims but any fees and costs allowed under deeds of trust or other security agree-ments after being approved by the Court as reasonable and necessary shall be added to the allowed claim of any secured creditor and shall be paid over time.

     5.2    <u>Class 2- Employee Priority Claims</u>

                A.     <u>Classification</u>: Class 2 consists of allowed claims arising under Bankruptcy Code Section 507(a)(3) and (4) including claims for wages and vacation pay earned by employees of the Debtor within 90 days before the filing of the bankruptcy petition. The Debtor estimates there are claims in this class which do not exceed $16,000.00.

B.      Impairment: Not impaired.

C.      Treatment: The Plan provides for the payment in cash, in full, of all allowed Class 2 claims on the later of the Effective Date or the date upon which such claim becomes an allowed claim or the date listed in the Plan.

5.3      Class 3- Claims of Governmental Units

A.      Classification: Class 3 claims consists of all allowed claims of the United States Internal Revenue Service("IRS") and/or State of Arizona, Department of Revenue("AZDOR") and/or the Department of Economic Security("ADES), Pima County or other government agency which are entitled to priority pursuant to Section 507(a)(7) of the Bankruptcy Code except ad valorem taxes.  Debtor believes that claims in this Class may exceed $100,000.00.

B.      Impairment: Class 3 is impaired.

C.      Treatment:  Each holder of a Class 3 allowed claim shall retain its lien or claim, in accordance with Section 1129 of the Bankruptcy Code.   The claim shall bear simple interest at a fixed rate equal to that rate which would be required to be paid as of the Effective Date under Section 6621 and/or 6622 of the Internal Revenue Code, or such other interest rate as the Bankruptcy Court determines is sufficient to confer upon the tax note a value as of the Effective Date equal to the principal amount of such claim.  The allowed claim shall be payable over 60 months or sooner from lot sales, along with accrued interest, in deferred cash payments over a period not to exceed 60 months from date of assessment.   The claim is subject to prepayment at any time without penalty or premium and shall have such other terms as are usual and customary.

5.4      Class 4 - Secured Ad Valorem Real Property Tax Claims

A.      Classification: Class 4 shall consist of pre-petition allowed Ad Valorem Real Property Tax Claims of Pima County  which are secured by liens on real property.  The Debtor estimates claims may exceed $1,300,000.00..

B.      Impairment: Class 4 is impaired.

C.      Treatment: Each holder of a Class 4 allowed claim shall retain its lien and/or

claim and be paid an aggregate principal amount sufficient to satisfy, in accordance with Section 1129 of the Bankruptcy Code, the allowed claim. Pima County's claim/lien shall bear simple interest which will accrue at the statutory rate, unless a different rate is set by the Bankruptcy Court. Pima County's Claims shall be payable upon sale of each lot, along with any accrued interest, or from monies held by Debtor, within 60 months from Effective Date of the Plan, whichever is sooner. The lien/claim is subject to prepayment at any time without penalty or premium.

     5.5    Class 5 - Secured Claim of Kennedy Funding, Inc. & Anglo-American Financial, LLC ("Kennedy")

              A.    Classification: This claim consists of the allowed secured claim of Kennedy to the extent of the value of the secured creditor's interest in the Debtor's interest in the real and personal property of the Debtor. This claim is evidenced by a Promissory Note, Deed of Trust and UCC in the amount of approximately $23,000,000.00. Kennedy is believed to be a cross collateral-ized creditor of Saguaro Ranch Investments, LLC and Saguaro Ranch Development Corp. Debtor believes that Kennedy may not be entitled to default interest and other monies claimed due by Kennedy.

              B.    Impairment: Class 5 is impaired.

              C.    Treatment: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH KENNEDY AS TO ITS TREATMENT, THE TERMS AND CONDITIONS **THEREIN** WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN. Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured. The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. Kennedy has obtained a current appraisal on the property which shows that the debtor's assets have a current value of $14,700,000 and Kennedy will be paid the full amount of their allowed claim plus an above

33

market rate of interest of 6.0.% on its secured obligations. The debtor proposes to limit the Class 5 creditor's secured claim up to the value set by its appraiser, Gladstone Gregg, at $14,700,000.00 with interest accruing on the unpaid balance at the rate of 6% per annum. Any other amount representing an allowed claim of Kennedy shall be paid in the same manner as Class 15 unsecured claims.

The allowed secured claim of the Class 5 creditor shall retain its lien and shall be paid from lot sales as set forth in the cash flow / sources and uses of cash statement attached as Exhibit E subject to any offsets due Debtor, by then end of 72 months. Debtor proposes to amend the existing Deed of Trust to set release prices on lots at $136,842.00 and other amendments.

The "Lot Value" "Release Price" shall be the amount Kennedy shall be paid to release its Deed of Trust, lien, or interest in the Property being sold, which is the "Lot Value" set forth in the Appraisal and identified in the chart above. Pursuant to Kennedy's appraisal, the Kennedy secured claim will be in the amount of $14,700,000.00 ("Secured Claim"), and shall be paid as follows:

1. Interest shall accrue on the unpaid Secured Claim at the rate of 6.0% per annum (or a different rate if so determined by the Court to be market rate of interest, or by stipulation between the parties), commencing on the Effective Date. Interest shall be paid monthly from monies held by Debtor.

2. From and after the Effective Date, Debtor shall make principal reduction payments as the lots are sold. Kennedy shall release its Deed of Trust as to each lot sold upon payment of the Lot Value or Release Price of $136,842.00. For example, for each lot sold, Kennedy will release its Deed of Trust upon payment of the Lot Value/Release Price in the sum of $136,842.00 for each lot sold.

3. On the Effective Date, the monthly interest payments, based on an unpaid Secured Claim shall be paid per month. Based upon the values set forth it its appraisal, Kennedy shall release its Deed of Trust and any other lien or interest it may claim as to each lot upon payment of $136,842.00. Those payments shall reduce the Kennedy Secured Claim, and interest will accrue at the rate of 6.0% per annum on unpaid balance.

5.6 Class 6 - Secured Claim of Mollie Cohen ("Cohen")

               A. Classification: This claim consists of the allowed secured claim of Mollie Cohen and/or her successor in interest to the extent of the value of the secured creditor's interest in the Debtor's interest in the real property of the Debtor. This claim is evidenced by a note and DOT on the 3.3 acres where the sales office is located in the approximate amount of $70,500.00 plus any accrued interest Cohen is believed to be a creditor of Saguaro Ranch Investments, LLC and fully secured.

               B. Impairment: Class 6 is impaired.

               C. Treatment: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH COHEN AND/OR HER SUCCESSOR IN INTEREST AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREAT-MENT SET FORTH HEREIN. Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured. The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor does not propose to limit the Class 6 creditor's secured claim and to treat the claim as fully secured along with a market rate of interest.

The allowed secured claim of the Class 6 creditor shall be paid and secured by the promissory note and deed of trust, modified as follows:

1. The allowed secured claim shall accrue interest from the Effective Date of the Plan at the rate of eight (8.0%) percent per annum. The Class 6 creditor is entitled to interest on its allowed secured claim from the Petition date to the Confirmation Date.

2. The note shall be payable in equal monthly installments of principal and interest amor-tized over 120 months and paid from proceeds of sale of properties owned by Debtor or from other monies available to Debtor.

3. The note of the Class 6 creditor shall continue to be secured by the first position deed of trust on the property to the extent of its value. Any security for payment of the allowed claim which Cohen had at the petition date which encumbers the property shall be retained post-confirmation.

5.7     Class 7 - Secured Claim of Ford Motor Credit ("Ford")

A.     Classification: This claim consists of the allowed secured claim of Ford to the extent of the value of the secured creditor's interest in the Debtor's interest in the property of the Debtor. This claim is evidenced by a title lien on a Ford vehicle identified as (1081). Ford is believed to be a creditor of Saguaro Ranch Development Corp.

B.     Impairment: Class 7 is impaired.

C.     Treatment: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH FORD CREDIT AS TO ITS TREATMENT, THE TERMS AND CONDI-TIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN. Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured. The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor propose to limit the Class 7 creditor's secured claim to current market value and to pay interest at the rate of 6.0 % and to pay that amount over sixty months. If the debtor and the Class 7 creditor cannot agree as to the amount of the Class 7 creditor's allowed secured claim, the Court will be called upon to make that determination.

5.8     Class 8 - Secured Claim of Ford Motor Credit ("Ford")

A.     Classification: This claim consists of the allowed secured claim of Ford to the extent of the value of the secured creditor's interest in the Debtor's interest in the property of the Debtor. This claim is evidenced by a title lien on a Ford vehicle identified as (3841- #36). Ford is believed to be a creditor of Saguaro Ranch Development Corp.

36

B.     Impairment: Class 8 is impaired.

C.     Treatment: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH FORD CREDIT AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN.  Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured.  The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim.  The debtor propose to limit the Class 8 creditor's secured claim to current market value and to pay interest at the rate of 6.0% and to pay that amount over sixty months.  If the debtor and the Class 8 creditor cannot agree as to the amount of the Class 8 creditor's allowed secured claim, the Court will be called upon to make that determination.

5.9     Class 9 - Secured Claim of Ford Motor Credit ("Ford")

A.     Classification: This claim consists of the allowed secured claim of Ford to the extent of the value of the secured creditor's interest in the Debtor's interest in the property of the Debtor. This claim is evidenced by a title lien on a Ford vehicle identified as (3841 - #37).  Ford  is believed to be a creditor of Saguaro Ranch Development Corp.

B.     Impairment: Class 9 is impaired.

C.     Treatment: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH FORD CREDIT AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN.  Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured.  The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in

37

the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor propose to limit the Class 9 creditor's secured claim to current market value and to pay interest at the rate of 6.0 % and to pay that amount over sixty months. If the debtor and the Class 9 creditor cannot agree as to the amount of the Class 9 creditor's allowed secured claim, the Court will be called upon to make that determination.

5.10    Class 10 - Secured Claim of Ford Motor Credit ("Ford")

A.    Classification: This claim consists of the allowed secured claim of Ford to the extent of the value of the secured creditor's interest in the Debtor's interest in the property of the Debtor. This claim is evidenced by a title lien on a Ford vehicle identified as (3841 - #37). Ford is believed to be a creditor of Saguaro Ranch Development Corp.

B.    Impairment: Class 10 is impaired.

C.    Treatment: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH FORD CREDIT AS TO ITS TREATMENT, THE TERMS AND CONDI-TIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN. Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured. The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor propose to limit the Class 10 creditor's secured claim to current market value and to pay interest at the rate of 6.0 % and to pay that amount over sixty months. If the debtor and the Class 10 creditor cannot agree as to the amount of the Class 10 creditor's allowed secured claim, the Court will be called upon to make that determination.

5.11    Class 11 - Secured Claim of Amanti Electric Co. ("Amanti")

A.    Classification: This claim consists of the allowed secured claim of Amanti Electric Co. to the extent of the value of the secured creditor's interest in the Debtor's interest in

38

collateral securing its claim. <u>This claim is evidenced by a mechanic's lien in the amount of $28,133.00</u>. Amanti is believed to be a creditor of Saguaro Ranch Development Corp.

        B.    <u>Impairment</u>: Class 11 is impaired.

        C.    <u>Treatment</u>: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH AMANTI AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN. Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured. The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor proposes to limit the Class 11 creditor's claim and to treat the claim in the same manner as a Class 15 unsecured creditor.

    5.12    <u>Class 12 - Secured Claims of Arizona Labor Force, Inc.</u>

        A.    <u>Classification</u>: This claim consists of the allowed secured claim of Arizona Labor Force, Inc. to the extent of the value of the secured creditor's interest in the Debtor's interest in collateral securing its claim. <u>This claim is evidenced by a mechanic's lien believed to be in the amount of $4,959.00</u>. Arizona Labor Force, Inc. is believed to be a creditor of Saguaro Ranch Development Corp.

        B.    <u>Impairment</u>: Class 12 is impaired.

        C.    <u>Treatment</u>: IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH ARIZONA LABOR FORCE AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN. Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured. The allowed

amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor proposes to limit the Class12 creditor's claim and to treat the claim in the same manner as a Class 15 unsecured creditor.

5.13    Class 13 - Secured Claim of Earhart Equipment Corporation ("Earheart").

A.    Classification: This claim consists of the allowed secured claim of Earhart Equipment Corporation to the extent of the value of the secured creditor's interest in the Debtor's interest in the real property of the debtor.    This claim is evidenced by a mechanic's lien in the amount of $80,754.00.    Earhart is believed to be a creditor of Saguaro Ranch Development Corp.

B.    Impairment: Class 13 is impaired.

C.    Treatment:   IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH EARHART AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN.   Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured.   The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor proposes to limit the Class 13 creditor's claim and to treat the claim in the same manner as a Class 15 unsecured creditor.

5.14    Class 14 - Secured Claim of Tucson Tractor Company

A.    Classification: This claim consists of the allowed secured claim of Tucson Tractor Company to the extent of the value of the secured creditor's interest in the Debtor's interest in the real property of the Debtor.  This claim is evidenced by a mechanic's lien in the amount of $17,028.90.  Tucson Tractor Company is believed to be a creditor of Saguaro Ranch Development Corp.

40

B.     Impairment: Class 14 is impaired.

C.     Treatment:  IN THE EVENT THE DEBTOR IS ABLE TO REACH A STIPULATION WITH TUCSON TRACTOR COMPANY AS TO ITS TREATMENT, THE TERMS AND CONDITIONS THEREIN WILL SUPERCEDE THE TREATMENT SET FORTH HEREIN.  Under §506 of the Bankruptcy Code, a secured creditor has a secured claim to the extent of the creditor's interest in the Debtor's interest in the collateral and an unsecured claim for the balance, if any, unless the creditor, if eligible, elects to have it's claim treated as fully secured.  The allowed amount of the Creditor's secured claim will be the lesser of value of the creditor's interest in the debtor's interest in the property as determined under § 506, or the allowed amount of the creditor's claim. The debtor proposes to limit the Class 14 creditor's claim and to treat the claim in the same manner as  a Class 15 unsecured creditor.

5.15   Class 15 -  Unsecured and Deficiency Claims.

A.    Classification:  Class 15 consists of all unsecured claims and deficiency claims against the debtor. In the event Kennedy elects 11 U.S.C. § 1111(b) (2), its Class 15 claims shall not receive any interest or be allowed to vote for or against Debtor's Plan.

B.     Impairment: Class 15 is impaired.

C.     Treatment: The Plan provides that each and every holder of a Class 15 Allowed Claim shall be paid the amount of their allowed claim in cash from lot sales or other sources, at one percent (1%) interest on the unpaid balance.  Any liens held by the Class 15 creditors shall be null and void and removed as of the Effective Date.

5.16   Class 16 - Interest of Equity Holders.

A.    Classification:  Class 16 consists of the interest of the debtor.

B.     Impairment: Class 16 is impaired.

C.     Treatment: The debtor's equity holders shall be allowed to retain their current percentage of interest or a percentage thereof by becoming participating investors and contribute substantial capital required to fund this Plan and/or make capital improvements for the debtor  as

41

allowed by debtors' Board of Directors.

    5.17    <u>Class 17 - Contingent, Unliquidated and Disputed Claims.</u>

    A.    <u>Classification</u>: Class 17 consists of the claims of all contingent, unliquidated and disputed claims..

    B.    <u>Impairment</u>: Class 17 is impaired.

    C.    <u>Treatment</u>: Class 17 creditors shall receive no distribution under the Plan unless their claim is allowed. If allowed, it shall be treated as a Class 17 claim for payment purposes only.

    5.18    <u>Class 18 - Claims of Participating Investors.</u>

    A.    <u>Classification</u>: Class 18 consists of the claims of participating investors.

    B.    <u>Impairment</u>: Class 18 is impaired.

    C.    <u>Treatment</u>: Participating investors may be required to contribute substantial capital required to fund this Plan and/or make capital improvements to the subject property, if any.

## *SECTION VI*

*Post-Confirmation Management*

    The reorganized jointly administered debtors will continued to be managed by Stephen D. Phinny. Mr. Phinny will be paid a salary of $100,000.00 per year commencing on Effective Date of Plan.

## *SECTION VII*

*Income Tax Consequences of Reorganization*

    The Debtor has been advised by Eric Slocum Sparks, Esq. to obtain independent tax advice to determine the consequences of going forward under the Plan and retaining the Property hereunder. The Debtor has advised Eric Slocum Sparks, Esq. that outside tax counsel has been/or will be retained and/or consulted to assist in drafting, amending or revising the Plan as proposed. The debtor

42

and Eric Slocum Sparks, P.C. have been advised that the debtor can retain the property without significant adverse tax consequences.

7.1 *Disclaimer: The income tax consequences of the reorganization of the Debtor pursuant to this Plan will be different and will depend upon the Debtor's tax situation. Eric Slocum Sparks, P.C. is not advising the Debtor regarding the tax consequences of the reorganization of the Debtor and the Debtor will consult with its own tax advisor regarding the tax consequences of reorganization of the Debtor according to the Plan.*

*ANY POTENTIAL PARTICIPATING INVESTORS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO THE OVERALL TAX IMPLICATIONS OF PARTICIPATION OR NON-PARTICIPATION UNDER THE PLAN.*

7.2 <u>Consummation</u>: For purposes of Local Bankruptcy Rule 2015, and consistent with Bankruptcy Code Section 1001(2), consummation of the Plan shall occur upon the ① funding of the contributions due from participating investors hereunder; and ② commencement of disbursements to Class One through Class Nineteen as provided in the Plan.

## SECTION VIII

### Feasibility

As a condition to confirmation of a plan of reorganization, Section 1129(a)(11) of the Bankruptcy Code requires that the confirmation is not likely to be followed by a liquidation or the need for further financial reorganization, except as proposed in such plan.

The debtor sets out as **Exhibit "D"** its Anticipated Income / Expense and Sources and Uses of Cash.

THE FINANCIAL PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT REPRESENT A PREDICTION OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS OF THE DEBTOR. ANTICIPATED FUTURE EVENTS MAY OR MAY NOT OCCUR AND THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSUR-

ANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR. BECAUSE OF THE UNCER-
TAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS, THE ACTUAL RESULTS OF
OPERATIONS MAY WELL BE DIFFERENT FROM THOSE PREDICTED AND SUCH
DIFFERENCES MAY BE MATERIAL AND ADVERSE.

THE FINANCIAL PROJECTIONS ARE INTENDED TO ASSESS THE FUTURE
ASSETS, LIABILITIES, INCOME AND CASH FLOW AVAILABLE FOR DEBT SERVICING
AND ARE NOT DESIGNED OR INTENDED TO BE USED FOR PURPOSES OF PROJECTING
THE FUTURE VALUE OF THE DEBTOR'S INTERESTS OR DEBENTURES ISSUED BY OR
ON BEHALF OF THE REORGANIZED DEBTOR.

## SECTION IX

### *Liquidation Analysis*

The primary assets and significant income-producing assets of the Debtor's estate are the real
and personal properties of the debtor, the restaurant and other assets. All of the physical assets are
subject to and encumbered by asserted liens and security interest held by the creditors of this estate.

In the event this case were converted to a case under Chapter 7 and the assets of the estate
liquidated, Kennedy Funding would proceed to foreclose upon its interest in the property eliminating
any payments to other creditors. A foreclosure of the property would eliminate any prospect of any
payment to remaining secured, unsecured and priority creditors of any substantial payment. Since
significant secured and priority claims exist, the liquidation of the debtor's assets and cessation of
business would yield little or no monies for remaining creditors. As a result, it is the debtor's
opinion that all claimants are best served through implementation and effectuation of the Plan which
provides for payments on allowed claims. Creditors and other interested parties are urged to review
the debtor's schedules and statement of affairs as filed with the United States Bankruptcy Clerk's
Office (and as amended from time to time) for purposes of confirming the debtor's conclusions
contained in this liquidations analysis, attached hereto as **Exhibit "C".**

# *SECTION X*

## *Acceptance and Confirmation*

10.1    <u>What is Necessary for Court Approval of a Plan</u>:  Chapter 11 of the Bankruptcy Code permits the readjustment of secured debt, unsecured debt and equity interests.  A Chapter 11 plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness, and may even provide some return to equity owners absent full satisfaction of indebtedness, so long as no impaired class votes against the plan (except as provided below).

Even if an impaired class votes against the plan, implementation of the plan is still possible so long as the plan is fair and equitable and that class is afforded certain treatment defined by the Code.  That certain treatment may be very broadly defined as giving a claimant the full value of his claim or interest.  Such value is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.  If the latter is equal to or greater than the former, the Plan may be confirmed over the dissent of that class, depending upon the treatment of junior claims and interests.  In particular, senior claims must be satisfied in full prior to payment of junior claims or interests, unless the holders of senior claims agree to different treatment. This principle, commonly known as the "absolute priority rule", applies only in cases when a class of unsecured claims or equity interests is impaired and does not accept the plan.  In that event, the absolute priority rule does not apply to all classes of unsecured claims and equity interests, but only to the dissenting class and classes junior to the dissenting class.

The exception to the absolute priority rule is that an existing Debtor can contribute money or property which is (1) new (fresh); (2) substantial; (3) necessary, and (4) not readily available from other sources.  Debtor proposes to obtain and contribute $3,000,000.00 to the reorganized Debtor.

In the event a class is unimpaired, it is automatically deemed to have accepted the plan.  In this proposed Plan, Classes 3 through 18 will be impaired, as defined in §1124 of the Code, as the result of the Plan.  All other classes will be unimpaired.

The Code states that if there is no dissenting class, the test for approval by the Court of a Chapter 11 plan (i.e., confirmation) is whether the plan is feasible and in the best interests of creditors and interest holders. In simple terms, a plan is in the best interests of creditors and interest holders if the plan will provide a better recovery to the creditors and interest holders than they would obtain if the Debtor were liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities. The Court, in considering this factor, need not consider any other alternative to the plan but liquidation.

In considering "feasibility", as mentioned earlier, the Bankruptcy Court is only required to determine whether the plan has a reasonable prospect of being accomplished. This entails determining the availability of cash for payments required at the effective date, and any other factor which might make it impossible for the reorganized Debtor to accomplish that which it proposes to accomplish in the plan.

In addition, in order to confirm a plan, the Court must find that the plan was proposed in good faith and that the plan and the Debtor are in compliance with the applicable provisions of Chapter 11. Finally, similar to the requirement that the Court find the plan to be feasible, the Court must find that liquidation or further reorganization of the reorganized Debtor is not likely to occur after implementation of the plan.

The determination by the Court that a plan is fair, equitable and feasible occurs at the confirmation hearing after a plan has been accepted. The Court's judgment on these matters does not constitute an expression of the Court's opinion as to whether the plan is a good one, nor does it constitute an opinion by the Court regarding any debt or equity interest or securities issued to creditors under the plan.

10.2 <u>Alternatives to the Plan</u>: Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment as to whether to vote for or against this proposed Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief reminder of the alternative to the Plan is in order.

This alternative includes the probable liquidation of the Debtor through conversion of the case to one under Chapter 7. The Debtor believes the Plan to be in the best interests of the creditors and the interest holders. In arriving at this conclusion, the Debtor emphasizes that the debtor has assets in excess of the obligations encumbering its assets (refer to debtor's schedules). The debtor is concerned that if this case were converted to a Chapter 7, Kennedy Funding would "fire sale" the debtor's collateral depriving other creditors of being paid in full. Consequently, the unsecured creditors of the debtor would likely receive small or no distributions under a Chapter 7 liquidation. THE DEBTOR HAS ATTEMPTED TO SET FORTH THE LIKELY LIQUIDATION ALTERNA-TIVE TO ITS PROPOSED PLAN. THE DEBTOR MUST CAUTION CREDITORS HOWEVER, THAT A VOTE MUST BE FOR OR AGAINST THE PLAN. THE VOTE ON THE PLAN DOES NOT INCLUDE A VOTE ON THE LIKELY LIQUIDATION ALTERNATIVE TO THE PLAN. THERE IS NO ASSURANCE THAT THE LIKELY LIQUIDATION ALTERNATIVE WILL, IN FACT, FOLLOW IF THE PLAN FAILS ACCEPTANCE. IF YOU BELIEVE THE LIQUIDATION ALTERNATIVE IS PREFERABLE TO THE PLAN AND YOU WISH TO URGE IT UPON THE COURT, YOU SHOULD CONSULT COUNSEL.

10.3    Specific Consideration in Voting:  All of the foregoing gives rise to the following implications and risks concerning the Plan.

While the Plan provides for certain payments, such payments will apply only to allowed claims and certain interests. Under the Bankruptcy Code, a claim may not be paid until it is "allowed". A claim will be allowed in the absence of an objection. A claim to which an objection has been filed will be heard by the Court at a regular evidentiary hearing and will be allowed in full, in part, or disallowed. While the Debtor will bear the principal responsibility for claim objections, any interested party may file claim objections. Accordingly, payment on all claims may be delayed until objections to such claims are ultimately settled.

10.4  Risk Factors.  For classes of claims which do not receive cash on the Effective Date, there are certain risks inherent in accepting the Plan, including the absence of absolute certainty of

ultimate payment.

10.5  Disclosure Required by the Code:  The Code requires disclosure of certain facts as follows:

1)  there are no payments or promises made of the kind specified in Section 1129(a)(4)(A) of the Code which have not previously been disclosed to the Court;

2)  the ownership of the Reorganized Debtor will not be affected by the Plan. Management of the Reorganized Debtor will remain with Stephen Phinny, upon confirmation of the Plan.

# SECTION XI

## Other Provisions of the Plan

11.1  Retention of Jurisdiction:  The Bankruptcy Court shall retain exclusive jurisdiction over this case to supervise the Plan, to hear, if applicable law provides, and to determine, among other things, the following matters:

1)  any and all objections to the allowance of claims or interests except as provided in the Plan including the claims of Kennedy Funding and any of its various related entities.

2)  any and all applications for payment for fees from the Debtor made by attorneys and other professional pursuant to Sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid by the Debtor under Section 327 of the Bankruptcy Code, and any objections thereto;

3)  any and all pending applications for rejection, the assumption, or assignment as the case may be of unexpired leases and executory contracts;

4)  any and all motions, applications, adversary proceedings and contested or litigated matters properly before the Bankruptcy Court;

5)  modifications of this Plan;

6)  all matters relating to the implementation or consummation of this Plan;

7)  any and all suits or actions brought for collection or recoupment of debts or

48

other obligations owed to the Debtor.

11.2    Retention of Causes of Action: The Debtor shall retain all claims or causes of action which it has as of the Confirmation Date, the powers of the debtor-in-possession for purposes of prosecuting claims and causes of action arising under the Bankruptcy Code, and full authority to pursue, compromise, and resolve all such claims and causes of action unless the Court has granted any such right to a creditor of this estate.

11.3    Retention or Rejection of Executory Contracts and Leases:  The Plan provides that pursuant to Section 365 of the Bankruptcy Code, the Debtor accepts all executory contracts and unexpired leases to which they are a party, except leases or executory contracts specifically provided for prior to the hearing on the Disclosure Statement.

11.4    Amendments to Plan:  The Plan may be altered, amended, or modified by the proponents before the Confirmation Date, in the manner provided for by Section 1127 of the Bankruptcy Code or otherwise provided for by law.  The Plan may also be altered, amended, or modified by the proponents after the Effective Date in accordance with the Bankruptcy Code and applicable law.  A holder of a claim or interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected as the case may be the Plan as modified unless the modification detrimentally effects the holder of such claim or interest without the prior consent thereof.

11.5    Offer, Issuance and Resale of Plan Securities:  The offer and issuance of Plan Securities by any Debtor which constitutes securities under the Securities Act of 1933, as amended (the "1933 Act") or applicable state securities laws have not been registered under the 1933 Act or such state securities laws, pursuant to the exemption therefrom provided by Section 1145 of the Bankruptcy Code.

The Plan Securities will bear the following legend:

> "The offer and sale of this Plan Security has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws, and this Plan Security may not be offered, sold or transferred in the absence of such registration or an exemption there-from under such laws."

49

Resale or other transfer of a Plan Security by a creditor who has acquired it pursuant to the Plan, may or may not be exempt from the registration requirements of Section 5 of the Securities Act of 1933 and any applicable state securities laws or Blue Sky Laws.

BY ITS RECEIPT OF A PLAN SECURITY, EACH RECIPIENT SHALL BE DEEMED TO ACKNOWLEDGE THAT IT IS RESPONSIBLE FOR ITS COMPLIANCE WITH ALL APPLICA-BLE SECURITIES LAWS. EACH CREDITOR SHOULD CONSULT HIS OR HER OWN ATTORNEY AS TO WHETHER ANY RESALE OF A PLAN SECURITY REQUIRES REGIS-TRATION OF SUCH SECURITY UNDER THE SECURITIES ACT OF 1933 OR AN APPLICA-BLE STATE SECURITIES LAW.

11.6 **Provision for Filing Reports and Payments of Fees to the Office of the United States Trustee**: The Debtor shall continue to timely file all quarterly reports and post-confirmation reports and shall pay all fees to the United States Trustee as required by law and will incorporate such language into the order confirming the Debtor's Plan of Reorganization.

### SECTION XII

*Recommendation of Debtor*

The Debtor recommends that the Plan of Reorganization be approved in light of the alternative that only Kennedy Funding is likely to be paid a significant portion of its claim based on its liquidation value. The Debtor is of the opinion that the Plan approval is in the best interest of all creditors.

### CONCLUSION

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms. Therefore, you are urged to review this material in order to make an informed vote on the Plan.

DATED July 15, 2010.

LAW OFFICES OF
ERIC SLOCUM SPARKS, P.C.


/s/ Sparks AZBAR #11726
Eric Slocum Sparks
Attorney for Debtor


COPIES of the foregoing
mailed/delivered/faxed
July 15, 2010, to:

Ilene J. Lashinsky
Christopher J. Pattock
UNITED STATES TRUSTEE
230 N. First Ave. #204
Phoenix, Arizona 85003

Official Committee of Unsecured Creditors:

     Arizona Restaurant Supply, Inc.
     Attn: Tom Carr
     6077 N. Travel Center Drive
     Tucson, Arizona 85741

     Linthicum Corp.
     Attn: Clayton Boop
     20789 N. Pima Road, #250
     Scottsdale, Arizona 85255

     Rick Engineering Company, Inc.
     Attn: Paul Iezzi
     3945 E. Fort Lowell Road, #111
     Tucson, Arizona 85712-1046

     Three Architecture, Inc.
     Attn: Jack Baines
     4040 N. Central Expressway, #1200
     Dallas, TX 75204

     Earth-Scrapes Excavating, Inc.
     Attn: Jody Mott
     P O Box 69576
     Oro Valley, AZ 85737

Sally Darcy, Esq.
McEvoy, Daniels & Darcy, P.C.
4560 E. Camp Lowell Dr.
Tucson, AZ 85712

51

Attorney for Unsecured Creditors Committee

Terri A. Roberts, Esq.
German Yusufov, Esq.
PIMA COUNTY ATTORNEY'S OFFICE
32 North Stone Avenue
Suite 2100
Tucson, AZ 85701
Attorneys for Pima County


Neil Eckel, Esq.
DURAZZO & ECKEL, P.C.
45 North Tucson Boulevard
Tucson, Arizona 85716
Attorneys for Amanti Electric, Inc.

Alan M. Levinsky
BUCHALTER NEMER
16435 North Scottsdale Road
Suite 440
Scottsdale, Arizona 85254
Attorneys for Ford Motor Credit Company LLC

Dewain D. Fox, Esq.
FENNEMORE CRAIG, PC
3003 N. Central Ave.
Suite 2600
Phoenix, AZ 85012
Attorney for Kennedy Funding (SGRMC)

Michael W. Baldwin, Esq.
LAW OFFICE OF MICHAEL BALDWIN, PLC
P. O. Box 35487
Tucson, AZ 85740-5487
Attorney for: Theresa Chamberlain; Steven Blomquist;
         Sharyl Cummings and Timothy Blowers

Robert J. Spurlock, Esq.
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
2901 North Central Avenue
Suite 1000
Phoenix, AZ 85012
Attorney for Deere & Company

Linda Boyle
10475 Park Meadows Drive
Suite 400
Littleton, CO 80124
Representing TW Telecom Inc.


Jon Saffer, Esq.

52

Snell & Wilmer
1 S. Church Ave.
Tucson, AZ 85701
Attorney for Katherine B. Phinny

George O. Krauja
Laura Davis
Fennemore Craig, PC
1 S. Church Ave.
Suite 1000
Tucson, AZ 85701-1627
Attorneys for Kennedy Funding, Inc.
And Anglo-American Financial, LLC

Kevin J. Blakely, Esq.
GAMMAGE & BURNHAM, P.L.C.
Two North Central Avenue
18th Floor
Phoenix, AZ 85004
Attorney for Arizona Labor Force, Inc.

Daniel R. Warner, Esq.
LAW OFFICES OF J. PHILLIP GLASSCOCK, P.C.
13430 North Scottsdale Road
Suite 106
Scottsdale, AZ 85254
Attorney for Mobile Mini, Inc.

Gerard R. O'Meara, Esq.
GUST ROSENFELD, PLC
1 South Church Avenue
Suite 1900
Tucson, AZ 85701-1627
Attorney for Tapestry Properties III, L.L.C.

/s/ L. Anderson

53