Fennemore Craig, P.C.
George O. Krauja (No. 10964)
One South Church Avenue, Suite 1000
Tucson, AZ 85701-1627
Telephone: (520) 879-6800
Email: gkrauja@fclaw.com

Fennemore Craig, P.C.
Laurel E. Davis (Nevada Bar No. 3005)
300 South Fourth Street, Suite 1400
Las Vegas, NV 89101
Telephone: (702) 692-8000
Email: ldavis@fclaw.com

Attorneys for Kennedy Funding, Inc.
and Anglo-American Financial, LLC

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SAGUARO RANCH DEVELOPMENT CORPORATION,<br><br>    Debtor. | Case No. 4:09-bk-02490-EWH<br>**(Jointly Administered)**<br><br>Chapter 11 |
| In re:<br><br>PCC INVESTMENTS, LLC,<br><br>    Debtor. | Case No. 4:09-bk-02484-EWH |
| In re:<br><br>SAGUARO GUEST RANCH MANAGEMENT CORPORATION,<br><br>    Debtor. | Case No. 4:09-bk-02489-EWH |
| In re:<br><br>SAGUARO RANCH INVESTMENTS, LLC,<br><br>    Debtor. | Case No. 4:09-bk-02492-JMM |
| In re:<br><br>SAGUARO RANCH REAL ESTATE CORPORATION,<br><br>    Debtor. | Case No. 4:09-bk-02494-EWH<br><br>**KENNEDY FUNDING AND ANGLO-AMERICAN FINANCIAL'S OBJECTION TO DEBTORS' THIRD AMENDED AND MODIFIED PLAN OF REORGANIZATION DATED MARCH 16, 2011**<br><br>**Date: May 16, 2011**<br>**Time: 10:30 a.m.** |

115266.6

1    Kennedy Funding, Inc. and Anglo-American Financial, LLC (collectively "Kennedy

2    Funding") file their objection (the "Objection") to the Debtors' Third Amended and Modified

3    Plan of Reorganization Dated March 16, 2011 (the "Third Amended Plan") [DN 555]. Federal

4    law establishes this Court does not have jurisdiction to consider the Third Amended Plan while

5    the Debtors' appeal the Lift Stay Order (defined below) and the rejection of the Second Amended

6    Plan. If the Court had jurisdiction it should deny approval, because the Third Amended Plan does

7    not satisfy the requirements of section 1129 of the Bankruptcy Code. Kennedy Funding supports

8    this Objection by the following Memorandum of Points and Authorities, the Declarations filed in

9    support of this Objection, all Exhibits introduced at the January 31 and February 4, 2011,

10   confirmation hearings relating to Debtors' Second Amended Plan, and all exhibits and argument

11   to be presented at the May 16, 2011 confirmation hearing if it is held.

12                        **MEMORANDUM OF POINTS AND AUTHORITIES**

13                            **BRIEF FACTUAL BACKGROUND**

14        1.      Pre-petition, Kennedy Funding provided the Debtors with a loan (the "Loan")

15   which was secured, in relevant part, by the Debtors' real property (the "Real Property", and

16   together with all other security interests, the "Collateral"). The Debtors have been in default of

17   the Loan since May, 2008, and the loan fully matured on December 31, 2008. [DN 306,

18   Supplemental Wolfer Declaration, ¶ 5; Exh. 12 to Second Amended Plan Confirmation Hearing.]

19        2.      On February 13, 2009 (the "Petition Date"), the Debtors filed voluntary chapter 11

20   cases in the Bankruptcy Court for the District of Arizona (the "Court").

21        3.      On March 1, 2010, the Debtors filed their initial disclosure statement [DN 232]

22   and also filed their initial proposed plan of reorganization [DN 233]. The Debtors amended their

23   Disclosure Statement twice, ultimately culminating in Debtors' Second Amended Disclosure

24   Statement [DN 363] (the "Second Amended Disclosure Statement"). The Second Amended

25   Disclosure Statement provided information to creditors with respect to Debtors' First Amended

26   and Modified Plan of Reorganization Dated June 30, 2010 (the "First Amended Plan"). The

27   Bankruptcy Court approved the Second Amended Disclosure Statement.

28

1    4.    On March 11, 2010, Kennedy Funding filed its statement of election under section

2  1111(b) [DN 236] (the "Election"), asserting its secured claim in the approximate amount of

3  $33,944,874 as of January 31, 2010, plus accruing post-petition interest. [DN 218, ¶¶ 10-11.]  As

4  of January 31, 2011, the debt to Kennedy Funding is at least $39,966,930. [DN 218, ¶ 10.]

5    5.    On March 11, 2010, Kennedy Funding filed its motion for relief from the

6  automatic stay [DN 237] (the "Stay Relief Motion") requesting a Court order lifting the automatic

7  stay to allow Kennedy Funding to foreclose on the Collateral.

8    6.    On January 27, 2011, Debtors filed their Second Amended and Modified Plan of

9  Reorganization, Dated January 15, 2011 [DN 469] (the "Second Amended Plan").

10    7.    The Bankruptcy Court held a combined two-day Evidentiary Hearing on Debtors'

11  Second Amended Plan and the Stay Relief Motion on January 31, 2011, and February 4, 2011

12  (the "Confirmation Hearing").  The Bankruptcy Court did not approve the Second Amended Plan.

13  On February 9, 2011, the Bankruptcy Court entered its order lifting the automatic stay in favor of

14  Kennedy Funding [DN 489] (the "Lift Stay Order").

15    8.    On March 16, 2011, some five weeks after the Bankruptcy Court's entry of the

16  Lift Stay Order, the Debtors filed their Third Amended and Modified Plan of Reorganization

17  Dated March 16, 2011 [DN 555] (the "Third Amended Plan").

18    9.    On March 18, 2011, Debtors filed a notice of appeal [DN 562] (the "Appeal") with

19  respect to the Lift Stay Order.  In their statement of issues on appeal [DN 581] (the "Statement of

20  Issues"), the Debtors have included, among several other issues relating to the Court's denial of

21  confirmation and lifting of the stay, the following issues:

22          9.    Whether the [Bankruptcy] Court erred in finding that
             Saguaro Ranch had no reasonable possibility of a successful
23          reorganization within a reasonable time.

24          10.   Whether the Bankruptcy Court abused its discretion in
             determining that the property was not necessary to an effective
25          reorganization.

26          11.   Whether the Bankruptcy Court abused its discretion in
27          determining that Saguaro Ranch's Second Amended Plan of
             Reorganization was not confirmable.

28

12.     Whether the Bankruptcy Court abused its discretion in granting Kennedy Funding relief from the automatic stay.

*Statement of Issues*, at ¶¶ 9-12.

10.     On March 21, 2011, Debtors filed with the Bankruptcy Court a motion seeking a stay pending appeal of the Lift Stay Order [DN 563].

11.     On April 7, 2011, the Bankruptcy Court entered its order [DN 593] (the "Stay Pending Appeal Order"), which granted only a limited stay pending appeal "until such time that Debtors' counsel can argue a request for stay before the Appellate Panel." *Id.*   On May 2, 2011, the Bankruptcy Appellate Panel of the Ninth Circuit (the "BAP") denied Debtors' motion for a further stay pending appeal (BAP No. AZ-11-1125) [DN 627].   Accordingly, the Debtors' stay pending appeal has expired by its own terms pursuant to this Court's Stay Pending Appeal Order, and the BAP separately denied any further stay pending appeal.

12.     The Appeal of the Lift Stay Order and the Court's denial of confirmation of the Second Amended Plan is currently pending before the BAP, with the Debtors/Appellants' initial appellate brief due on or prior to May 26, 2011.

## ARGUMENT

### I.     THE COURT DOES NOT HAVE JURISDICTION TO HEAR CONFIRMATION OF THE THIRD AMENDED PLAN

An appeal divests the bankruptcy court of jurisdiction "over those aspects of the case involved in the appeal." *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000). *See also Whispering Pines Estates, Inc. v. Flash Island, Inc.*, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007) ("It is well established that the filing of a notice of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over the subject matter involved in the appeal."). "The rule divesting lower courts of jurisdiction of aspects of a case involved in an appeal is [a] judge-made doctrine designed to avoid the confusion and waste of time that might flow from putting the same issues before two courts at the same time." *Padilla*, 222 F.3d at 1190. *See also Whispering Pines*, 369 B.R. at 757 ("The purpose of the general rule is to avoid the confusion of placing the same matter before two courts at the same time and preserve the integrity

FENNEMORE CRAIG, P.C.
TUCSON

115266.6

of the appeal process."). Accordingly, although a bankruptcy court "has jurisdiction to take actions that preserve the status quo during the pendency of an appeal … [it] may not finally adjudicate rights directly involved in the appeal." *Padilla*, 222 F.3d at 1190. *See also Whispering Pines*, 369 B.R. at 759 ("[O]nce an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal as to interfere with or effectively circumvent the appeal process."). In this respect, "[a]bsent a stay or supersedeas, the trial court … retains jurisdiction to implement or enforce the judgment or order but may not alter or expand upon the judgment." *Padilla*, 222 F.3d at 1190. A bankruptcy court's order entered contrary to these guidelines is "null and void." *Id.*

Debtors are appealing the Lift Stay Order and denial of Confirmation of the Second Amended Plan. At the same time, however, they seek confirmation of a Third Amended Plan that deals with the identical project and the identical property that are the subject of the pending appeal to the BAP. The BAP, not this Court, has jurisdiction.

The Ninth Circuit dealt with this jurisdiction issue in *In re: Samuel G. Bialac*, 694 F.2d 625 (9th Cir. 1982). Debtor Bialac filed a petition for reorganization under Chapter 11. *Id.* at 126. The creditor, Harsh Investment, sought relief from the automatic stay. *Id.* The bankruptcy court lifted the stay, and the Bankruptcy Appellate Panel and the Ninth Circuit refused to stay the order pending appeal. *Id.* Before Harsh Investment could foreclose on the note, however, Bialac obtained an injunction from another bankruptcy court judge restraining the sale. *Id.* On appeal, the BAP vacated the second judge's injunction and upheld the first order lifting the automatic stay. *Id.* at 126. The Ninth Circuit affirmed the BAP's order vacating the injunction ordered by the second bankruptcy court finding:

> "That court lacked jurisdiction *because the issues before it were the same as those presented at trial for relief from the automatic stay*. The only difference was that counsel was attempting to develop further the contention that ownership of the note was necessary to an effective reorganization. *The appeal divested the lower court of jurisdiction to proceed further in the matter*." *Id.* at 627 (emphasis added.)

In *Whispering Pines*, the debtor appealed an order confirming a creditor's plan of reorganization, which provided for the sale of the debtor's property. 369 B.R. at 754-56. While the appeal was pending, the bankruptcy court also granted the creditor's motion for relief from the automatic stay, allowing the creditor to foreclose on the same property discussed in the confirmed plan. *Id.* On appeal, the 1st Circuit BAP reversed the bankruptcy court's entry of the stay relief order, holding that the bankruptcy court lacked jurisdiction to consider the stay relief motion while the appeal was pending. The court found:

> [O]nce a notice of appeal has been filed, the lower court loses jurisdiction over the *subject matter of the appeal* and those aspects of the case involved in the appeal. Subject matter is not limited to the issues specifically defined in the appeal, but *includes all of those matters that can directly affect the outcome of the appeal*. *Id.* at 760-61 (emphasis added.)

Here, considering a Third Amended Plan dealing with the property, while the Court's granting of the Lift Stay Order and the denial of the Second Amended Plan dealing with the identical property are on appeal, is exactly the type of action that would "directly affect" the appeal process. This Court lacks the jurisdiction to consider the Third Amended Plan.

In *In re Legend Radio Group, Inc.*, the bankruptcy court considered competing plans from a creditor and the debtor, and the court confirmed the creditor's plan. 248 B.R. 281, 283 (W.D. Va. 1999). After the debtor filed a notice of appeal, the debtor proposed a modified plan to the bankruptcy court. *Id.* In finding that the bankruptcy court lacked jurisdiction to consider the debtor's modified plan while the appeal of the order confirming the creditor's competing plan was on appeal, the Virginia district court held:

> Before the Bankruptcy Court was a proposal to substitute one plan calling for Debtors to remain in control of the radio station for a previously confirmed plan calling for Debtors to sell the station. *It is obvious that only one of the two plans can be given effect.* Therefore, this court holds that the two plans are inextricably linked to one another, and that the Nicewonder plan thus involves a matter which is substantially affected by the issue currently on appeal to the Fourth Circuit, namely the confirmation of Edwards' plan.

FENNEMORE CRAIG, P.C.

TUCSON

*Id.* at 284 (emphasis added).[1]

The Debtors' appeal, shown by the Debtors' Statement of Issues, involves this Court's (i) denial of confirmation of the Second Amended Plan, and (ii) granting the Lift Stay Order. Just as in *Legend Radio*, the subject matter addressed in the Third Amended Plan is inextricably linked with the subject matter currently pending in the Appeal. Contrary to *Bialac*, the Third Amended Plan proposes to sell portions of the Real Property comprising Kennedy Funding's Collateral, which would be inconsistent with the treatment allowed by the Lift Stay Order authorizing Kennedy Funding to foreclose on <u>all</u> of its Collateral. Any determination by this Court' concerning the Third Amended Plan will <u>directly</u> have an affect on the Appeal, a result prohibited by Ninth Circuit precedent.

The rule a trial court loses jurisdiction over the subject matter on appeal is not unique to bankruptcy courts. The rule applies in federal district court appeals. *Small v. Operative Plasterers' & Cement Masons', Int'l.*, 611 F.3d 483, 495 (9th Cir. 2010). State courts follow the same rule as well. *Lightning "A" Ranch Venture v. Tankersley*, 161 Ariz. 497, 499-500, 779 P.2d 812, 814-15 (App. 1988). ("A trial court loses jurisdiction of a case while an appeal is pending, except with regard to matters in furtherance of the appeal. A trial court has no power to enter a new judgment related to the subject matter of a judgment pending an appeal.... Lack of subject matter jurisdiction ... cannot be waived.")

The Court should not hold the confirmation hearing, because the Court lacks subject matter jurisdiction to consider the Third Amended Plan. Any ruling would be void. Without waiving the jurisdiction defect, the remainder of these points and authorities will address the substantial deficiencies in the Third Amended Plan, and accompanying Disclosure Statement, which mandate denial of confirmation.[2]

---

[1] The court in *Legend Radio* later determined the Fourth Circuit revested the bankruptcy court with jurisdiction to consider the debtor's modified plan. The BAP has not revested this Court with jurisdiction in this case.

[2] "Questions of the bankruptcy court's subject matter jurisdiction may be raised for the first time on appeal." *Krasnoff v. Marshack (In re General Carriers Corp.)*, 258 B.R. 181, 185-86 (B.A.P. 9th Cir. 2001). In fact, the appellate court may raise the issue of jurisdiction *sua sponte*. *Id.* at 186.

FENNEMORE CRAIG, P.C.
TUCSON

II. **THE THIRD AMENDED PLAN IS NOT FEASIBLE**

To obtain confirmation, the Debtor must submit a feasible plan. *See Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374 (9th Cir. 1985). The feasibility standard arises from the language of 11 U.S.C. § 1129(a)(11), which requires plan proponents to show that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.'" 7 COLLIER ON BANKRUPTCY § 1129.02[11] (16th ed. 2009). At this stage of the case, Debtors carry a heavy burden: "After expiration of the exclusivity period, the debtor must offer sufficient evidence to indicate a successful reorganization within a reasonable time is *assured*." *In re Sun Valley Newspapers*, 171 B.R. 71, 74 (B.A.P. 9th Cir. 1994.) (Emphasis added.)

In determining whether a plan is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it "offers a reasonable prospect of success and is workable." 7 COLLIER ON BANKRUPTCY, 1129.02[11]. The Ninth Circuit characterizes the feasibility issue as:

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*Pizza of Hawaii*, 761 F.2d at 1382 (quoting 5 COLLIER ON BANKRUPTCY, ¶ 1129.02[11] at 1129-34 (15th ed. 1984)). "Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *S & P, Inc., v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995). A plan is not feasible where income projections are not based on concrete evidence of financial progress, or are speculative, conjectural, or unrealistic. *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983). The Court should not approve a plan if it depends on successful fulfillment of every assumption of the debtor to be feasible and is "so narrowly constructed that any swing in the assumptions to the negative causes the plan to fail." *In re Cott*, 49 B.R. 570, 571-72 (Bankr. W.D. Mo. 1985). As such, "[w]here the financial realities do not accord with the proponent's

FENNEMORE CRAIG, P.C.

TUCSON

115266.6

- 7 -

| 1 | projections or where the proposed assumptions are unreasonable, the plan should not be |
| 2 | confirmed." *Lakeside Global*, 116 B.R. at 507. |
| 3 | Courts have defined the feasibility requirements of section 1129(a)(11) to include |
| 4 | consideration of these elements: "(1) the adequacy of the capital structure; (2) the earning power |
| 5 | of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the |
| 6 | continuation of the same management; and (6) any other related matter which determines the |
| 7 | prospects of a sufficiently successful operation to enable performance of the provisions of the |
| 8 | plan." *See Teamsters Nat'l Freight Ind. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S.* |
| 9 | *Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1986); 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11] |
| 10 | (16th ed. 2009). The inquiry here, thus, is whether the Debtors have sufficiently established their |
| 11 | post-confirmation viability and their ability to meet future obligations. Particularly important in |
| 12 | this regard is that Debtors demonstrate that their predictions are based on objective facts. *See S &* |
| 13 | *P, Inc.*, 189 B.R. at 182 ("Courts have interpreted Chapter 11's feasibility standard to be firmly |
| 14 | rooted in predictions based on objective fact."); *Lakeside Global*, 116 B.R. at 510 ("While all |
| 15 | speculations are just that, predictions on performance must be met with objective fact and judged |
| 16 | in that light."). The objective facts reveal that the Debtors propose a speculative, and impossible, |
| 17 | scheme of reorganization that cannot be confirmed. |
| 18 | **A.     Debtors Lack an Adequate Capital Structure** |
| 19 | Analysis of the adequacy of a debtor's capital structure requires the consideration of the |
| 20 | Debtors' access to credit or the possibility of other infusions of capital to fund the Plan. First, the |
| 21 | Debtors have not received Court approval to obtain any financing, and neither the Third Amended |
| 22 | Plan nor the Disclosure Statement (or the recently filed supplement) discuss the possibility of |
| 23 | future financing beyond the promised but unsubstantiated $3 million new value contribution, with |
| 24 | no information regarding the terms on which it is supposedly being made, or even its source. |
| 25 | In fact, serious allegations have been raised in Stephen Phinny's individual Chapter 11 |
| 26 | case currently pending before this Court (Case No. 4:09-bk-04669-EWH) [hereinafter referred to |
| 27 | |
| 28 | |

as the "Phinny Bankruptcy"].[3] A creditor in the Phinny Bankruptcy has filed a motion to convert the Chapter 11 case or appoint a trustee [Phinny Bankruptcy, at DN 221] (the "Conversion Motion") based on, among other things, allegations that monies have been flowing to and from certain of the corporate Debtors to related entities:

> 17. 209 Development [Company, L.L.C., hereinafter referred to as "209 Development"] has transferred over $850,000.00 to the Saguaro Ranch Debtors during the pendency of the Saguaro Ranch Bankruptcy. ...

> 18. Over the last two years the Saguaro Ranch Debtors, under the control of Stephen Phinny, have raided their own debtor-in-possession accounts to transfer nearly $73,000.00 to the non-bankruptcy 209 Development. ...

> 19. In particular, Saguaro Guest Ranch and Saguaro Ranch Development transferred over $50,000.00 to 209 Development between January and April of 2010. ...

Conversion Motion, at ¶¶ 17-19.[4] An evidentiary hearing on the Conversion Motion is currently scheduled for July 11. Although the Court has not ruled on the Conversion Motion, the bank statements attached to the Conversion Motion detail transfers of funds by Debtors to and from 209 Development. The Debtors did not seek or obtain prior Court approval of these transfers, provide notice to creditors and parties-in-interest with respect to these transfers, or conspicuously identify these transfers in their monthly operating reports. These post-petition transfers were not authorized, and they further undermine the adequacy of the Debtors' capital structure.

Second, the Debtors' most recent monthly operating reports reflect only $10,018 in unrestricted cash as of February 2011. *See* DN 583 ($0.00 in available cash); DN 584 ($0.00 in available cash); DN 585 ($5,018 in unrestricted cash); DN 586 ($5,000 in available cash); DN 587 ($0.00 in available cash). The Debtors' own operating capital is grossly insufficient to fund the Third Amended Plan, including the $300,000 to pay administrative expenses on the effective

---

[3] Mr. Phinny is the Debtors' CEO.

[4] 209 Development is an Arizona limited liability company. Mr. Phinny is Trustee of The Stephen D. Phinny Trust, a member of 209 Development.

date, some $2 million in unpaid property taxes, and millions of dollars of promised construction.[5] *See In re Doemling*, 157 B.R. 565, 575 (Bankr. W.D. Pa. 1993) (plan not feasible where claims that were to be paid in full at time of confirmation were greater than amount of funds that debtor had available to distribute). Without funds to make payments as of the effective date, the Debtors cannot continue with the grandiose task to develop, market, and sell the Real Property. *See S & P, Inc. v. Pfeifer*, 189 B.R. 173, 186 (N.D. Ind. 1995) ("[C]ourts have consistently found that the availability of prospective credit, the adequacy of funds for equipment replacement, and provisions for adequate working capital are factors to be examined in determining the feasibility of a reorganization plan."). Accordingly, the Plan is not feasible and it cannot be confirmed.

**B.    The Debtors' Historically Poor Performance Shows the Third Amended Plan's Optimistic Projections of Future Earning Power are Unreliable**

"Where a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of the Chapter 11 is probative of feasibility." *In re Merrimack Valley Oil Co., Inc.,* 32 B.R. 485, 488 (Bankr. D. Mass. 1983). During their more than two-years in chapter 11, the Debtors have not closed a sale of a single lot, and all Debtors together have realized an aggregate combined net loss during the post-petition period in excess of $1 million. *See* DN 583 ($500 in net losses); DN 584 ($1,262 in net losses); DN 585 ($854,343 in net losses); DN 587 ($500 in net losses); and DN Nos. 115, 145-147, 284-287, 309, 327, 356, 368, 393-394, 423, 429, 438, 528, 586 (reflecting $200,404 loss for Guest Ranch). Yet, the Third Amended Plan magically projects a net gain of more than $4.7 million in year one (which is $1 million more in year one than was projected by the rejected Second Amended Plan), and the realization of approximately $38.8 million in net cash flow over the next 10 years.[6] *See* Third Amended Plan

---

[5] The Debtors' first amended plan of reorganization, filed approximately one year ago, also estimated that administrative expenses would total approximately $300,000 on the effective date. The passage of time alone would require an upward adjustment to this estimate, which has not been detailed in either the plan or disclosure statement. In addition, there have been no fee applications or applications for allowance and payment of administrative expenses filed prior to plan confirmation.

[6] Debtors projected $72 million in net cash flow over 10 years under the rejected Second Amended Plan. The $38.8 million under the current plan represents approximately $33 million

at Exhibit C. Such a one year turnaround is unprecedented even in the best of times – it is speculative, unrealistic, and improbable in the present downturn economy and depressed real estate market.

The Debtors have not presented any objective evidence to support their inflated numbers, especially when considering their paltry performance during the past two years in bankruptcy. *See In re Lakeside Global II, Ltd.,* 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989) ("Certainly when the net cash flow estimates are incredible or simply unrealistic … the court must find that the plan is not feasible."). The Third Amended Plan is therefore not feasible and it cannot be confirmed.

## C. Current Management Has Not Been Profitable and It Should Not Continue

The benchmarks reflected above are even more unlikely, and not promising, because the Third Amended Plan proposes to maintain the same management post-confirmation. This is the same management that is responsible for the chapter 11 petitions and a combined aggregate net loss in excess of $1 million during these bankruptcy proceedings. It is the same management that has failed to develop and aggressively market and sell the Real Property during the two-years in bankruptcy. It is the same management that failed to obtain post-petition financing. Continuation of the same management militates against a finding that the Third Amended Plan is feasible.

Serious allegations have been made in the Phinny Bankruptcy. In light of these serious questions about Mr. Phinny's capacity as fiduciary in these chapter 11 proceedings, as well as his own chapter 11 case, a plan that proposes continuation of current management led by Mr. Phinny is not feasible.

## D. The Depressed Economy and Real Estate Market Undermine the Lofty Projections in the Third Amended Plan.

### 1. Debtors' Fail to Recognize Prevailing Economic Conditions.

The nation, the State of Arizona and the Tucson metropolitan area have experienced a

less in projected net cash flow than presented only two months earlier in Debtors' Second Amended Plan. This dramatic reduction in cash flow by itself creates credibility questions, and indicates it is more likely than not that the Debtors' management is simply presenting numbers which suit their present purpose, without factual support.

FENNEMORE CRAIG, P.C.

TUCSON

profound economic downturn. The recession locally has been the deepest as measured by employment decline, in the post WWII era, or for more than 60 years. Indeed, the Debtors have continuously cited current economic conditions as a primary factor for seeking chapter 11 relief. The economy has not recovered, and it will not recover to the level contemplated by the projections prepared in support of the Third Amended Plan. Hope and optimism are not enough. This plan is destined to fail.

As demonstrated by Debtors' own confirmation appraisals, Kennedy Funding's Collateral is depreciating, and Kennedy Funding lacks adequate protection. Despite having had their day in Court on January 31, and February 4, 2011, the Debtors failed to confirm their Second Amended Plan. Further delay risks increasing the loss of value experienced by Kennedy Funding, while continuing to provide the Debtors and their shareholders with the potential for an upside with little, if any, risk.

**2.     The Plan Shifts Risks to Kennedy Funding Through Low Release Prices and Unachievable Sales Projections.**

Plan confirmation should be denied where the debtor attempts to shift the risk of loss to the principal secured creditor. *See Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569 (5th Cir. 1991) (lifting the automatic stay, finding that confirmation of a plan was not in prospect because it would provide a benefit only to investors and would prejudice the rights of creditors); *In re Castleton Assocs. Ltd. P'ship*, 109 B.R. 347 (Bankr. S.D. Ind. 1989) (in dismissing a single asset real estate case, finding that the risk-takers should not be given a soft landing on a bad business or investment decision). *See also* February 4, 2011 Transcript, at 204:14-17 (this Court recognized the Second Amended Plan could not be confirmed because it shifted too much risk to Kennedy Funding).

Debtors attempt to shift the risk to Kennedy Funding in multiple ways, including the failure to pay at least 70% of the sales price for residential lot sales to Kennedy Funding for each partial release, the failure to recognize the section 1111(b) Election, and a "minimum" payments schedule in anticipation of the failure to make timely payments. Additionally, the lot absorption rate of 20 lot sales for the first year presented in the Third Amended Plan is approximately 65%

FENNEMORE CRAIG, P.C.

TUCSON

higher than the 13 lot sales projected for the first year of the Second Amended Plan, which this Court rejected on February 4, 2011. Further, the Third Amended Plan's absorption rates of 15 lots in years 2 through 8 and 6 lots in year 9, are higher than the absorption rates provided by Debtors' own appraiser, Bruce Greenberg. Mr. Greenberg testified:

> It is our opinion that over the next couple years, until the Tucson and U.S. economy further improves, that Saguaro Ranch can expect to sell <u>one lot every other month</u>.

DN 458, at Exhibit A, p. 40 (emphasis added). The wildly optimistic projections of the Third Amended Plan completely ignore Mr. Greenberg's testimony.

Mr. Greenberg testified that even at the peak of the market, Saguaro Ranch "has a historical sales rate of about 0.78 lots per month from 2003 to early 2008[,]" which is approximately 9.36 lots annually. *Id.* at Exhibit A, p. 54. No one disputes that the real estate market in 2011 has deteriorated from the boom times of 2003 through 2007. Yet, Debtors' Third Amended Plan projects an unprecedented increase, more than doubling the historical rate of lot sales for 2011, and predicting more than a 50% increase in years beyond. Debtors' projections are not credible, and they show the Plan is not feasible.

The sales contracts provided by the Debtors are simply contingent, "free look," agreements, which allow the purported buyers to walk away post-confirmation. The contracts generally provide for investigation and diligence periods of either 30 or 45 days post-confirmation, emphasizing their contingent nature. There are questions with respect to the good faith negotiations, and arms length nature, of some of these contracts. For example, William Ford is the purported buyer of two lots. He is a childhood friend of Mr. Phinny, and he has partnered with Mr. Phinny in a luxury development in Colorado as well as another company. At least two of the ten contracts are for lots that are not in first phase of Debtors' proposed development, and therefore cannot be closed on until additional funds are posted with Marana or development is completed. In addition, the purported contract prices are suspect, because they far exceed prices obtained in actual resales by prior lot buyers, and exceed even listing prices of independently owned lots on the market. [DN 650, David Henry Declaration.] These contracts are highly

FENNEMORE CRAIG, P.C.
TUCSON

115266.6

suspect.

**3. The Minimum Payments Schedule Shows Debtors Do Not Believe Their Own Projections.**

Debtors know they cannot meet their projections, because they propose an alternative, lower, "minimum" payments schedule. [Third Amended Plan, at p. 20.] The "minimum" payment for year one is only $5 million, some $3 million less than the "plan" payment shown on Exhibits D and E to the Third Amended Plan. The "minimum" payments must be recognized as the true plan Debtors propose.

An additional problem with the minimum payments is that Debtors assert they can select lots to be released after making the minimum payment. This approach would allow Debtors to obtain lot releases for payments of interest rather than principal, and to cherry-pick collateral to be taken from Kennedy Funding. The minimum payments scheme is not fair and equitable, and does not give Kennedy Funding the indubitable equivalent of its claim.

**4. The Lot 50 Sale Is Not Achievable.**

The Debtors' proposed sale of Lot 50 (the "Casita Lot") ignores the fact that the recorded subdivision plat prohibits subdividing or splitting the Casita Lot without the Town of Marana's approval, and fails to pay Kennedy Funding in full as required for release of the Casita Lot. In their supplement to the Second Amended Disclosure Statement [DN 622] (the "Supplemental Disclosure"), the Debtors advise creditors they anticipate that they will receive Town of Marana approval to subdivide, yet fail to recognize that Kennedy Funding's consent is required to split the Casita Lot. Kennedy Funding has not and will not consent to such a subdivision of the Casita Lot.

The loan documents only allow for releases of the luxury residential lots, and therefore require Kennedy Funding's loan be paid in full before Debtors could obtain release of the commercial Lot 50 collateral. [DN 218-1, Second Amended Plan Hrg. Exh. 4, Loan Agreement, ¶ 23(b)]. Mr. Phinny admitted the loan documents do not provide for any release price for Lot 50. [DN 503, January 31, 2011 Transcript, at p. 178, lines 10-13.] Furthermore, the purported buyer of the Casita Lot, Stonehill Enterprises USA, Inc. is not required to build casitas on the Casita

115266.6

FENNEMORE CRAIG, P.C.

TUCSON

1   Lot. Instead, Stonehill may find it more viable to develop the Casita Lot in a manner that
2   competes with the Debtors' proposed development, or to resell the land immediately.

3       **5.      Debtors Continue to Reduce Construction Costs With No Support Given.**

4       The Debtors' projected construction costs are now 50% less than the projected costs
5   provided by the engineer most knowledgeable about the Saguaro Ranch project. [*Compare DN*
6   *243, Declaration of Paul J. Iezzi, P.E., Regarding Costs of Construction*, (projecting more than
7   $27 million in construction costs as of December 2009) (the "Iezzi Declaration") *with Third*
8   *Amended Plan*, Exhibit C (projecting approximately $13 million in construction costs).] Mr.
9   Iezzi and his firm were involved as lead civil engineering consultants since 2002, and Mr. Iezzi is
10  intimately familiar with the Saguaro Ranch project. *See Iezzi Declaration*, at ¶ 3. Although
11  Kennedy Funding acknowledges that Mr. Iezzi's estimate of construction costs was prepared in
12  December 2009, Kennedy Funding refutes Debtors' implied contention that construction costs
13  have been cut in half since December 2009. Debtors' internally prepared and unrealistically low
14  construction costs estimates further undermine the integrity of the assumptions made in the Third
15  Amended Plan and the feasibility of the Plan.

16      In light of their past performance, Debtors' future projections are unrealistic, and
17  improperly shift more risk to Kennedy Funding. As a result, the Third Amended Plan is not
18  feasible, and it cannot be confirmed.

19  **III.    THE THIRD AMENDED PLAN IMPROPERLY SURCHARGES KENNEDY**
20          **FUNDING'S COLLATERAL**

21      The Third Amended Plan impermissibly surcharges Kennedy Funding's Collateral for the
22  costs of reorganization by failing to pay Kennedy Funding its contractually bargained-for release
23  prices, and allowing the Debtors to spend the proceeds from the sale of Kennedy Funding's
24  Collateral to pay operating and other expenses associated with the proposed reorganization plan.[7]
25  Such a surcharge violates well established bankruptcy law.

---

26  [7] The loan documents require release prices of the greater of 70% of gross sales price, or
    $900,000. Even removing the $900,000 minimum, the contractual release price is 70% of gross
27  sales price. Assuming a $500,000 sales price, Kennedy Funding would get $350,000, not the
    mere $213,975 now proposed by Debtors. The shortfall only increases if lot sales prices increase
28  over time, because the $213,975 is fixed and does not increase as sales prices increase.

"The general bankruptcy rule is that, absent an express agreement to the contrary, the expenses associated with administering a bankruptcy estate are not chargeable to a secured creditor's collateral or claim, but must be borne out of the unencumbered assets of the estate." 4 COLLIER ON BANKRUPTCY ¶ 506.05 (16th ed. 2009). *See also Central Bank of Montana v. Cascade Hydraulics & Util. Servs., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) ("Administrative expenses or the general costs of reorganization may not generally be charged against secured collateral."). Despite this general rule, the Third Amended Plan's "release price" provisions improperly propose to surcharge Kennedy Funding's Collateral to satisfy the Debtors' administrative expenses.

Section 506(c) of the Bankruptcy Code, which provides for a surcharge under limited circumstances, states as follows:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c). Absent the secured creditor's consent, a debtor seeking a surcharge must demonstrate that the expenses were reasonable, necessary, and beneficial to the secured creditor.[8] *Cascade Hydraulics*, 815 F.2d at 548. "This is not an easy standard to meet." *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc.,* 255 F.3d 1061, 1068 (9th Cir. 2001). The Debtors do not even attempt to satisfy the "onerous" burden "of showing a 'concrete' and 'quantifiable' benefit" to Kennedy Funding in exchange for this impermissible surcharge. *See Debbie Reynolds*, 255 F.3d at 1068.

Furthermore, a surcharge may not be allowed where the administrative expenses incurred "merely aided the Debtor in its attempt to salvage some equity" and "were not necessary to the [secured creditors], nor were they reasonably incurred insofar as the [secured creditors'] recovery was concerned." *Compton Impressions Ltd. v. Queen City Bank, N.A.*, 217 F.3d 1256, 1261 (9th Cir. 2000). Here, the purported $300,000 plus in administrative expenses appears to have been

---

[8] Kennedy Funding has not consented to a surcharge.

115266.6

FENNEMORE CRAIG, P.C.
TUCSON

incurred only to salvage (or attempt to create) equity for the Debtors and their shareholders, including Mr. Phinny. For example, the disclosure statement filed in the Phinny Bankruptcy expressly provides that upon confirmation of the Debtors' jointly administered cases, "Mr. Phinny will be able to access the millions of dollars in trapped equity he has built up over the last 30 years and pay all of his creditors in full." *See* Stephen D. Phinny's First Amended Disclosure Statement dated July 16, 2010 [DN 134-1, Case No. 4:09-bk-04669-EWH, p. 5.] For the purpose of his individual chapter 11 case, Mr. Phinny claims there is "trapped equity," yet in these cases, consisting of Debtors owned and controlled by Mr. Phinny, he takes the opposite position and asserts there is no equity in Kennedy Funding's Collateral, resulting in the admission that Kennedy Funding is an undersecured creditor. These inconsistent positions taken by Mr. Phinny demonstrate the lack of good faith of this plan, and they certainly do not support a surcharge of Kennedy Funding's Collateral. Accordingly, the Third Amended Plan cannot be confirmed.

## IV. THE THIRD AMENDED PLAN FAILS TO SATISFY MULTIPLE OTHER MANDATORY 1129(A) REQUIREMENTS

### A. *Many of the 16 Requirements Have Not Been Satisfied Here*

"The 16 requirements of section 1129(a) are the focus of all confirmation hearings." 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (16th ed. 2009). "In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with of the requirements of § 1129(a) of the Bankruptcy Code." *Lakeside Global*, 116 B.R. at 505. "The plan proponent ... bears the burden of proof of establishing that each of these requirements have been satisfied." *Id.* Section 1129(a)(2) provides that "[t]he court shall confirm a plan only if ... (2) [t]he proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Under these standards, the Third Amended Plan cannot be confirmed. *See Coventry Commons Assocs.*, 155 B.R. at 453-54 (E.D. Mich. 1993).

### B. *The Third Amended Plan Fails to Properly Consider Claim Amount Under Section 506(a)*

As one leading treatise notes, "Section 1129(a)(1) can ... be used as the grounds for denial of confirmation ... if the plan selectively rides roughshod over and attempts to nullify important

1  provisions of the Bankruptcy Code." 7 COLLIER ON BANKRUPTCY ¶ 1129.02[1] (16th ed. 2009).

2  This plan attempts to ride "roughshod" over the clear requirements of sections 506(a) and 1111(b)

3  of the Bankruptcy Code.

4          Section 506(a) provides a secured creditor has a secured claim against the debtor to the

5  extent of the value of its collateral. *See* 11 U.S.C. § 506(a). At the April 26, 2010 valuation

6  hearing when the Debtors were seeking DIP financing, Debtors argued an "as is" property value

7  of $64 million, and they argued a huge equity cushion adequately protected Kennedy Funding,

8  despite Kennedy Funding's appraisal evidence that value was $14.7 million. On April 26, 2010,

9  the Court found that the "as is" value of the Real Property was approximately $49 million,

10  thereby finding Kennedy Funding was an oversecured creditor with an equity cushion. Debtors,

11  however, suddenly took the opposite position when seeking to confirm their Second Amended

12  Plan, and they obtained a new appraisal of $17,250,000.[9] The Debtors' numbers are inconsistent,

13  contradictory, and conveniently shift to suit their purpose.[10] As a result, section 506(a) of the

14  Bankruptcy Code has been ignored, and Section 1129(a)(1) has been violated.

15      *C.      The Plan Ignores the 1111(b) Election*

16          The Plan ignores Kennedy Funding's election to have its claim treated as fully secured

17  under 11 U.S.C. § 1111(b). "The choice of whether a secured claim will be treated as fully

18  secured under section 1111(b)(2) belongs solely to the creditor." *In re Coventry Commons*

19  *Assocs.*, 155 B.R. 446, 450 (E.D. Mich. 1993). Kennedy Funding's Election informed the

20  Debtors that its secured claim was at least $33,944,874 as of January 31, 2010. [DN 236.] Based

21  upon the Court's $49 million valuation in April of 2010, Kennedy Funding was an oversecured

22  creditor prior to the hearings held on January 31, and February 4, 2011. At January 31, 2011,

23  Kennedy Funding's claim was at least $39,966,930. [DN 218, at ¶ 10.]

---

24  [9] On February 4, 2011, the Court assumed the Real Property had a value of $17.25 million. *See*
    DN 489, Lift Stay Order (granting Kennedy Funding relief from the automatic stay under section
25  362(d)(2), which required a determination that there was no equity in the Collateral); and DN
    503, February 4, 2011 Transcript, at p. 200, lines 15-25.
26

27  [10] In their Second Amended Plan, Debtors projected approximately $72 million in net cash flow
    over the 10-year post-confirmation period, while the Third Amended Plan projects only $38.2
28  million in projected net cash flow for the same time period.

1      Despite these facts, the Third Amended Plan separately classifies what the Debtors

2 purport are Kennedy Funding's secured and unsecured deficiency claims.[11]  Further, in very fine

3 print, Exhibit D to the Third Amended Plan purports to comply with Kennedy Funding's

4 Election, yet it proposes to pay far less than Kennedy Funding's full claim.  As such, the Debtor's

5 Plan fails to comply with the applicable provisions of title 11 and cannot be confirmed pursuant

6 to section 1129(a)(1).

7     **D.**    ***Debtors Have Violated Section 363(b)***

8      The Debtors' Disclosure Statement itself proves that section 363(b) of the Bankruptcy

9 Code has been violated, due to the Debtors' failure to satisfy the notice and hearing requirements

10 for non-ordinary course business transactions.  The Disclosure Statement states:

11      4.9 <u>Cash Collateral Agreement</u>: The Debtor and Kennedy
Funding had entered into an agreement to allow the Debtor to
12 utilize monies from business to continue operating its business.
Those monies have not been sufficient to continue to operate
13 Debtor's[sic] business including payments to over 27 employees.
***Debtor[sic] has received monies to continue to operate its***
14 ***business***.

15

16 Disclosure Statement, § 4.9 (emphasis added).   The Debtors' monthly operating reports for

17 November 2010 state as follows:

18      Additional funding is being obtained in order to develop additional
lots and create needed inventory.  The funding will also be used to
19 construct amenities on the project that will enhance the value of the
lots and the project.  This will also stimulate sales.

20

21 *See* November 2010 Monthly Operating Reports, DN 435, 436, 437, & 439. *See also* DN 438,

22 question 16 (admitting money was borrowed in November 2010).  The bankruptcy docket does

23 not reveal any Court order authorizing the Debtors to obtain any "monies" or "funding" to

24 continue to operate their businesses.  In fact, on April 26, 2010, the Court rejected the Debtors'

25

26 [11] Class 15 (in which Kennedy Funding's purported deficiency claim is included) provides that
"[i]n the event Kennedy [Funding] elects 11 U.S.C. § 1111(b)(2), its Class 15 claims shall not
27 receive any interest or be allowed to vote for or against Debtor's Plan." Plan, § 3.15(A). Kennedy
Funding made its Election over a year ago, and it has previously raised this same point in many
28 pleadings filed over the last year.

1    only attempt to obtain DIP financing.

2        In the Phinny Bankruptcy, the Conversion Motion alleges, with documentary support, that

3    209 Development, a company in which Mr. Phinny's trust holds an interest, "has transferred over

4    $850,000.00 to the Saguaro Ranch Debtors during the pendency of the Saguaro Ranch

5    Bankruptcy." Conversion Motion, at ¶ 17. The Conversion Motion asserts that "the Saguaro

6    Ranch Debtors, under the control of Mr. Phinny, have raided their own debtor-in-possession

7    accounts to transfer nearly $73,000.00 to 209 Development." *Id.* at ¶ 18. These allegations

8    identify impermissible, non-ordinary course transfers in violation of section 363(b) of the

9    Bankruptcy Code.

10       As of November 30, 2010, Saguaro Ranch Development Corp. listed $845,553 as post-

11    petition debt characterized as "other," without further explanation. *See* DN 585. This

12    corroborates the allegations of the Conversion Motion with respect to the prohibited post-petition

13    transfers. The Debtors' own monthly operating reports, and the evidence in support of the

14    Conversion Motion, establish the Debtors have violated section 363(b) of the Bankruptcy Code,

15    which requires this Court to deny plan confirmation.

16       *E.*    *The Debtors Have Failed to Satisfy Section 1125*

17       On April 7, 2011, the Court entered its order scheduling the confirmation hearing [DN

18    592] (the "Supplementation Order") which required Debtors to "supplement [their] Second

19    Amended Disclosure Statement and address and provide information requested by Attorney

20    Krauja on page 7 of his objection." On April 22, 2011, Debtors filed their supplemental

21    disclosure [DN 622] (the "Supplemental Disclosure"), yet failed to provide the level of

22    information ordered by the Court, including:

23       ▪  The Relationship of all Purported Buyers to the Debtor and its Insiders:

24           ○  With respect to this area of inquiry, the Debtors merely stated, as to each
purchaser, that such entity and/or individual was a "prospective purchaser" and not
25              an insider. This fails to provide the level of specificity required by the Court's
Supplementation Order that such purported buyers' *relationship* with the Debtors
26              be disclosed. For instance, William C. Ford is, upon information and belief, a
childhood friend of Mr. Phinny and is, in fact, a partner of Mr. Phinny's with
27              respect to two other projects and/or companies. Yet, the Supplemental Disclosure
fails to provide any information with respect to such relationships.

28

- ▪ The Lot 50 Buyer's Development Experience and Development Plan for Site:

  - o Debtors wholly fail to provide any information about the purported buyer, much less the buyer's development experience and business plan for the casita project. Debtors also fail to discuss the purported buyers' contingency plan to develop Lot 50 should proceeding with casita lots not prove to be viable in today's marketplace. In this respect, Debtors' appraiser, Mr. Greenberg, testified on February 4 that "[t]here's no market today" for casitas. [DN 503, February 4, 2011 Transcript, at 15:10-14.]

- ▪ Evidence the Lot 50 Buyer Actually Has Funds to Close:

  - o Debtors have not provided any admissible evidence of sufficient funds to close.

- ▪ Contingency Plan if Lots Do Not Close and Absorption Rates Are Not Met:

  - o Debtors wholly fail to address their contingency plan, instead assuming as "fact" all lot sales will close. This fails to address the Court's Supplementation Order requiring the Debtors to provide information regarding a contingency plan. Further, Debtors again provide inconsistent numbers, first projecting approximately 18 lot sales per year, then projecting approximately 20 to 28 lot sales in the first year, and finally projecting 20 lots sales in the first year and 15 lot sales every year thereafter. Which one is it? Debtors' Supplemental Disclosure underscores the problems with their projections, since, as noted by the Debtors, their own appraiser projects approximately six lot sales per year in the early years of the Plan. Debtors' own expert witness refutes Debtors' lofty numbers, and the Supplemental Disclosure fails to provide creditors and parties-in-interest with the required additional information to explain these inconsistent representations. [12]

Debtors have failed to provide adequate information as required by this Court's order and section 1125 of the Bankruptcy Code. Accordingly, the Third Amended Plan cannot be confirmed under section 1129(a)(2).

## V. THE THIRD AMENDED PLAN IS NOT FAIR AND EQUITABLE

### A. The Third Amended Plan does not Provide Kennedy Funding with Deferred Payments Equal to the Value of its Claim

Section 1129(b)(1) of the Bankruptcy Code allows the Court, on request of the plan

---

[12] Debtors now attempt to undermine their own Greenberg Appraisal by contending that it was conducted eight months ago when there were only seven lot contracts, while now they have ten. Yet, the addition of three sales contracts in eight months fails to justify Debtors' lofty aspirations of 28 sales contracts in year one – which requires the sale of an additional 1.5 lots per month in addition to the projected 10 lot sales per month.

proponent, to confirm a plan over the objection of an impaired creditor if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).[13] Section 1129(b)(2) specifies that a fair and equitable plan provide one of the following three alternatives for the holders of secured claims: (i) retention of the lien and deferred cash payments totaling the value of the interest, (ii) sale with the lien attaching to the proceeds, or (iii) realization of the indubitable equivalent of the secured claim. *See* 11 U.S.C. § 1129(b)(2)(A)(i)-(iii). The Third Amended Plan is not fair and equitable, because Kennedy Funding is neither receiving the deferred cash payments equivalent to its current claim, nor retaining a lien on the proceeds of any Real Property sales, nor receiving the indubitable equivalent of its claim. The Third Amended Plan shifts all the risk to Kennedy Funding – using its Collateral to finance the other creditors and the Debtors, and providing the equity position holder the ability to realize a substantial profit with little, if any, risk. The Third Amended Plan satisfies none of the required provisions.

As noted in the Election, Kennedy Funding held a claim of approximately $33,944,874 as of January 31, 2010, including post-petition interest accruing at the non-default rate of at least $301,103 per month and the contract's default rate of at least $501,838 per month. As of January 31, 2011, Kennedy Funding's secured claim has increased by an additional $6 million in interest (exclusive of all other applicable fees and costs), thereby establishing Kennedy Funding's claim at approximately $40 million. The total payments proposed under the Third Amended Plan, however, fail to provide Kennedy Funding with aggregate payments totaling its secured claim of approximately $40 million, or with payments whose discounted present value is at least equal to the value of the Real Property. In fact, the Third Amended Plan has *no analysis* of the present value of the payment stream to Kennedy Funding. The Court adopted a 20% discount rate appropriate in its April 26, 2010 ruling on valuation. Debtors' current appraiser, Bruce

---

[13] Since the Third Amended Plan fails to satisfy several mandatory section 1129(a) confirmation requirements, the Court need not reach the "cram down" requirements under section 1129(b)(1). Nevertheless, the Third Amended Plan also fails to satisfy the cram down standards, as more fully discussed herein.

115266.6

FENNEMORE CRAIG, P.C.
TUCSON

Greenberg, applied a 21.5% discount rate in reaching his property value of $17.25 million. Expert testimony from Frank Hundley will establish a 25% discount rate is appropriate. [DN 651, Declaration of Frank T. Hundley].

Because the Third Amended Plan contemplates deferred cash payments to Kennedy Funding, the present value of the payment stream must be equal to the lesser of the Real Property's current value or Kennedy Funding's claim. *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.05[2][b] (16th ed. 2009). "This is done by selecting a rate at which an amount today could be invested to yield the promised amount when it is promised to be paid." *Id*. This present value analysis "assumes that the payments will be made as promised." *Id*. at 1129.05[2][a]. "Compensation for the risk that the promised payments will be made is taken into account when selecting the components of the analysis, such as the interest or discount rates to be used." *Id*.

The Ninth Circuit has adopted a case-by-case market approach for calculating present value payments under section 1129(b)(2)(A)(i)(II):

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*U.S. v. Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1505 (9th Cir. 1987) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.03[4][f][i], at 1129-107 (15th ed. 1987)).

Rather than analyzing the present value of the payments to Kennedy Funding using an appropriate discount rate, as required by the Bankruptcy Code in response to an 1111(b) election, the Third Amended Plan makes no analysis at all. The Court recognized a 20% discount rate as appropriate when determining value at the April 26, 2010 valuation hearing, and the Debtor's appraiser, Mr. Greenberg, used a 21.5% discount rate for his recent opinion of value. In fact, Mr. Greenberg testified at deposition that a rate of 6% is outside the acceptable range, and during his February 4, 2011 testimony in this Court, he testified a 6% discount rate is not appropriate for this project. [DN 503, February 4, 2011 Transcript, at 59:5-7.]

Debtors seek to use two contradictory positions with discount rate. Debtors use Mr. Greenberg's 21.5% rate to determine a value of the Real Property. Debtors then apparently assume a drastically lower rate of 6% (the coupon rate paid to Kennedy Funding) as a defacto assumption of present value of the payments to Kennedy Funding. Two different discount rates cannot be used. Having used the 21.5% discount rate to value the property, Debtors then must use a 21.5% rate to discount to present value the proposed payments to Kennedy Funding. *In Re Weinstein*, 227 B.R. 284, 293 fn 11 (B.A.P. 9th Cir. 1998). When an appropriate discount rate is used, the value of the present payment stream to Kennedy Funding is less than $17.25 million. [14]

Kennedy Funding asks this Court to determine the present value of the payments to Kennedy Funding using a discount rate of 20% to 25%. The Supplemental Declaration of Steven M. Pritulsky [DN 648] uses these appropriate discount rates, which are consistent with the discount rate used to value the property, to demonstrate the present value of Debtors' proposed payments to Kennedy Funding is below $17.25 million. The present value of the Debtors' proposed minimum payments is even lower than the present value of the so-called Plan payments. The Third Amended Plan grossly fails to provide Kennedy Funding with the present value of its claim, contrary to the requirements of the Bankruptcy Code. The Third Amended Plan fails to satisfy section 1129(b)(2)(A)(i)(II), and it cannot be confirmed.

**B.    *Kennedy Funding's Lien Must Attach to the Proceeds of each Sale under Section 1129(b)(2)(A)(ii).***

Section 1129(b)(2)(A)(ii) requires Kennedy Funding's lien attach to the sale proceeds of its Collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(ii). The Third Amended Plan instead requires Kennedy Funding to partially release its lien upon the payment of fixed release prices of $213,975, an amount substantially less than the total sale proceeds and less than the release prices required by the governing loan documents. Under the loan documents, for a partial release upon a residential lot sale, Kennedy Funding must receive the greater of 70 percent of the sale proceeds

---

[14]Debtors' purported "minimum" payments to be made to Kennedy Funding also fail the 1111(b) election, by paying Kennedy Funding less than the amount of its claim, and because the present value of the payments is less than the value of the collateral.

or $900,000. The Third Amended Plan ignores these contract provisions, and it does not even propose to pay as much as 70 percent of sale proceeds.[15] Indeed, the Court denied confirmation of the Second Amended Plan on grounds it was not fair and equitable because "the lot release prices are so low compared to what they were under the existing loan documents...." [DN 503, February 4, 2011 Transcript, at 206:22-25.] This glaring error remains in the Third Amended Plan, and it again requires this Court to deny confirmation for the same reasons. *See In re Sparks*, 171 B.R. 860, 865 (Bankr. N.D. Ill. 1994) (finding that a plan which proposed a similar "release price" scenario did not comply with section 1129(b)(2)(A)(ii)).

### C. The Third Amended Plan does not Provide Kennedy Funding with the Indubitable Equivalent of its Claim

The Third Amended Plan is not fair and equitable, because it fails to provide Kennedy Funding with the indubitable equivalent of its claim as required under section 1129(b)(2)(A)(iii). The Ninth Circuit has described the concept of "indubitable equivalent":

> [T]he creditor's right "to get his money or at least the property" may be denied under a plan for reorganization only if the debtor provides 'a substitute of the most indubitable equivalence.' Such a substitute clearly must *both compensate for present value and insure the safety of the principal.*

*Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd.*, 166 B.R. 428, 434 (C.D. Cal. 1993) (quoting *In re Mariner Indus., Inc.*, 734 F.2d 426, 433 (9th Cir. 1984)) (emphasis added by court).

As shown above, the Third Amended Plan fails to provide Kennedy Funding with total payments that equal its claim, and whose present value equals or exceeds the fair market value of the Real Property. The Third Amended Plan requires Kennedy Funding to release its lien on each lot upon the payment of a fixed release price of $213,975, an amount far below the 70% of sales price minimum. As a result, Kennedy Funding loses a portion of its Collateral with each sale

---

[15] Debtors actually acknowledge their proposed release price scheme is inadequate, because they invite the Court to determine another release price. [Third Amended Plan, at p. 19, lines 10-11]. It is Debtors' obligation to propose a plan that meets statutory requirements. Debtors' request the Court revise or negotiate a plan for them shows they know their plan is not confirmable.

without significant debt reduction, which correspondingly reduces Kennedy Funding's ability to realize on any increase in value of the Real Property (in contravention of section 1111(b)).[16] This exposes Kennedy Funding to considerable additional risk, which results in Kennedy Funding being deprived of the indubitable equivalent of its secured claim. *See In re Wester*, 84 B.R. 770, 772 (Bankr. N.D. Fla. 1988) ("The debtors have failed to demonstrate that the piecemeal carving up of the property subject to the lien of M & S will not result in a diminution in value of the remaining property to such an extent that M & S will lose the protection of whatever equity cushion is presently available. Accordingly, we cannot find that this plan will give M & S the 'indubitable equivalent' of its claim. Thus, this plan is not fair and equitable with respect to the claim of M & S.").[17]

In fact, this Court found the Second Amended Plan was not fair and equitable to Kennedy Funding for exactly the same reasons:

> But, again, I have to find that the plan is fair and equitable. And I can't find it's fair and equitable when the lot release prices are so low compared to what they were under the existing loan documents and where Kennedy is going to be required to provide releases on a piece of collateral that it's not required to provide releases on under its existing loan documents. And there's no compensation to Kennedy for that additional risk.

[DN 503, February 4, 2011 Transcript, at 206:21-207:3.]

Once again, Debtors have failed to address the Court's prior rulings with respect to the Second Amended Plan. Their Third Amended Plan instead continues to propose a piecemeal sale process that fails to provide Kennedy Funding with the indubitable equivalent of its claim.

---

[16] These facts and circumstances also result in an impermissible surcharge of Kennedy Funding's collateral for the costs of the Debtors' reorganization. *See* Section III, *supra*.

[17] Any arguments to the contrary are belied by the Third Amended Plan which, although valuing Kennedy Funding's secured claim at only $17.25 million, projects Real Property sales of approximately $18 million by the end of year 2 and in excess of $78 million over the life of the Third Amended Plan. *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 513-14 (Bankr. S.D. Tex. 1989) (in denying confirmation of a plan on feasibility grounds, recognizing that a debtor's proposal to pay secured lenders $3 million when projections show a value of $6-7 million in a couple of years "give[s] the secured interest owner ... the downside potential but not the upside.").

Debtors still offer no new additional collateral to compensate Kennedy Funding for the additional risk. In addition, the Third Amended Plan proposes to sell the Casita Lot for $3.25 million, with payment of $3 million to Kennedy Funding. In doing so, the Plan ignores the fact that the loan documents do not require Kennedy Funding to release its lien on the Casita Lot absent full payment, an amount significantly higher than $3 million.

A comparison of the Debtors' Second Amended Plan and Third Amended Plan demonstrates the proposed Casita Lot payment to Kennedy Funding is not fair and equitable. While ignoring the fact that the Casita Lot has not been subdivided, the Second Amended Plan projected the sale of 63 casita sites for aggregate gross sale proceeds of approximately $24 million. The Second Amended Plan proposed to pay Kennedy Funding a release price of $123,214 per lot sale, for a total of about $7,762,482 paid to Kennedy Funding. Despite the fact that this Court denied confirmation of their Second Amended Plan, the Debtors' Third Amended Plan now proposes to pay Kennedy Funding over $4 million less, while incredulously asserting the Third Amended Plan overcomes the deficiencies of the Second Amended Plan. Less money to Kennedy Funding evidences worse treatment, resulting in the conclusion that Kennedy Funding does not receive the indubitable equivalent under the Third Amended Plan.

As the Tenth Circuit BAP has aptly noted, "[e]vidence of the requisite indubitable equivalent is present if, under the treatment proposed in the Plan, there is no reasonable doubt that [the secured creditor] will receive the full value of what it bargained for when it made its contract with the Debtor." *F.H. Partners, L.P. v. Investment Co. of the S.W., Inc. (In re Investment Co. of the S.W., L.P.)*, 341 B.R. 298, 319 (B.A.P. 10th Cir. 2006). There is considerable doubt, to the point of inevitability, that Kennedy Funding will not receive the full value of its secured claim. This is underscored by the facts of *F.H. Partners*, in which confirmation of the debtor's plan was reversed on appeal, despite the fact that the secured creditor, Compass, was offered more protection than Kennedy Funding for the alteration of its collateral.

Unlike the secured creditor in *F.H. Partners*, the Third Amended Plan contemplates that Kennedy Funding will release its lien on each parcel of property sold without the benefit of additional principal payments, additional collateral, or the right to foreclose immediately in the

115266.6

FENNEMORE CRAIG, P.C.
TUCSON

event of Debtors' default. If such protections were not deemed to satisfy the "indubitable equivalent" standard in *F.H. Partners*, the standard is not satisfied in this case. The Third Amended Plan fails to correct the deficiencies this Court discussed in rejecting the Second Amended Plan, and fails to satisfy the cram-down requirements under Section 1129(b).

## CONCLUSION

The Debtors' appeal removes jurisdiction from this Court, and Kennedy Funding seeks entry of an Order declining to exercise jurisdiction over the Third Amended Plan. Alternatively for all of the reasons set forth above, Kennedy Funding seeks entry of an Order which denies confirmation of Debtors' Third Amended Plan, and grants Kennedy Funding such other and further relief to which it may be entitled.

DATED this 11th day of May, 2011.

FENNEMORE CRAIG, P.C.

By  s/ George O. Krauja   #010964
    George O. Krauja

By  s/ Laurel E. Davis, Nevada Bar No. 3005
    Laurel E. Davis

Attorneys for Kennedy Funding, Inc. and
Anglo-American Financial, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, with service electronically upon:

Eric Slocum Sparks
LAW OFFICES OF ERIC SLOCUM
SPARKS, P.C.
110 S. Church Avenue, #2270
Tucson, AZ 85701
eric@ericslocumsparkspc.com
Attorney for Debtors

Christopher J. Pattock
UNITED STATES TRUSTEE
230 N. First Avenue #204
Phoenix, AZ 85003
Christopher.J.Pattock@usdoj.gov

Dennis J. Clancy
RAVEN, CLANCY & McDONAGH, P.C.
313 S. Convent

Kevin J. Blakley
GAMMAGE & BURNHAM, P.L.C.
Two N. Central Avenue, 18th Floor

| | | |
|---|---|---|
| 1 | Tucson, AZ 85701<br>dclancy@raylaw.com | Phoenix, AZ 85004<br>kblakley@gblaw.com |
| 2 | Attorneys for Theresa Chamberlain, Steven<br>Blomquist, Sharyl Cummings and Timothy | Attorneys for Arizona Labor Force, Inc. |
| 3 | Blowers | |
| 4 | Mark L. Collins | Sally M. Darcy |
| 5 | Gerard R. O'Meara<br>GUST ROSENFELD, P.L.C. | McEVOY, DANIELS & DARCY, P.C.<br>4560 E. Camp Lowell Drive |
| 6 | One S. Church Avenue, Suite 1900<br>Tucson, AZ 85701-1627 | Tucson, AZ 85712-3854<br>darcysm@aol.com |
| 7 | mcollins@gustlaw.com<br>Attorneys for Tapestry Properties, III, LLC | Attorneys for Official Committee of<br>Unsecured Creditors |
| 8 | Neal A. Eckel | Denise Faulk |
| 9 | DURAZZO & ECKEL, P.C.<br>45 N. Tucson Blvd. | Office of the Arizona Attorney General<br>400 W. Congress Street, #N0223 |
| 10 | Tucson, AZ 85716<br>neal@durazzo-eckel.com | Tucson, AZ 85701-1367<br>Denise.Faulk@azbar.org |
| 11 | Attorneys for Amanti Electric, Inc. | Attorneys for Arizona Department of<br>Revenue |
| 12 | Jeffrey H. Greenberg<br>STUBBS & SCHUBART, P.C. | Alan M. Levinsky<br>BUCHALTER NEMER |
| 13 | PO Box 50547<br>Tucson, AZ 85703-0547 | 16435 N. Scottsdale Road, #440<br>Scottsdale, AZ 85254 |
| 14 | jgreenberg@StubbsSchubart.com<br>Attorneys for Courtland Gettel | alevinsky@buchalter.com<br>Attorneys for Ford Motor Credit Company, |
| 15 | | LLC |
| 16 | Terri A. Roberts<br>German Yusufov | Thomas P. Sarb<br>ecfsarbt@millerjohnson.com |
| 17 | PIMA COUNTY ATTORNEY'S OFFICE<br>32 N. Stone Avenue, Suite 2100 | Attorneys for Sally Phinny |
| 18 | Tucson, AZ 85701<br>Terri.roberts@pcao.pima.gov | |
| 19 | Attorneys for Pima County | |
| 20 | Robert J. Spurlock | Daniel R. Warner |
| 21 | BONNETT, FAIRBOURN, FRIEDMAN &<br>BALINT, P.C. | LAW OFFICES OF J. PHILLIP<br>GLASSCOCK, P.C. |
| 22 | 2901 N. Central Avenue, Suite 100<br>Phoenix, AZ 85012 | 13430 N. Scottsdale Road, Suite 106<br>Scottsdale, AZ 85254 |
| 23 | bspurlock@bffb.com<br>Attorneys for Deere & Company | drw@jpglaw.com<br>Attorneys for Mobile Mini, Inc. |
| 24 | Stephen M. Weeks | |
| 25 | WEEKS & LAIRD, PLLC<br>2223 E. Speedway Blvd. | |
| 26 | Tucson, AZ 85719<br>Weeks@WeeksLaird.com | |
| 27 | Attorneys for Steven Blomquist, Timothy<br>Blowers, Theresa Chamberlain, and Sharyl | |
| 28 | Cummings | |

1       I further certify service has been made by U.S. mail upon:

2    Linda Boyle
      10475 Park Meadows Drive, Suite 400
3    Littleton, CO 80124
      Representing TW Telecom, Inc.

4

5                            s/ *Kathi Turnbull*